**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|  | : |  |
|---|---|---|
| In re PDI Securities Litigation | : | Civil Action No.: 02-cv-0211 (JLL) |
|  | : |  |
|  | : |  |
| _____ | : | **OPINION AND ORDER** |

**LINARES**, District Judge.

      This matter comes before the Court on the motion of Defendants PDI, Inc. ("PDI") and several PDI officers (hereinafter, collectively "Defendants") to dismiss the Second Consolidated and Amended Class Action Complaint and Jury Demand (hereinafter "Second Amended Complaint") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).  This is a securities fraud class action suit brought by individuals who purchased the common stock of PDI between May 22, 2001 and August 12, 2002 (hereinafter, the "Class Period").  Lead Plaintiffs Gary Kessel, Rita Lesser and Lewis Lesser (collectively, "Plaintiffs") are purchasers of common stock during the Class Period.  Plaintiffs aver that Defendants defrauded investors by artificially inflating that value of the common stock through accounting manipulations and false statements.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Oral argument was previously heard on this matter.  For the reasons discussed below, Defendants' motion to dismiss is GRANTED in part, and DENIED in part.

## FACTUAL AND PROCEDURAL BACKGROUND

For purposes of the instant motion, the relevant facts are as follows.  PDI is a Delaware corporation, with its principal executive offices in Upper Saddle River, New Jersey.  (Second Amended Complaint (hereinafter "Compl."), ¶7).  PDI provides customized sales and marketing services to the pharmaceutical industry.  (Id. ¶21).  PDI is a publicly held corporation whose common stock is registered with the United States Securities and Exchange Commission ("SEC") and is traded on the NASDAQ National Market.  (Id. ¶11).  Defendant Charles T. Saldarini was the Chief Executive Officer and Vice Chairman of the Board of Directors of PDI during the Class Period.  (Id. ¶8).  Defendant Bernard C. Boyle was PDI's Chief Financial Officer and Executive Vice President during the Class Period (collectively Saldarini and Boyle will be referred to as "Individual Defendants" hereinafter).  (Id. ¶9).

Until October 2000, PDI's business historically consisted entirely of what is referred to as "contract sales" or "professional detailing," which consists of providing sales representatives to pharmaceutical manufacturers who choose to outsource selling activities for particular drugs. (Compl. ¶21).  This business is referred to as "fee-for-service" because PDI's revenues are principally derived from the services that it provides, not the sale of the particular drug.  (Id.). For several year, up to and including 2000, PDI's contract sales business enjoyed substantial growth in revenues and earnings.  (Id. ¶22).  In a November 2001 conference call, Defendant Saldarini stated that PDI knew that it was necessary to "develop additional avenues of growth ... beyond just contract sales." (Compl. ¶22).  Consequently, PDI sought to develop alternative types of arrangements for the sales and marketing of drugs for pharmaceutical companies.  (Id.). The events that triggered the present litigation are as follows:

### The Ceftin Contract

PDI negotiated its first non fee-for-service arrangement with GlaxoSmithKline ("GSK") in October 2000, which gave PDI exclusive United States marketing, sales and distribution rights for Ceftin tablets and oral suspension.[1]  At the time PDI entered into the Ceftin contract, Ceftin had a 10.8% share of the Cephalosporin antibiotic market.  (Compl. ¶24).  This contract with GSK required PDI to make minimum quarterly Ceftin purchases and provided that the agreement could be cancelled by either party upon 120 days written notice.  (Id.).  Although PDI allegedly publicly stated that the Ceftin contract with GSK had a five-year term, the Ceftin patent was due to expire in 2003.  (Id.).

Plaintiffs allege that upon executing the contract, PDI promptly took steps to increase Ceftin sales and profits for the fourth quarter of 2000, by inducing drug distributors to stock up on Ceftin.  (Compl. ¶25).  As a result, that quarter, PDI reported $101 million of Ceftin revenues, representing more than half of PDI's total reported revenues for that period.  (Id.).  Additionally, Ceftin sales also had a dramatic effect on PDI's reported earnings for the fourth quarter of 2000, which increased to $0.77 per share, from $0.24 per share in the fourth quarter of 1999 and $0.41 per share in the third quarter of 2000.  (Id.).

Plaintiffs contend that PDI promoted the product for uses which had not been approved by the United States Food and Drug Administration ("FDA"), although there was no substantial evidence that the drug was effective for the unapproved uses.  (Id.).  Consequently, in March 2001, the FDA advised PDI that their promotional materials violated the U.S. Food, Drug and

---

[1]These are two dosage forms of Cephalosporin antibiotics that have been used to cure acute bacterial respiratory infections such as acute sinusitis, bronchitis and otitis media (acute ear infection).  (Compl. ¶24).

Cosmetic Act and applicable FDA regulations, and ordered PDI to "immediately cease distribution of the sales ads and other similar promotional materials for Ceftin that contain the same or similar claims or presentations." (Compl. ¶26).  Following the FDA's actions, Ceftin's share of the Cephalosporin market declined such that by May 2001, it was 10.7%.[2]  (Id. ¶27).  By July 2001, Ceftin's share of prescriptions for Cephalospotin fell further to 8.7%, representing a 20% decline from the drug's market share at the commencement of the Ceftin contract, and a decline of more than 30% from the level attained when the aforementioned marketing materials were in use.  (Id.). Additionally, Plaintiffs allege that when faced with this declining market share in the second quarter of 2001, PDI attempted to boost Ceftin's sales by announcing that price increases were to take effect in the beginning of July of that year, thereby inducing distributors to increase the Ceftin inventories in anticipation of the price change.  (Compl. ¶28).  As a result, PDI's reported Ceftin's sales in the second quarter of 2001 increased by an additional $10 million to $15 million and added $0.13-0.20 per share to its reported earnings.  (Id.).

Approximately one and one-half years prior to PDI entering into the Ceftin contract with GSK, another company, Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy"), had applied to the FDA for marketing approval for a generic version of Ceftin.  GSK initiated a patent infringement action seeking to enjoin Ranbaxy from producing the generic version of Ceftin.  (Compl. ¶29).  The district court entered an injunction against Ranbaxy, who then appealed to the United States Court of Appeals for the Federal Circuit.  (Id.).  In August 2001, the Federal Circuit reversed the lower court's decision on grounds that Ranbaxy's version of Ceftin did not violate the Ceftin

---

[2]0.1% lower than at the time PDI entered into the Ceftin contract, and down from 12.8% in February 2001.  (Compl. ¶27).

patent.  (Compl. ¶30).  Plaintiffs contend that Defendants allegedly assured investors that reduced profits were the "worst case scenario" for the Ceftin contract because the projections were based upon the first launch of the generic form on October 1, 2001, and PDI could avoid losses by terminating the contract.  (Id.).  Plaintiffs allege that not only was the October 1, 2001 date exaggerated (since no generic form of Ceftin was ever introduced in 2001), the representation concerning contract termination was false given PDI's knowledge of the millions of dollars in write-offs of capitalized contract acquisition costs, the continued liability for sales returns, and the cost of administering Medicaid rebates as a result of the Ceftin contract termination.  (Id.).  It was not until November 13, 2001 that PDI publicly disclosed that PDI would incur these costs if the Ceftin contract was terminated.  (Id.).

### *The Lotensin Contract*

In 2001, Novartis Pharmaceutical Corporation ("Novartis") was selling three drugs for treating hypertension, namely, Diovan, Lotrel and Lotensin, and was expected to introduce five new drugs in 2002.  (Compl. ¶¶33-35).  Lotensin, an angiotension converting enzyme ("ACE") inhibitor had been selling in the market for many years and was nearing the end of its patent life. (Id. ¶35).  Plaintiffs allege that in order to develop a relationship with Novartis, which PDI hoped would lead to profitable future contracts, PDI agreed to market Lotensin in the United States at its own expense. (Id. ¶36).  PDI's sole compensation for these efforts was a split of net Lotensin sales over a baseline amount.  (Id.).  Plaintiffs allege that the exact amount, undisclosed at the time, would cause PDI to lose money on the contract throughout 2001. (Id.)  Additionally, Plaintiffs contend that although Lotensin's market share was decreasing at this time, PDI was guaranteed to lose money on the contract even if it realized a substantial increase in market share.

(Id.).

Plaintiffs maintain that the baseline above which PDI would profit from Lotensin sales was so high that PDI lost $5 million on the contract in that quarter, even though Lotensin's share of the ACE inhibitor market had increased by the fourth quarter of 2001.  (Compl. ¶36).  According to Plaintiffs, PDI would have been required to increase Lotensin sales by another $10 million in the quarter in order to offset that loss .  (Id.).  Further, in order to achieve a projected $0.25 earnings per share, Lotensin sales would have had to have been increased over 30%.  (Id.).

Plaintiffs further allege that Defendants concealed this impediment to profitability that was created by the baseline.  (Compl. ¶37).  In support of this assertion, Plaintiffs rely on a statement made analyst in May 23, 2001, where he stated that "PDI's main goal with Lotensin will be to try and slow-down its market share deterioration ...."  (Id.).  It is Plaintiffs' contention that this was misleading because as stated above, Defendants believed that PDI needed to do a lot more than merely "slow-down" Lotensin's market share deterioration.  (Id.).  Plaintiffs claim that PDI regularly forecasted the future earnings and the earnings effect of large contract gains and losses.  (Compl. ¶38).  Thus, they maintain that PDI told the public that although the contract would be unprofitable in the second and third quarters of 2001, it would produce earnings of $0.25 per share by the fourth quarter of that year, knowing that this was impossible.  (Id. ¶38).

When the Defendants finally disclosed that the Lotensin contract would not produce $0.25 earnings in the fourth quarter in 2001, but would produce a loss of $0.23 per share, Defendants blamed this disparity on delay in completing market research and the preparation of marketing materials.  (Compl. ¶39).  Defendants also stated, for the first time, that the Lotensin contract was a "long-term strategic opportunity," presumably aimed at obtaining future profitable

business from Novartis.  (Id.).  At the time, Defendants announced the Lotensin contract, they refused to reveal the specific baselines that would be used to compute PDI's revenues.  (Id. ¶ 40). Plaintiffs admit that Defendants revealed that the baseline amount would decline over the contract life.  (Id.).  Despite the decline in 2002, PDI lost additional money on the contract in the first quarter of 2002, although Lotensin's market share had increased.  (Id. ¶40).  Similarly, at this time the Defendants stated that PDI would reduce the number of representatives assigned to sell Lotensin by 75%.  (Id.).

### *The Evista Contract*

On October 2, 2001, PDI declared that it entered into an agreement with Eli Lilly and Company ("Eli Lilly"), to co-promote Evista, an osteoporosis drug, in the United States. (Compl. ¶41).  Pursuant to the agreement, PDI would provide a sizeable number of sales representatives to augment the existing Eli Lilly sales force already promoting Evista.  (Id.). PDI's compensation for its participation in the co-promotion of Evista was a split of net sales over the baseline amount.  (Id. ¶43).  The specifics of the Evista agreement, however, were not publicly disclosed.  (Id. ¶44).

At the end of the Class Period, Defendants admitted that the Evista contract was a "long-term strategic opportunity."  (Compl. ¶ 46).  However, according to Plaintiffs, it was not until November 2002 that Defendants admitted that PDI cancelled the Evista contract because it was expected to continue to incur tens of millions of dollars of losses.  (Id.).  Given that the contract committed PDI to a certain level of spending for promotional activities which would result in expenses of approximately $32-48 million per year, the Evista contract, Plaintiffs assert, needed to exceed the contractual baseline by $32-48 million in order to break even.  (Id. ¶47).  By

November 2002, the Evista contract had cost PDI almost $50 million in losses as a result of prior losses on the contract in addition to a $9.1 million charge related to the contract.  (Id. ¶48).

Thereafter, Eli Lilly awarded a contract involving the promotion of the drug Cymbalta, a drug used to treat depression, to a competitor, Innovex.  (Id. ¶49).  The Cymbalta contract could have been very profitable for PDI as there is, as Plaintiffs explain, significant promotional potential for new prescription drugs that treat depression.  (Id.).

### Allegedly False and Misleading Statements

On May 22, 2001, the first day of the Class Period, PDI held a conference call with securities analysts to discuss the contract with Novartis for the distribution of Lotensin.  (Compl. ¶51).  During the conference call, Saldarini represented that the Lotensin agreement was expected to add $0.25 earnings per share to the company's fourth quarter 2001 earnings, although startup costs, such as training and promotional costs, would likely depress earnings for the second and third quarters.  (Id.).  Plaintiffs claim that these statements were intended to increase the price of PDI common stock.  (Id. ¶52).  Plaintiffs further claim that the price did increase by $5.10 following the May 22 conference from $86.08 per share on May 22, 2001 to close at $91.18 on May 23, 2001.  (Id.).  Plaintiffs further allege that these statements were intended to convey the false and misleading impression that the terms of the Lotensin contract were advantageous to PDI, and that PDI would earn significant profits after the initial investment of start-up costs.  (Id. ¶53).  Plaintiffs further charge that Defendants knowing or recklessly failed to disclose that PDI had purposefully entered into an unprofitable contract with Novartis in order to: (1) retain the services of marketing representatives who would otherwise have left PDI; and (2) to obtain future profitable business from Novartis.  (Id.).

PDI subsequently issued a press release on July 20, 2001 announcing that Pfizer, Inc. ("Pfizer") had elected not to renew a product detailing agreement that was due to expire on October 31, 2001.  (Compl. ¶54).  The press release assured investors that the termination would not adversely affect its earnings for 2001 or 2002.  (Id.; Declaration of Israel David ("David Decl."), Ex.3).

Thereafter, a conference call was held on August 14, 2001, involving Saldrini and Boyle. (Compl. ¶55; David Decl. Ex.4).  They discussed PDI's results for the second quarter of 2001 and its expected results for the remainder of 2001.  (Id.).  Defendants further noted that PDI would likely earn $0.20 per share less than previously forecasted for the third quarter due to a Ceftin inventory glut at distributors.  (Compl. ¶55; David Decl. Ex.4 at 8).  However, both Defendants advised that despite the expected weakness in the third quarter, PDI would meet previously announced expected earnings for the year 2001 of $2.30 per share based on expected strength in the fourth quarter.  (Compl. ¶55).  Plaintiffs allege that the aforementioned statements were materially false and misleading because Defendants failed to divulge that PDI had never increased Ceftin's market share, except for the periods where it was allegedly employing unlawful marketing materials or artificially increasing market share by "incentivizing" distributors to stock up on Ceftin.  (Id. ¶ 56).

Subsequently, PDI issued a press release on August 21, 2001, announcing the Federal Circuit's decision holding that Ranbaxy's generic Ceftin did not infringe GSK's patent.  (Compl. ¶57; David Decl. Ex.5).  Defendants advised that Ranbaxy could begin selling generic Ceftin upon obtaining FDA approval.  (Id.).  Further, the press release advised that PDI was evaluating its options and additional announcements would be forthcoming.  (Compl. ¶57).  PDI

subsequently issued a press release on August 23, 2001, discussing its options in light of the

Federal Circuit's decision.  (Id. ¶58).  PDI also discussed the financial implications on PDI's

business for the remainder of 2001 and 2002 resulting from the immediate introduction of

generic Ceftin, noting that in the third and fourth quarters of 2001, PDI "expects a severe impact

on net revenue and profitability," and that "[s]uch impact will result partly from wholesalers and

other trade customers reducing projected purchases from PDI in anticipation of building generic

cefuroxime axetil tablet inventories from other suppliers, and partly because sales and marketing

costs cannot be significantly reduced over the short-term."  (Compl. ¶59).

On August 24, 2001, Saldarini held a conference call to address concerns prompted by the

aforementioned developments concerning Ceftin.  (Compl. ¶60; David Decl. Ex.7).  Saldarini

explained that even if introduced in October of that year, the generic Ceftin could not satisfy the

entire fourth quarter demand for Ceftin, and he expected that 80% of the fourth quarter demand

would be satisfied by Ceftin and not the generic competition. (Compl. ¶61).  He further claimed

that the company was expecting Ceftin to contribute $0.30-0.40 earnings per share by 2002.  (Id.;

David Decl. Ex.7 at 6).  Plaintiffs contend Saldarini's statements regarding the impact of generic

competition for Ceftin were false and misleading because the Defendants failed to disclose that

the termination of the Ceftin contract would cause PDI to incur "massive expenses," and further,

PDI never increased Ceftin's market share, except when it "had unlawfully promoted the drug or

artificially inflated reserve by shifting sales into an earlier quarter at the expense of a later

quarter." (Compl. ¶62).

On November 12, 2001, PDI issued another press release announcing a loss of $17.3

million for the third quarter of 2001.  (Compl. ¶63).  Saldarini stated that PDI would terminate

the Ceftin agreement with GSK, but that PDI had "positive developments in the pipeline ...."

(Id.).  Plaintiffs maintain that the revelations in the November press release were much worse

than PDI had previously led investors to believe.  (Id. ¶65).  The price of PDI common stock

declined from a $29 per share close on November 12, 2001, to close at $18.35 per share on

November 13, 2001.  (Id.).

On November 13, 2001, PDI held a conference call with investors and analysts.  (Compl.

¶66; David Decl. Ex.8).  During the call, Saldarini revealed that PDI would not profit from the

Ceftin contract in the fourth quarter.  (Compl. ¶66).  He further advised that the Lotensin contract

would not contribute to fourth quarter earnings as expected because PDI "did not have the

marketing materials, the positioning and support programs in place."  (Id.).

### Procedural History

Plaintiffs initiated the instant action on January 16, 2002.  On May 23, 2002, the

Honorable Magistrate Judge Ronald J. Hedges, U.S.M.J. granted Plaintiff Gary Kessel's motion

to consolidate civil case 02-cv-211, with 02-cv-367 and 02-cv-699.  Thereafter, a Consolidated

and Amended Class Action Complaint was filed on July 30, 2002.  On November 19, 2002,

Plaintiffs' motion to file an Amended Complaint was granted, and the Second Amended

Complaint was subsequently filed on December 13, 2002.  Count I of Plaintiffs' Second

Amended Complaint is premised on violations of Section 10(b) of the Securities Exchange Act

of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17

C.F.R. § 240.10b-5, against all the Defendants.  Count II alleges a violation of Section 20(a) of

the Exchange Act, 15 U.S.C. § 78t(a), against Defendants Saldarini and Boyle as the controlling

persons of PDI.  Defendants presently move to dismiss the Second Amended Complaint under

Fed. R. Civ. P. 9(b), 12(b)(6), and the Private Securities Litigation Reform Act of 1995

(hereinafter the "Reform Act" or "PSLRA"), 15 U.S.C. §§ 78u-4, et seq.

**LEGAL STANDARDS**

**A.      Rule 12(b)(6), Rule 9(b), and the Reform Act**

  **1.      Fed. R. Civ. P. 12(b)(6)**

The applicable inquiry under Federal Rule 12(b)(6) is well-settled. Courts must accept all

well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of

the non-moving party.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other

grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982); Allegheny Gen. Hosp. v. Philip Morris, Inc.,

228 F.3d 429, 434-35 (3d Cir. 2000).  The question is not whether plaintiffs will ultimately

prevail in a trial on the merits, but whether they should be given an opportunity to offer evidence

in support of their claims. Scheuer, 416 U.S. at 236.  Dismissal under Rule 12(b)(6) is not

appropriate unless it appears beyond doubt that plaintiff can prove no set of facts in support of

his claim which would entitle him to relief.  Official Comm. of Unsecured Creditors v. R.F.

Lafferty & Co., 267 F.3d 340, 346 (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

The Third Circuit has further noted that courts are not required to credit bald assertions or

legal conclusions improperly alleged in the complaint.  In re Burlington Coat Fact. Sec. Litig.,

114 F.3d 1410, 1429 (3d Cir. 1997).  Similarly, legal conclusions draped in the guise of factual

allegations may not benefit from the presumption of truthfulness.  In re Nice Sys., Ltd. Sec.

Litig., 135 F. Supp. 2d 551, 565 (D.N.J. 2001).

Page 12 of  48

### 2.      Heightened pleading requirement

Fed. R. Civ. P. 9(b) imposes a heightened pleading requirement of factual particularity

with respect to allegations of fraud, independent of the standard applicable to a Rule 12(b)(6)

motion. Rule 9(b) states:  "In all averments of fraud or mistake, the circumstances constituting

fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  "This particularity

requirement has been rigorously applied in securities fraud cases."  In re Burlington, 114 F.3d at

1417 (citations omitted). As such, plaintiffs averring securities fraud claims must specify "'the

who, what, when, where, and how: the first paragraph of any newspaper story.'"  In re Advanta

Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. Ernst & Young, 901 F.2d

624, 627 (7th Cir. 1990)).  The Third Circuit has further noted that "[a]lthough Rule 9(b) falls

short of requiring every material detail of the fraud such as date, location, and time, plaintiffs

must use 'alternative means of injecting precision and some measure of substantiation into their

allegations of fraud.'"  In re Rockefeller Ctr. Props. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002)

(quoting In re Nice Sys., 135 F. Supp. 2d at 577).

In addition to the Rule 9(b) requirements, plaintiffs alleging securities fraud must also

comply with the heightened pleading requirements of the Reform Act, 15 U.S.C. § 78u-4(b)(1)

and (b)(2).  Specifically, § 78u-4(b)(1) of the Act requires plaintiffs to "specify each statement

alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information and belief, the complaint

shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

Further, with respect to securities fraud claims, such as Rule 10b-5 claims, the Reform Act

requires that "the complaint shall, with respect to each act or omission alleged to violate this

chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

The Reform Act modified the traditional Rule 12(b)(6) analysis.  "'[W]hereas under Rule 12(b)(6), we must assume all factual allegations in the complaint are true ... under the Reform Act, we disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute.'"  In re Rockefeller Center, 311 F.3d at 224 (quoting Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 345, 660 (8th Cir. 2001)).  The Reform Act requires a 'strong inference' of scienter, and accordingly, alters the normal operation of inferences under Rule 12(b)(6).  In re Digital Island Sec. Litig., 357 F.3d 322, 328 (3d Cir. 2004) (citing In re Rockefeller Ctr., 311 F.3d at 224 ) ("[U]nless plaintiffs in securities fraud actions allege facts ... with the requisite particularity ... they may not benefit from inferences flowing from vague or unspecific allegations-inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis.")); see also Greebel v. FTP Software, Inc., 194 F.3d 185, 196 (1st Cir. 1999) ("A mere reasonable inference is insufficient to survive a motion to dismiss."). The failure to meet the Reform Act's pleading requirements will result in dismissal of the complaint.  In re Advanta, 180 F.3d at 531.

With these heightened pleading requirements in mind, the Court will apply the requirements of Rule 9(b) and § 78u-4(b)(1) and (2). The Court now turns to the particulars of Plaintiffs' Second Amended Complaint.[3]

---

[3]Defendants maintain that Plaintiffs' claim is merely grounded in corporate mismanagement, and thus, should be dismissed.  In re Advanta, 180 F.3d at 540 (3d Cir. 1999) (noting that "claims essentially grounded on corporate mismanagement are not cognizable under federal law.") (quoting Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 638-39 (3d Cir. 1989)). This Court does not agree.  Plaintiffs' allegations of material misrepresentations and nondisclosure amount to more than mismanagement.

**B.      Section 10(b) and Rule 10b-5**

Plaintiffs bring claims pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15

U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

Section 10(b) proscribes the "use or employ[ment], in connection with the purchase or sale of

any security, ... [of] any manipulative or deceptive device or contrivance in contravention of such

rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5, in

turn, makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a

material fact necessary in order to make the statements made in the light of the circumstances

under which they were made, not misleading ... in connection with the purchase or sale of any

security."  17 C.F.R. § 240.10b-5(b).  As the Third Circuit has observed, "[t]he private right of

action under Section 10(b) and Rule 10b-5 reaches beyond statements and omissions made in a

registration statement or prospectus or in connection with an initial distribution of securities and

creates liability for false or misleading statements or omissions of material fact that affect trading

on the secondary market."  In re Burlington Coat Factory,  114 F.3d at 1417 (citing Central Bank

of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994)); Shaw v. Digital

Equip. Corp., 82 F.3d 1194, 1216-17 (1st Cir. 1996); Eckstein v. Balcor Film Investors, 8 F.3d

1121, 1123-24 (7th Cir. 1993), cert. denied, 510 U.S. 1073 (1994).

A Rule 10b-5 plaintiff must first establish that the defendant made a materially false or

misleading statement, or that defendant omitted to state a material fact necessary to make a

statement not misleading.  Id. (citing In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1243

(3d Cir. 1989)); Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1018 (5th Cir. 1996).  Next,

the plaintiff must demonstrate that the defendant acted with scienter and that the plaintiff's

reliance on the defendant's misstatement caused injury to the plaintiff.  Id. (citing Phillips, 881

F.2d at 1244); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,

Inc., 75 F.3d 801, 808 (2d Cir. 1996).  Finally, given that a "fraud" claim is being asserted, the

plaintiff must satisfy the heightened pleading requirements of Federal Rule 9(b).  Id.

## C.      Section 20(a)

Section 20(a) provides a cause of action against individual defendants who are alleged to

have been 'control persons' of companies deemed guilty of securities fraud.  Jones v. Intelli-

Check, Inc., 274 F. Supp. 2d 615, 644 (D.N.J. 2003).  Section 20(a) states:

> Every person who, directly or indirectly, controls any person liable
> under any provision of this chapter or of any rule or regulation
> thereunder shall also be liable jointly and severally with and to the
> same extent as such controlled person to any person to whom such
> controlled person is liable, unless the controlling person acted in
> good faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. § 78t(a).  A party can be held liable under this provision for exercising control over the

corporation that has committed the securities fraud.  In re MobileMedia Sec. Litig., 28 F. Supp.

2d 901, 940 (D.N.J. 1998).  Plaintiffs asserting a Section 20(a) violation "must plead facts

showing: (1) an underlying violation by the company; and (2) circumstances establishing

defendant's control over the company's actions."  Jones, 274 F. Supp. 2d at 645.  In order to

establish a defendant is a control person, a plaintiff must demonstrate "the defendant had actual

power or influence over the allegedly controlled person."  In re MobileMedia, 28 F. Supp. 2d at

940 (quoting Kersh v. Gen. Council of Assemblies of God, 804 F.2d 546, 548 (9th Cir. 1986)).

**LEGAL DISCUSSION**

A.    **Whether PDI's Statements Are Protected by Both Statutory Safe Harbors and the Bespeaks Caution Doctrine**

1.    **Safe harbor**

The Reform Act establishes a safe harbor protecting oral or written forward-looking statements from Rule 10b-5 liability.  15 U.S.C.A. § 78u-5.  Specifically, § 78u-5(c)(1)(A) provides that:

> [A] person ... shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that (A) the forward-looking statement is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary language statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement.

Id.  A forward-looking statement is defined as, inter alia,

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the [SEC].

15 U.S.C.A. § 78u-5(i)(1).  The cautionary language needs to be "directly related to the alleged misrepresentations," but it does not have to "actually accompany the alleged misrepresentation." GSC Partners CDO Fund v. Washington, 368 F.3d 228, 243 (3d Cir. 2004) (quoting EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 874 (3d Cir. 2000)); see also Semerenko v.

Page 17 of  48

Cendant Corp., 223 F.3d 165, 182 (3d Cir. 2000) (quoting In re Donald J. Trump Casino Sec.

Litig.-Taj Mahal Litig., 7 F.3d 357, 369 (3d Cir. 1993)).  In In re Trump, the Third Circuit

explained:

> [A] vague or blanket (boilerplate) disclaimer which merely warns
> the reader that the investment has risks will ordinarily be
> inadequate to prevent misinformation. To suffice, the cautionary
> statements must be substantive and tailored to the specific future
> projections, estimates or opinions in the prospectus which the
> plaintiffs challenge.

In re Trump, 7 F.3d at 371-72.  In Kline v. First Western Gov't Sec., Inc., 24 F.3d 480, 489 (3d

Cir. 1994), the Third Circuit clarified that "Trump requires that the language bespeaking caution

relate directly to that by which plaintiffs claim to have been misled."  The safe-harbor will not

apply, however, if the statement was made with actual knowledge that the statement was false or

misleading.  15 U.S.C. § 78u-5(c)(1)(B)(i); In re Advanta Corp., 180 F.3d at 535.  Here,

Defendants contend that the statements challenged by Plaintiffs are virtually all forward-looking

in that they all address PDI's prospects in the future, and in particular, its earnings and revenue

prospects for the third and fourth quarters of 2001 and for the full-year 2002.  Plaintiffs do not

contest this assertion.

Defendants claim that the Second Amended Complaint challenges earning and revenue

projections, which fall within the plain language of § 78u-5(i)(1)(A), and thus, as forward-

looking statements, the statements qualify for protection under the safe harbor provision.

Defendants maintain that each of the challenged statements were specifically identified by PDI as

forward-looking statements by virtue of the fact that they were referred to as "projections," and

consequently, by their very language they identify themselves as forward-looking.  In re Clorox

<u>Co. Sec. Litig.</u>, 2002 U.S. Dist. LEXIS 25221, *16 (N.D.Cal. Nov. 21, 2002) ("[A] prediction about future events is self-evidently a forward-looking statement."). These statements, identified in Defendants' moving brief, are the:

- May 22, 2001 conference call where Saldarini discussed expected earnings from the Lotensin contract. (Compl. ¶51).

- July 20, 2001 press release assuring investors that the termination by Pfizer would not adversely impact its earnings and its earnings guidance for 2001 or 2002 will not be changed. (<u>Id.</u> ¶54).

- August 14, 2001 conference call with the Individual Defendants regarding Ceftin and PDI's expected earnings. (<u>Id.</u> ¶55).

- August 23 press release providing an estimated financial impact the immediate introduction of generic Ceftin would have on PDI's business for the remainder if 2001 and 2002. (<u>Id.</u> ¶59).

- August 24, 2001 conference call discussing the potential impact of generic Ceftin, as well as PDI's expected earnings from Ceftin. (Compl. ¶61).

- November 13, 2001 conference call with investors and analysts discussing the expected earnings in connection with the Ceftin and Lotensin contracts. (Compl. ¶66).

- February 20, 2002 conference call where Saldarini discussed expected earnings in connection with the Lotensin contract. (<u>Id.</u> ¶73).

(Defendants' Memorandum in Support of Motion to Dismiss ("Defs.' Mem. in Supp."), at 13).

According to Defendants, language incorporated in the Second Amended Complaint further supports their assertion that the statements are forward-looking, as Plaintiffs indicate that PDI used broad terms such as "expected" "would likely earn" and "anticipated." (<u>See, e.g.,</u>Compl. ¶¶ 51, 54, 55, 59, 61, 64, 68, 70, 77). This Court finds that these statements are forward-looking within the meaning of § 78u-5(i)(1)(A) as they pertain to earning and revenue prospects. Moreover, these statements were all identified as such as the time they were made.

For example, the July 20, 2001 press release included an entire paragraph on the Reform Act's safe harbor provision, and specifically identified the statements contained therein as forward-looking statements.  (David Decl. Ex.3).[4]

Next, Defendants urge this Court to find these statements are entitled to safe harbor protection because they used meaningful, pervasive cautionary language before and throughout the alleged class period regarding the very risks that ultimately caused the Ceftin, Lotensin and Evista contracts to become unprofitable and the PDI's projections to falter.  Defendants rely on the following statements to support their safe harbor defense:

---

[4]The press release included the following language:

> In accordance with the safe harbor provision of the Private Securities Litigation Reform Act of 1995 and Section 21E of the Exchange Act, the Company notes that statements in this release which look forward in time involve risks and uncertainties that may cause actual results or achievements to materially differ from those indicated by the forward-looking statements. These forward-looking statements include statements relating to the Company's existing programs and development of new business opportunities, as well as any other statements which are not solely historical.  The Company's plans and objectives are based on assumptions involving judgments with respect to future economic, regulatory, competitive and market conditions and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the Company.  Therefore, there can be no assurance that the forward-looking statements will prove to be accurate.  The Company's documents filed with the SEC, including the Company's recent Registration Statement on Form S-3, identify important factors that may cause the actual results to differ materially from those indicated by the forward-looking statements.

(David Decl. Ex.3).

- <u>Risks associated with new line of business</u> "We have entered into a new line of business [performance based contracts] with which we have no prior experience and, therefore, our prospects for success are uncertain."
  (David Decl. Ex.16 at 6).

- <u>Risks associated with performance based contracts</u> "[I]f we fail to meet certain performance objectives, or if we incorrectly assess the market potential of a particular product, the margins on that contract and our overall profitability may be adversely affected." (David Decl. Ex.16 at 10).

- <u>Risks associated with introduction of generic equivalents</u> "[R]isks include ... competition from new or existing drug products, including introduction of generic equivalents ...."
  (<u>Id.</u> at 6).

- <u>Risks relating to early termination of contracts</u> "The termination of a contract by one of our major clients would not only result in lost revenue, but may cause us to incur additional costs and expenses." (David Decl. Ex.1 at 9).

- <u>Risks relating to the ceftin agreement</u> "In the event that management's estimates of the demand for Ceftin are not accurate ... the Ceftin transaction could have a material adverse impact on [PDI's] financial condition, cash flows and liquidity." (David Decl. Ex.16 at 4-5).

  "If we cannot maintain or increase sales of Ceftin from their current levels, our business, operations and financial results could be adversely affected." (<u>Id.</u> at 7).

  "If Ceftin's patent rights expire, the introduction of generic alternatives will adversely impact the market for Ceftin." (<u>Id.</u> at 8).

- <u>Risks relating to Lotensin</u> "In the event our estimates of the demand for Lotensin are not accurate or more sales and marketing resources than anticipated are required, the [Lotensin] transaction could have material adverse impact on our results or operations, cash flows and liquidity." (David Decl. Ex.21 at 13).

- <u>Risks relating to Evista</u> "In the event the predetermined net sales levels are not achieved, we will not receive any revenue to offset expenses incurred."
  (David Decl. Ex.11 at 4).

  "While the company currently estimates that its future revenues from Evista sales will exceed its costs associated with this agreement, there is no assurance that actual revenues will exceed costs; in which event the activities covered by this agreement would continue to yield an operating loss." (David Decl. Ex.13 at 8).

Defendants contend that in light of these warnings, all of the challenged forward-looking statements are fully immunized by the statutory safe harbor.

Plaintiffs maintain that Defendants' statements were not accompanied by meaningful cautionary language relating to Defendants' warnings regarding the Ceftin, Lotensin and Evista contracts. Plaintiffs contend that the language used by the Defendants renders their warnings insufficient because they had the materially adverse information that would affect the profitability of the contracts that they entered into but Defendants failed to disclose this information.

As Defendants have outlined certain cautionary language relating to the Ceftin, Lotensin and Evista contracts, the Court will now examine the warnings in relation to the forward-looking statements in order to determine whether they are accompanied by substantive and tailored cautionary language to satisfy the requirements of the Reform Act's safe harbor provision. In re Trump Casino Sec. Litig., 7 F.3d at 371-72.

First, Plaintiffs challenge the May 22, 2001 conference call related to PDI's contract with Novartis for the distribution of Lotensin. (Compl. ¶ 51). During the call, Saldarini advised that startup costs such as training and promotional costs could have a negative effect on earnings during the second and third quarters of that year, and that PDI expected an increase in earnings to its fourth quarter 2001 earnings. (Compl. ¶51). In the August 14, 2001 SEC filing, Defendants warned that inaccurate estimates on demand, sales or marketing, could negatively impact PDI's revenues. (David Decl. Ex.21 at 13). Plaintiffs allege, however, that the statements were false and misleading because, among other things, Defendants did not disclose the terms of the Lotensin contract, including the baseline on the contract, and that Defendants' statement "was

intended to convey the false and misleading impression that the terms of the Lotensin contract were very favorable, and that PDI would earn significant profits after the initial investments in start-up costs ....."  (Compl. ¶53).  Although the cautionary language relates to training and promotional costs associated with Lotensin, it is not clear that the challenged statements can be deemed immaterial, as information about the contract baseline may have assumed actual significance to a reasonable investor.  "Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact."  Shapiro v. UJB Financial Corp., 964 F.2d 272, 281 (3d Cir. 1992).  Only if the adequacy of the representation or the materiality of the statement is so obvious that reasonable minds could not differ, will the representation or omission be immaterial as a matter of law.  EP Medsystems, 235 F.3d at 877 (citing Weiner v. Quaker Oats Co., 129 F.3d 310, 321 (3d Cir. 1997)).  Here, the adequacy of the warnings is not so obvious to this Court, and thus, Defendants' motion to dismiss as to this statement based on the safe harbor defense, is denied.  In re Lucent Techs., Inc. Sec. Litig., 217 F. Supp. 2d 529, 557 (D.N.J. 2002) (noting that it is for trier of fact to determine sufficiency of cautionary language).

The next challenged statement is the July 20, 2001 press release announcing that Pfizer had elected not to renew its contract with PDI.  (Compl. ¶54).  In the press release, PDI advised that the termination would not adversely affect earnings.  (David. Decl. Ex.3).  In a November 15, 2000 SEC filing, PDI addressed the termination of a contract by an existing client, noting: "Our contracts are generally for a term of one year and may be terminated by the client at any time for any reason.  The termination of a contract by one of our major clients would not only result in lost revenue but may cause us to incur additional costs and expenses."  (David Decl.

Ex.16).   The cautionary language suffices to negate as a matter of law any alleged

misrepresentations concerning the impact a termination would have on earnings.  Therefore,

inasmuch as the statement relates to the affect of the termination of the Pfizer agreement on

earnings, this statement is protected by the statutory safe harbor.

In their Second Amended Complaint, Plaintiffs also challenge the August 14, 2001

conference call, where Saldarini explained that PDI would earn less than previously forecasted

for the third quarter of 2001 due to an oversupply of Ceftin inventory with distributors. (Compl.

¶55).  In a November 15, 2000 SEC Registration Statement on Form S3, Defendants advised that

there could be an adverse financial impact if management's estimated demand for Ceftin was not

accurate.  (David Decl. Ex.16 at 4-5).  PDI further warned: "If we cannot maintain or increase

sales of Ceftin from their current levels, our business, operations and financial results could be

adversely affected."  (Id. at 7).  Plaintiffs allege, however, that these statements were false and

misleading because Defendants "failed to disclose that except for the period where it was

employing unlawful marketing materials, or artificially increasing market share by

"incentivizing" distributors to stock up on ceftin, PDI had never increased Ceftin's market

share." (Compl. ¶56).  While the cautionary statements seemingly have a connection to the issue

of Ceftin inventory, it is not so clear to this Court that the accompanying warnings negate any

potentially misleading effect that omissions concerning marketing materials or "incentivizing"

would have on a reasonable investor.  Therefore, the motion to dismiss based on the safe harbor

defense is also denied as to this statement.

In the Second Amended Complaint, Plaintiffs also challenge the November 13, 2001

conference call, where Saldarini explained that due to the lack of marketing and support

programs, the Lotensin and Ceftin contracts would not contribute to fourth quarter earnings in 2001. (Compl. ¶66). In an August 14, 2001 Form 10Q filing with the SEC, Defendants advised that inaccurate estimates on demand, sales or marketing, could negatively impact PDI's revenues. (David Decl. Ex.21 at 13). Morever, PDI advised that if it "incorrectly assess[es] the market potential of a particular product, the margins on that contract and our overall profitability may be adversely affected." (David Decl. Ex.17 at 13). However, as Plaintiffs explain, during the call, Saldarini failed to disclose the baselines in the Lotensin contract. (Compl. ¶66). Although addressing potential marketing and support concerns, the cautionary disclaimers do not appear to address Plaintiffs' allegations concerning the baseline or otherwise discuss the terms of the Lotensin contract. Accordingly, whether the warnings are sufficient to neutralize Defendants' representations is not so obvious as to be decided as a matter of law. Likewise, this Court finds that the February 20, 2002 conference call, where Saldarini commented on fiscal results of the Lotensin contract, may also not be protected. (Compl. ¶73). It is true that Defendants previously advised that inaccurate estimates on the demand for Lotensin, or regarding sales or marketing, could have a materially adverse impact, and further cautioned that they were entering into a new line of business which involved performance-based contracts, with which there was no prior experience, and therefore, the results were uncertain. (David Decl. Ex.24 at 13; David Decl. Ex.17 at 10). However, during the call, Saldarini also makes reference to a "declining baseline." (Compl. ¶74). Again, it is not obvious to this Court that cautionary statements were precisely tailored to address Defendants' failure in discussing the terms of the baseline. Accordingly, as a matter of law, these statements may not be dismissed as immaterial.

Finally, the Court cannot say that the warnings in connection with the August 23 and August 24, 2001 statements are so obvious as to render the statements immaterial.  In the August 23, 2001 press release, Saldarini addressed the estimated financial impact of generic Ceftin on PDI's business for the remainder of 2001 and 2002.  (Compl. ¶59).  PDI had provided warnings as to the risks associated with "competition from new or existing drug products, including introduction of generic equivalents prior to the expiration of Ceftin's patents[.]"  (David Decl. Ex.16 at 6).  While PDI does advise of the general risks associated with the introduction of generic equivalents, it is not clear that the warning is substantive or specific enough on the impact of the immediate release of generic Ceftin into market or on customer inventories.  Accordingly, this statement cannot be deemed immaterial as a matter of law.  Further, during the August 24, 2001 conference call, Saldarini explained that 80% of the fourth quarter of 2001 demand would be satisfied by Ceftin and not the generic competition.  (Compl. ¶61).  Again, it is not clear that these statements are neutralized, as PDI's warnings about the introduction of generic did not appear to disclose the risks associated with termination of the Ceftin contract due to generic competition.  (Compl. ¶62).  Accordingly, these statements may not be dismissed as a matter of law, and should be addressed by the trier of fact.

To summarize, it is clear that a defendant has no liability for a forward-looking statement if the statement is either immaterial or is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  §78u-5(c)(1)(A). This Court finds that all of challenged statements discussed above are forward-looking statements.  It is not so clear to this Court, however, that the cited cautionary language renders all

of the statements immaterial as a matter of law.  Accordingly, with the exception of the July 20, 2001 press release, Defendants' motion to dismiss based on safe harbor grounds is denied.[5]

## 2.   The common law "bespeaks caution" doctrine

Defendants also argue that PDI's forward-looking statements are independently protected by the judicially-created "bespeaks caution" doctrine, which was reaffirmed by the Reform Act. Under the doctrine, "cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." EP Medsystems, 235 F.3d at 873 (citing In re Trump, 7 F.3d at 371).  The doctrine only applies to forward-looking statements, and cannot be invoked for misleading statements of existing fact.  In re Trump, 7 F.3d at 371; Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1213 (1st Cir. 1996); In re MobileMedia Sec. Litig., 28 F. Supp. 2d 901, 928 (D.N.J. 1998); Voit v. Wonderware Corp., 977 F. Supp. 363, 371-72 (E.D. Pa. 1997). Furthermore, the Third Circuit has recognized that for the doctrine apply, "the cautionary language must be directly related to the alleged misrepresentations or omissions." EP Medsytems, 235 F.3d at 874 (citing Kline, 24 F.3d at 480).  For the reasons already discussed above, this Court finds that it is for the trier of fact to determine whether the forward-looking statements identified above, with the exception of July 20, 2001 press release, are immunized from challenge.

---

[5]As noted, the Reform Act provides that a forward-looking statement is shielded by the safe-harbor provision unless the plaintiff proves it was made with "actual knowledge ... that the statement was false or misleading." § 78u-5(c)(1)(B)(i); see also In re Advanta, 180 F.3d at 537 (finding that plaintiff's complaint failed to plead specific facts supporting actual knowledge of falsity).  In the instant matter, the Seconded Amended Complaint does not plead any particularized facts to support an inference that Defendants had actual knowledge of their statement's falsity.

**B.      Particularity Requirement of 15 U.S.C. § 78u-4(b)(1)**

Defendants maintain that Plaintiffs have not met the requirements of § 78u-4(b)(1)

because the earnings and revenue projection allegations lack any factual basis.  As indicated

above, the Reform Act requires that any securities fraud claim brought under the 1934 Act

"specify each statement alleged to have been misleading, the reason or reasons why the statement

is misleading, and, if an allegation regarding the statement or omission is made on information

and belief, the complaint shall state with particularity all facts on which that belief is formed."

15 U.S.C. § 78u-4(b)(1).  If this pleading requirement is not satisfied, "the court shall ... dismiss

the complaint."  15 U.S.C. § 78u-4(b)(3)(A).  It is not disputed that, with the exception of several

statements grounded in confidential sources (discussed more fully below), Plaintiffs herein

identify Defendants' allegedly false and misleading statements with particularity.  However, the

Reform Act also directs plaintiffs to specify "the reason or reasons why the statement is

misleading."  15 U.S.C. § 78u-4(b)(1).  The Court must now determine whether this particularity

requirement has been satisfied.

**1.      May 22, 2001 conference call (regarding Lotensin)**

During the call, Saldarini stated that PDI expected the Lotensin agreement to "to add

$0.25 earnings per share to the company's fourth quarter of 2001, although startup costs, such as

training and promotional costs would likely depress earnings for the second and third quarters."

(Compl. ¶51).  Plaintiffs allege that the statements were false and misleading because Defendants

"knew" that PDI was "guaranteed to lose money" on the Lotensin contract. (Id. ¶¶ 36-38, 51, 53,

69, 71).  Plaintiffs have not cited to any facts that suggest that Defendants did not actually

believe that these earnings would materialize, and point to no documents or statements

suggesting that any Defendant doubted that the earnings would materialize as predicted or that Lotensin was guaranteed to lose money.  Furthermore, Plaintiffs' claim that PDI lost money in the fourth quarter of 2001 and first two quarters of 2002, see Compl. ¶¶39, 40, 64, is an unacceptable attempt to plead fraud by hindsight.  California Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 158 (3d Cir. 2004) ("CalPERS") (the Third Circuit has "long rejected attempts to plead fraud by hindsight"); see also In re Suprema Specialities, Inc. Sec. Litig., 334 F. Supp. 2d 637, 647 (D.N.J. 2004) ("Allegations that a company's later financial difficulties imply that earlier financial statements were untrue or misleading are 'fraud by hindsight' and do not state a claim.") (citations omitted).  Moreover, Plaintiffs' reliance on the proximity in time between the favorable statement of May 22 regarding its fourth quarter earnings and the alleged downward revision made by Saldarini during a November 13, 2001 conference call, is also unavailing.  (Compl. ¶39).  This Court rejects Plaintiffs' temporal proximity argument, finding that the six-month period between the two statements is not enough to sustain the Complaint.  See, e.g., Ronconi v. Larkin, 253 F.3d 423, 437 (9th Cir. 2001) (holding that a five week lapse was too long).

Additionally, this Court finds that the motivation alleged by Plaintiffs for PDI entering into the Lotensin contract  – to retain employees and obtain future profitable business from Novartis  –  is irrelevant in light of the fact that Plaintiffs have offered no factual support suggesting that the Lotensin agreement was in fact guaranteed to lose money.   (Compl. ¶¶53, 71, 74).  Indeed, there have been no factual allegations plead to support Plaintiffs' claims that PDI was apprehensive that members of the sales force would leave PDI if it had not entered into the Lotensin contract; nor are there factual allegations to support Plaintiffs' assertion that PDI

purposefully incurred losses in exchange for obtaining future profitable business.  Therefore, for all of these reasons, is not reasonable to infer falsity as to these statements.[6]

However, Plaintiffs argue that the May 15, 2002 projection regarding Lotensin was also materially false and misleading because Defendants failed to disclose the contract baselines. (Compl. ¶¶36,51,53).  In the Third Circuit, it is clear that a duty to disclose "'may arise when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete, or misleading prior disclosure.'"  In re Digital Island Sec. Litig., 223 F. Supp. 2d 546, 552 (D.Del. 2002) (quoting Oran v. Stafford, 226 F.3d 275, 285-286 (3d Cir. 2000)).  Here, the Second Amended Complaint has identified prior disclosures that were rendered "inaccurate, incomplete, or misleading" by the alleged omission.  Accordingly, this Court cannot disregard the allegations pertaining to the baseline.  Nevertheless, for all the reasons already discussed above, Defendants' motion to dismiss shall be granted as to Plaintiffs' remaining challenges to the May 22, 2001 statements for failure to adequately plead falsity.

---

[6] In this Circuit, it is settled that plaintiffs may not amend the complaint through statements contained in a brief in opposition to a motion to dismiss.  Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988); Shoenfeld Asset Mgmt. LLC v. Cendant Corp., 142 F. Supp. 2d 589 613-14 (D.N.J. 2001).  In their opposition, Plaintiffs allege that on May 22, 2001, Defendants projected earnings in the fourth quarter of 2001, and an operating income of $45-62.5 million on revenues of $225-250 million from 2001-2003.  (Pls.' Opp'n at 20).  Defendants' motion to dismiss is granted to the extent that Plaintiffs attempt, by way of responsive papers, to challenge the May 22, 2001 Lotensin projection.  Likewise, Plaintiffs' claims of falsity surrounding Lotensin and Defendants' revenue projections for 2001-2003 does not appear to have been challenged in Plaintiffs' Second Amended Complaint.  (Id. at 20-21).  Therefore, this Court shall grant Defendants' motion as to these statements as well. Similarly, Plaintiffs' opposition, for the first time, challenges Defendants' November 13, 2001 profit projection for Lotensin ($60 million in revenue with a profit margin of 20-25%).  (Pls.' Opp'n at 22).  Plaintiffs' opposition, also for the first time, challenges Defendants' February 20, 2002 affirmation of its November 13, 2001 profit projection for Lotensin.  (Id.).  As these statements are also improperly raised in Plaintiffs' opposition, Defendants' motion is granted as to them as well.

**2.      The November 13, 2001 and February 20, 2001 statements (regarding Evista)**

During a November 13, 2001 conference call, Saldarini stated that he expected the Evista

contract to provide "approximately $53-60 million in revenue for 2002," and further, that he

expected to report a contribution from Evista in the fourth quarter of 2002.  (Compl. ¶68).

During a subsequent conference call on February 20, 2002, Saldarini discussed an increase in the

brand share for Evista.  (Compl. ¶77).  Additionally, he declared an expectation of an

approximately 50% increase in brand share, resulting in a net sales growth of 25-30% year-over-

year basis.  (Id.).  Plaintiffs maintain that the statements were false because Defendants

"knowingly or recklessly failed to disclose ... that PDI had purposefully entered into an

unprofitable [Evista] contract with Eli Lilly" and because "the contract's baselines were set at

levels that guaranteed PDI would not earn revenue, even in the event it materially increased

Evista's rate of growth ...."  (Compl. ¶¶69,78).

Plaintiffs further allege that Defendants' projections of $53-60 million in Evista revenue

for 2002 are actionable because they did not genuinely believe them in light of the statements of

former PDI employees.  In support, they rely on two unnamed confidential sources, namely, an

alleged "former senior PDI employee" and an alleged "former PDI regional manager."  (Compl.

¶97).  The Second Amended Complaint states,

> [A]ccording to a former senior PDI employee with personal
> knowledge, defendant Saldarini stated in his presence at or about
> the time the Evista contract was entered into, that he did not expect
> the Evista contract to be profitable.  According to a former PDI
> regional manager, the fact that the Evista contract was not expected
> to be profitable was confirmed by PDI executives in meetings of
> regional managers, and was common knowledge at PDI.

(Compl. ¶97).  Although the Third Circuit rejects any requirement under the Reform Act that confidential sources be named as a general matter, a plaintiff must still, nonetheless, meet the pleading requirements of the Reform Act.  CalPERS, 394 F.3d at 147.  A plaintiff's confidential sources must be "'described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'"  Id. at 155. (quoting Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir.), cert. denied, 531 U.S. 1012 (2000)). The CalPERS court, adopting the Second Circuit's approach in Novak, held that a court must evaluate the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia."  CalPERS, 394 F.3d at 147.  Applying these standards, Plaintiffs fail to plead falsity of Defendants' statements with the particularity demanded by the Reform Act because the confidential sources relied upon by Plaintiffs are not accompanied by corroborative facts.  Notably, Plaintiffs have failed to provide supporting facts that explain what department the "former senior PDI employee" worked in, what Saldarini actually said, and what other parties were present.  Similarly, Plaintiffs have not provided any details on how the "former PDI regional manager" determined that it was allegedly "common knowledge at PDI" that Evista was guaranteed to lose money – that is, to whom was this language common, and when and how did this knowledge become common.  In light of the foregoing, this Court finds that Plaintiffs' sources have not been described with sufficient particularity to support the probability that a person in the position occupied by the

source would possess the information alleged, and therefore, Plaintiffs have failed to plead the falsity of Defendants' statements with the particularity demanded by the Reform Act.[7]

Additionally, Plaintiffs point to Saldarini's statements during an August 13, 2002 conference call wherein he advised that PDI did not earn any revenues on account of Evista in the first two quarters of 2002, and noted that the results were "consistent with our actual expectations." (Declaration of Lee A. Weiss ("Weiss Decl."), Ex.3 at 5). Plaintiffs have not however, explained how the August 2002 statement renders Defendants' admissions regarding the 2002 Evista revenue projection made November 13, 2001, nine-months earlier, actually false or misleading at the time. Furthermore, it is also not reasonable to draw the inference of actual knowledge of falsity based on Plaintiffs' allegation that the Evista contract was terminated upon PDI learning that Eli Lilly had awarded the Cymbalta contract to Innovex. (Pls.' Opp'n at 14, 23). Therefore, for all of these reasons, it is not reasonable to infer falsity as to these statements.

As already indicated, Plaintiffs also maintain that the statements were false because "the contract's baselines were set at levels that guaranteed PDI would not earn revenue, even in the event it materially increased Evista's rate of growth ...." (Compl. ¶¶69,78). Here, the Plaintiffs have identified prior disclosures that were rendered "inaccurate, incomplete, or misleading" by the alleged omission. Digital Island, 223 F. Supp. 2d at 552. Accordingly, this Court cannot disregard these allegations pertaining to the baseline terms. Nonetheless, Defendants' motion to dismiss is granted with respect to the remaining challenges to the November 13, 2001 and February 20, 2001 statements for all the reasons already discussed above.

_____

[7]Even if this Court were to accept this allegation, it does not appear to contradict the challenged Evista revenue projection. It is not clear to this Court how the issue of whether or not PDI expected Evista to produce profits in the first two years has a bearing on whether PDI believed its revenue projection would materialize.

### 3.   July 20, August 14 and August 21, 23-24 statements (regarding Ceftin)

This Court will now evaluate whether Plaintiffs have pled falsity as to the Ceftin statements with the requisite particularity mandated by the Reform Act.  15 U.S.C. § 78u-4(b)(1). Plaintiffs claim that Defendants' July 20,[8] August 14, August 23 and August 24, 2001 earnings projections are actionable because Defendants "failed to disclose that except for the periods where it was employing unlawful marketing materials, or artificially increasing market share by incentivizing distributors to stock up on Ceftin, PDI had never increased Ceftin's market share." (Compl. ¶56).  Initially, this Court finds that for the reasons indicated by Defendants, the Ceftin allegations set forth in the July 20 and August 14 statements fail to properly plead particularized facts explaining why the statements made by PDI were false when made.  For example, Plaintiffs cite no facts indicating that Defendants did not actually believe that these earnings projections would materialize.  Furthermore, the FDA letter issued to PDI in mid-March does not support claims of falsity.  Since Plaintiffs have not alleged that Defendants failed to take the FDA letter into account in making future projections, the unlawful promotion allegations do not reasonably support allegations of falsity.  In addition, simply because Ceftin sales in the second quarter of 2001 exceeded PDI's expectations, that alone does not support the allegation that PDI had reason to believe that its earnings projections for the third and fourth quarters of 2001 and for full year 2002 would not materialize.  Moreover, this Court finds Defendants' motion to dismiss paragraphs 25-28 and paragraphs 54-59 of the Second Amended Complaint, which include the July 20 and August 14 statements, as well as the August 21 and 23 statements, is also deemed

---

[8]This Court has already found, <u>supra</u>, that the July 20, 2001 statement is protected by the safe harbor provision insofar as the press release relates to the adverse impact on earnings resulting from termination of the Pfizer agreement.

unopposed inasmuch as Plaintiffs have failed to address these portions of Defendants' motion in their opposition to the motion to dismiss.  (Pls.' Opp'n at 25)  Accordingly, Plaintiffs have abandoned these claims.  Therefore, Defendants' motion to dismiss shall be granted as to the July 20 and August 14, 21 and 23 statements regarding Ceftin.

The remaining Ceftin claims concern Plaintiffs' challenge to PDI's projections regarding the supposed "worst-case scenario," and ability to minimize losses in connection with Ceftin. (Compl. ¶¶61, 62).  Plaintiffs allege that Defendants' statements during the August 24 conference call were clearly false and misleading when made because Defendants failed to disclose the costs to be incurred upon termination of the Ceftin contract.  (Compl. ¶¶30, 63, 98). Plaintiffs argue that the results of the termination could actually be more grave than the "worst-case scenario" referenced by Saldarini.  Specifically, Plaintiffs allege that Defendants "knew all of the expenses for which PDI was contractually responsible in the event of early termination ...." (Compl. ¶98).  There is not allegation, as Defendants correctly observe, that Defendants failed to consider the contract costs in formulating its projection.  Thus, Plaintiffs' attempt to characterize Saldarini's statements as false or misleading is unreasonable.  Accordingly, falsity has not been adequately pled, and therefore, the motion to dismiss is also granted as to the August 24, 2001 Ceftin statements.

## C.    Scienter

In addition to the particularity requirement of 15 U.S.C. § 78u-4(b)(1), the Reform Act requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u-4(b)(2).  A plaintiff may establish the requisite strong inference of fraudulent intent in one of two ways: (1) by alleging facts "establishing a

motive and an opportunity to commit fraud"; or (2) "by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior." In re Advanta, 180 F.3d at 534; see also In re Burlington, 114 F.3d at 1418.  Defendants contend that the Second Amended Complaint is devoid of particularized facts giving rise to a "strong inference" of fraudulent intent.  This Court confines its analysis to Plaintiffs' challenge to the remaining Lotensin and Evista projections based on the failure to disclose the baseline terms.

### 1.      Motive and opportunity

As noted by the Third Circuit, after the passage of the Reform Act, it remains sufficient for plaintiffs to plead scienter by alleging facts establishing motive and opportunity to commit fraud .  In re Advanta, 180 F.3d at 534 (citations omitted).  "[B]lanket assertions of motive and opportunity" are inadequate, and "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." Id. at 535.  Moreover, "'[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud.'"  GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004) (quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001)).  As Defendants herein correctly observe, the Second Amended Complaint does not contain any allegations of motive and opportunity.

To the extent that this Court can construe an allegation of motive based on Plaintiffs' claims that Defendants' projections regarding the Lotensin and Evista contracts were a part of an undisclosed business strategy in order to "obtain future profitable contracts," see Compl, ¶¶46,

53, 71, 74, and to "retain the services of hundreds of marketing representatives who otherwise would have left the company," see Compl. ¶¶53, 71, 74, this Court concludes that Plaintiffs' allegations are inadequate and fail to meet the scienter requirement.  In re Boeing Sec. Litig., 40 F. Supp. 2d 1160, 1175 (W.D.Wash. 1998) (noting that "the desire to remain profitable[ ] is a generic motive that fails to satisfy the heightened pleading standards for scienter under the PSLRA."); accord San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 814 (2d Cir. 1996) (finding that a "company's desire to maintain a high bond or credit rating" is an insufficient motive for fraud because such motive could be imputed to any company); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068 (5th Cir.1994) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.") (citation omitted).  The allegations before this Court fail to provide the specificity necessary to raise a strong inference of fraudulent intent.

      2.      **Recklessness or conscious behavior**

      Given that Plaintiffs have failed to adequately plead that Defendants had both motive and opportunity to commit fraud, the Second Amended Complaint survives the motion to dismiss only if they allege specific facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness."  Oran, 226 F.3d at 288-89; Kalnit, 264 F.3d at 142 ("Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.") (citations omitted).  The Reform Act requires a strong – as opposed to merely reasonable – inference in order to withstand a motion to dismiss.  Rockefeller, 311 F.3d at 224; In re Burlington, 114 F.3d at 1424; see also Greebel v. FTP Software, Inc., 194 F.3d

185, 197 (1st Cir. 1999); <u>Bryant v. Avado Brands, Inc.</u>, 187 F.3d 1271, 1282-83 (11th Cir. 1999).

"[I]t is not enough for plaintiffs to merely allege that defendants 'knew' their statements were

fraudulent or that defendants 'must have known' their statements were false." <u>GSC</u>, 368 F.3d at

239 (citations omitted). Rather, plaintiffs must plead allegations of scienter with particularity.

15 U.S.C. § 78u-4(b)(2). Plaintiffs must support their allegations by specifying "the who, what,

when, where and how" of the events at issue. <u>In re Burlington</u>, 114 F.3d at 1422 (citing <u>DiLeo v.</u>

<u>Ernst & Young</u>, 901 F.2d 624, 627 (7th Cir.1990)).

In this matter, Plaintiffs argue that the Lotensin projections were materially false and

misleading because Defendants failed to disclose the contract baselines. (Compl. ¶¶36,51,53).

Similarly, they contend that Evista projections were false because the contract's baselines "were

set at levels that guaranteed PDI would not earn revenue, even in the event it materially increased

Evista's rate of growth ...." (Compl. ¶¶69,78). While the facts alleged may raise the prospect of

fraud – this is not enough under the heightened pleading requirements of the Reform Act.

Plaintiffs have not made the requisite showing of a <u>strong</u> inference of fraudulent intent.

<u>Rockefeller</u>, 311 F.3d at 224 (emphasis supplied).

Likewise, this Court finds that the recklessness standard is not met. A reckless statement

has been defined as a material misrepresentation or omission "'involving not merely simple, or

even inexcusable negligence, but an extreme departure from the standards of ordinary care, and

which presents a danger of misleading buyers or sellers that is either known to the defendant or is

so obvious that the actor must have been aware of it.'" <u>In re Advanta</u>, 180 F.3d at 535 (quoting

<u>McLean v. Alexander</u>, 599 F.2d 1190, 1197 (3d Cir. 1979)). To satisfy the recklessness standard

in a case alleging non-disclosure, a plaintiff must demonstrate: "(1) the defendant knew of the

potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." Wilson v. Bernstock, 195 F.Supp.2d 619, 639 (D.N.J. 2002) (citations omitted).  Here, Plaintiffs have failed to allege particularized facts that Defendants knew their statements were misleading to investors.

Hence, this Court therefore holds that the specific allegations set forth in Plaintiffs' Second Amended Complaint fail to provide strong circumstantial evidence of either conscious or reckless misconduct giving rise to the requisite strong inference of fraudulent intent with respect to Plaintiffs' allegations of falsity as to the remaining Lotensin and Evista projections based on a failure to discuss the baseline terms.  Accordingly, Plaintiffs' claims based on these statements are dismissed.  15 U.S.C. § 78u-4(b)(3)(A).[9]

**D.      Whether the Non-Forward Looking Statements Should Be Dismissed for Failing to State a Claim**

Defendants maintain that while the forward looking statements account for a majority of the challenged statements, the remaining allegations cited by Plaintiffs fail to state a claim. Specifically, Defendants argue that Plaintiffs' challenges regarding the February 19, 2002 press release, February 20, 2002 conference call and May 14, 2002[10] conference call should all be dismissed for failing to state a claim.  Each statement will be addressed in turn.

---

[9]In their responsive papers, Plaintiffs note that the Individual Defendants sold shares of PDI stock in November 2000 - over a year prior to the beginning of the alleged class period. (Pls.' Opp'n at 35 n.30).  However, such sales outside of the class period have been held to negate scienter.  Lirette v. Shiva Corp., 27 F.Supp.2d 268, 283 n.10 (D.Mass. 1998) (noting that sales taking place outside the class period do not support a strong inference of scienter).

[10]Plaintiffs evidently refer to a May 15, 2002 conference call in error.  The transcripts provided to this Court only reveal a May 14, 2002 conference call.  (Weiss Decl. Ex.2; David Decl. Ex.12).  Accordingly, the Court will hereinafter refer to it as the May 14, 2002 conference call.

### 1.    February 19, 2002 press release

In the press release, PDI stated that "there was a 'positive contribution' from Lotensin in the fourth quarter."  (Compl. ¶72).  Plaintiffs contend that this statement was false because Saldrini, in a conference call on May 14, 2002, admitted that PDI lost $5 million in connection with the Lotensin contract in the fourth quarter of 2001.  Defendants respond that this allegation is frivolous because a review of the document cited by Plaintiffs reveal that he stated no such thing.  When allegations contained in a complaint are contradicted by the document it cites, the document controls.  In re Hunter Envtl. Servs. Inc. Sec. Litig., 921 F. Supp. 914, 918 (D. Conn. 1996).  In this matter, a review of the transcript of the call reveals Saldarini commenting that first quarter revenues were off $4.5 million.  (David Decl. Ex.12 at 8) (emphasis supplied).  This Court agrees that no such statements are supported by the record, and accordingly, Defendants' motion is granted to the extent the Seconded Amended Complaint relates to statements in the February 19 press release.

### 2.    February 20, 2002 conference call

During the February 20 call, Saldarini commented on PDI's ability to minimize losses from Lotensin.  (Compl. ¶75).  Saldarini stated: "It's important for everyone to realize that we control all the spending on the brand [Lotensin] and if the performance is not in line or the performance does not follow we can make adjustments ...."  (Id.).  He further noted: "Because we control the spending on the product, we can manage the income statement effect of Lotensin very successfully."  (Id.).  However, as Defendants note, Plaintiffs fail to challenge the historical accuracy of the statements because they fail to explain how the alleged losses render an accurate

statement of fact concerning PDI's control over expenses to be false. Therefore, this statement is inactionable.

Similarly, Plaintiffs also challenge several additional statements made by Saldarini during the February 20, 2002 conference call:

- "[Lotensin] is currently trending in the right direction for our 2002 expectations. I think it's fair to characterize our view of Lotensin as delayed, not damaged." (Compl. ¶73).

- "Lotensin is currently trending ahead of our revised expectations. We are creating a substantive delta over a declining baseline." (Id.).

- "In the fourth quarter we have made progress against both our baseline as well as against our growth target." (Id.).

Here, too, Plaintiffs have failed to challenge the historical accuracy of these statements, and, accordingly, these factual recitations fail to state a claim. In re Advanta, 180 F.3d at 538 (finding that "positive portrayals [that] do not contradict any of defendants' other statements but merely report previous successes and express confidence" are not actionable). Thus, this Court shall grant Defendants' motion as to these statements as well.

### 3.    May 14, 2001 press release and May 14, 2002 conference call

In their Second Amended Complaint, Plaintiffs also challenge the May 14, 2002 conference call, where "the Company announced that it had reduced the number of representatives selling Lotensin from 500 to 150 in order to decrease its losses from the Lotensin contract." (Compl. ¶80). Plaintiffs, however, fail to allege that the statement was false – i.e., that PDI did not reduce the number of representatives selling Lotensin. Plaintiffs' allegations that Defendants knew PDI would continue to suffer losses on the Lotensin contract do not contradict Defendants' statement that they were reducing the number of sales representatives to decrease losses. Accordingly, this statement is also not actionable.

Plaintiffs' Second Amended Complaint also references a May 14, 2002 press release as well as the May 14, 2002 PDI conference call, where PDI reported "that it lost $8.5 million in the first quarter of 2002 in connection with the Evista contract."  (Compl. ¶81).  Plaintiffs allege that the statements were materially false and misleading because Defendants failed to disclose that the losses would have been higher "absent significant distributor overstocking during the quarter."  (Compl. ¶81).  In support, Plaintiffs rely on a July 18, 2002 Eli Lilly press release, which stated: "[Evista] [s]ales growth in the U.S. was negatively affected by wholesaler destocking in the second quarter of 2002 ...."  (Weiss Decl. Ex.6 at 4).  Plaintiffs explain such "destocking" would only have been necessitated by overstocking in the prior quarter.  However, there can be no claim based on this statement because Plaintiffs have not alleged that the historical data was false, and, Plaintiffs fail to provide any factual allegations that Defendants were aware of overstocking.  Therefore, there is no actionable claim arising from this statement.

**E.    Puffery**

"[V]ague and general statements of optimism 'constitute no more than puffery and are understood by reasonable investors as such.'"  In re Advanta, 180 F.3d at 538 (quoting In re Burlington, 114 F.3d at 1428 n.14).  See also In Re ATI Techs., Inc. Sec. Litig., 216 F. Supp. 2d 418, 433 (E.D. Pa. 2002) (holding that "ATI's spin on its historical performance, as setting a 'record in revenue,' conferring a 'strong start,' and giving ATI 'market leadership,' is puffery") (citations omitted); In re Milestone Scientific Sec. Litig., 103 F. Supp. 2d 425, 457-58 (D.N.J. 2000) (finding various statements to be puffery).  General and vague statements of optimism have been held to not constitute actionable statements under the securities laws.  San Leandro Emergency Med. Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996).  In In re

Burlington, the court noted that "[c]laims that these kinds of vague expressions of hope by

corporate managers could dupe the market have been almost uniformly rejected by the courts."

114 F.3d at 1427; see also Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997)

("[S]ome statements are so vague and such obvious hyperbole that no reasonable investor would

rely upon them.").  Here, Defendants contend that the following statements fall into this category:

• "We are confident we will be able to transition this Pfizer team successfully onto other efforts."  (Compl. ¶54).

• "We continue to feel confident about Lotensin's ability to contribute positively to 2002 financial results ...."  (Id. ¶64).

This Court agrees.  These statements appear to be nothing more that vague and general

statements of optimism, see Advanta, 180 F.3d at 538, and can therefore be deemed puffery.

Accordingly, the Second Amended Complaint will be dismissed insofar as it asserts securities

fraud on the basis of these statements.

**F.     Statements of Independent Third-Party Analysts**

The Second Amended Complaint cites a May 23, 2001 report where an analyst stated

"PDI's main goal with Lotensin will be to try and slow-down its market share deterioration."

(Compl. ¶37).  This statement cannot be imputed to them unless Plaintiffs "pled facts showing

that a particular defendant both made the statement to the analyst and controlled the content of

the report."  In re U.S. Interactive, Inc. Sec. Litig., 2002 U.S. Dist. LEXIS 16009, *48 (E.D. Pa.

Aug. 23, 2002) (citing Klein v. Gen. Nutrition Cos., 186 F.3d 338, 345 (3d Cir. 1999)).

There is no liability arising from the May 23 analysts statement as it is not specifically

attributable to any particular Defendant.  Accordingly, the motion is granted insofar as the

Second Amended Complaint relies on same.

G.    **Defendant Boyle**

Plaintiffs invoke the group pleading doctrine[11] to attribute statements to Bernard C. Boyle

(PDI's Chief Financial Officer and Executive Vice President) in order to hold him liable for

violations of section 10(b) and Rule 10b-5.  Under this doctrine,

> [T]he identification of the individual sources of statements is
> unnecessary when the fraud allegations arise from misstatements or
> omissions in group-published documents, such as annual reports,
> prospectuses, registration statements, press releases, or other
> 'group published information' that presumably constitute the
> collective actions of those individuals involved in the day-to-day
> affairs of the corporation.... In the typical scenario, the group
> pleading doctrine is used ... to attribute group published
> information to senior executives of a corporate defendant.

In re Aetna Sec. Litig., 34 F. Supp. 2d 935, 949 (E.D. Pa. 1999) (quoting Wool v. Tandem

Computers, Inc., 818 F.2d 1433, 1440 (9th Cir. 1987)) .  Plaintiffs claim that they have alleged

the elements necessary to use the group pleading doctrine to link the false and misleading

statements set forth in Second Amended Complaint, even though they were not specifically

attributed to Boyle.

Defendants contend that since Plaintiffs do not allege a misstatement or omission on the

part of Boyle, the claims against him should also be dismissed.  Relying on Pinker v. Roche

Holdings, Ltd., 292 F.3d 361 (3d Cir. 2002), Defendants argue that under Third Circuit

precedent, section 10(b) liability may be incurred by the one who actually makes a material

misstatement or omission.  Id. at 373 (noting that in order "[t]o state a valid claim for securities

---

[11]Also referred to as the "group published information" presumption.  In re Aetna, 34 F.
Supp. 2d at 949 n.6.

fraud under § 10(b) and Rule 10b-5, a plaintiff must allege [among other elements] that the

defendant ... made a misstatement or an omission of a material fact.").

While the Third Circuit has not specifically addressed the applicability of group pleading

under the Reform Act, numerous district courts within this Circuit have persuasively held that the

Reform Act has effectively abolished the doctrine.  See e.g., P. Schoenfeld Asset Mgmt. LLC v.

Cendant Corp., 142 F. Supp. 2d 589, 620 (D.N.J. 2001); Marra v. Tel-Save Holdings, Inc., 1999

WL 317103, at *5 (E.D. Pa. May 18, 1999) ("The continued vitality of the judicially created

group pleading doctrine is suspect since the PSLRA specifically requires that the untrue

statements or omissions be set forth with particularity ...."); see also In re Home Health Corp. of

Am. Sec. Litig., 1999 WL 79057, at *21 (E.D. Pa. Jan.29, 1999) ("The court agrees that the

group published information doctrine is inconsistent with the PSLRA's pleading requirements,

and thus, that specific allegations as to the actions and scienter of each defendant are

necessary.").

This Court agrees with P. Schoenfeld and other district courts' refusal to recognize the

group published information doctrine subsequent to the passage of the Reform Act. It appears

that the application of the group pleading doctrine "would circumvent the PSLRA's heightened

pleading requirements," see Jones, 274 F. Supp. 2d at 646, and as such, the doctrine is not

available to Plaintiffs herein.  Accordingly, Defendants' motion to dismiss is granted as to

Defendant Boyle.

**H.     Control Person Claim**

Plaintiffs also bring a claim against each of the Individual Defendants – Saldarini and

Boyle – based on § 20(a) of the Exchange Act.  As discussed above, a § 20(a) plaintiff must

plead facts demonstrating: (1) an underlying securities violation, and (2) a defendant's control over the corporation guilty of the fraud.  Jones, 274 F. Supp. 2d at 645; Campbell Soup, 145 F. Supp. 2d at 599.  But see In re Cendant Corp. Litig., 60 F. Supp. 2d 354, 379 (D.N.J. 1999) (citing Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 885 (3d Cir. 1975) (holding that plaintiff must also allege that control persons are "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons.")).

In the Second Amended Complaint, Plaintiffs specifically allege that the both of these Defendants acted as control persons of PDI within the meaning of § 20(a) of the Exchange Act. Plaintiffs state,

> By virtue of their high level positions with the Company, participation in and awareness of the Company's operations, and intimate knowledge of the Company's actual performance, [the Individual Defendants] had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements Lead plaintiffs contend are materially false and misleading.

(Compl. ¶114).  In Shapiro, the Third Circuit noted, "[t]he text of the statute plainly requires the plaintiff to prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Act.  If no controlled person is liable, there can be no controlling person liability."  964 F.2d at 279 (citing Wool, 818 F.2d at 1440-41 n.8).

"Liability under Section 20(a) is derivative and must be predicated upon an independent violation of the '34 Act."  In re Digital Island, 357 F.3d at 337 (citing In re Advanta, 180 F.3d at 541).  Here, because Plaintiffs fail to adequately plead an actionable predicate violation of §10(b) or Rule 10b-5, Plaintiffs' Count II claim for "control person" liability under §20(a) must also be

dismissed.  Shapiro, 964 F.2d at 279.  Defendants' motion to dismiss is therefore also granted on Plaintiffs' § 20(a) claim.

**I.      Leave to Amend**

The legal standard governing a motion to amend is well settled.  Federal Rule of Civil Procedure 15(a) provides that "leave [to amend] shall be freely given when justice so requires." Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility.  Foman v. Davis, 371 U.S. 178, 182 (1962); Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993).  The Court does not see any basis to justify denying Plaintiffs leave to amend.  Accordingly, this request is granted, and Plaintiffs are hereby granted leave to amend the Second Amended Complaint.

**CONCLUSION**

For the foregoing reasons, it is on this 16th day of August, 2005,

**ORDERED** that Defendants' motion to dismiss based on the statutory safe harbors and the bespeaks caution doctrine is DENIED as to all statement with the exception of the July 20, 2001 press release, for which the motion is GRANTED WITHOUT PREJUDICE; and it is further

**ORDERED** that Defendants' motion to dismiss the challenges to the Lotensin, Evista and Ceftin projections for failure to meet the particularity requirements of 15 U.S.C. § 78u-4(b)(1) is GRANTED WITHOUT PREJUDICE, with the exception of the challenges to the Lotensin and Evista projections in connection with the baseline terms; and it is further

**ORDERED** that Defendants' motion to dismiss the remaining Lotensin and Evista projections for failure to plead scienter in accordance with 15 U.S.C. § 78u-4(b)(2), is hereby GRANTED WITHOUT PREJUDICE; and it is further

**ORDERED** Defendants' motion is also GRANTED WITHOUT PREJUDICE with respect to Plaintiffs' challenges to the February 19, 2002 press release, February 20, 2002 conference call and May 14, 2002 conference call, for failure to state a claim; and it is further

**ORDERED** that the motion to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims as against Defendant Boyle is also GRANTED WITHOUT PREJUDICE; and it is further

**ORDERED** that Defendants' motion to dismiss Plaintiffs' section 20(a) claims against Defendants Boyle and Saldarini, is also GRANTED WITHOUT PREJUDICE;

**ORDERED** that the motion to dismiss the statements set forth in paragraph 37 of the Second Amended Complaint is also GRANTED; and it is further

**ORDERED** that the motion to dismiss the statements contained in paragraphs 52 and 64 of the Second Amended Complaint is also GRANTED; and it is further

**ORDERED** that Plaintiffs are hereby GRANTED leave to amend the Second Amended Complaint.

It is so ordered.

/s/ Jose L. Linares

DATED: August 16, 2005                    UNITED STATES DISTRICT JUDGE