# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| In re PDI SECURITIES LITIGATION | : | Civil Action No. 02-211 (GEB) |
| | : | |
| | : | **O P I N I O N** |

**APPEARANCES:**

ALLYN ZISSEL LITE, Esq.,
JOSEPH J. DEPALMA, Esq.,
SUSAN D. PONTORIERO, Esq.,
      LITE, DEPALMA, GREENBERG & RIVAS, LCC
      Two Gateway Center, 12th Floor
      Newark, New Jersey 07102-5003
LEE A. WEISS, Esq.,
SHARON M. LEE, Esq.,
      MILBERG WEISS BERSHAD & SCHULMAN LLP
      One Pennsylvania Plaza
      New York, New York 10119-0165
SHERRIE R. SAVETT, Esq.,
CAROLE A. BRODERICK, Esq.,
GARY E. CANTOR, Esq.,
      BERGER & MONTAGUE, P.C.
      1622 Locust Street
      Philadelphia, Pennsylvania 19103
Attorneys for Plaintiffs:
GARY KESSEL, RITA LESSER, LEWIS LESSER and the class of all others similarly situated,
as well as Consolidated Plaintiffs BENJAMIN VINCENT and MARY KAY RICHARDSON

ALAN S. NAAR, Esq.,
GINA MARIE PONTORIERO, Esq.,
      GREENBAUM, ROWE, SMITH & DAVIS
      Metro Corporate Campus One
      P.O. Box 5600
      Woodbridge, New Jersey 07095-0988
Attorneys for Defendants:
PDI, INC., CHARLES T. SALDARINI and BERNARD C. BOYLE

**GARRETT E. BROWN, JR., Chief Judge**

This matter is before the Court on Defendants' motions to dismiss the Plaintiffs' Third Consolidated and Amended Class Action Complaint ("Motion") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4, et seq.[1]

For the reasons discussed below, Defendants' Motion will be GRANTED, and Plaintiffs' Third Consolidated and Amended Class Action Complaint will be DISMISSED WITH PREJUDICE.

## PROCEDURAL HISTORY

Plaintiffs, purchasers of the common stock of Defendant PDI, Inc. ("PDI" or "Company") between May 22, 2001, and August 12, 2002 ("Class Period"), brought this securities fraud class action alleging that Defendants defrauded investors by artificially inflating the value of the common stock through false and misleading statements disseminated into the investing community.

The litigation was initiated on January 16, 2002.[2]  See Docket Entry No. 1.  On November 19, 2002, Plaintiffs' motion to file an Amended Complaint was granted, see Docket Entry No. 29,

---

[1]

Plaintiffs'  Complaint consists of fifty pages and 127 paragraphs, and is, effectively, a narrative listing (1) the events that Plaintiffs deem pertinent, (2) various Defendants' statements (those challenged, as well as those apparently frowned at but not actually challenged by Plaintiffs), and (3) Plaintiffs' twenty-five allegations, scattered between (1) and (2), above.  Moreover, Plaintiffs' discussions of factual predicate for Plaintiffs' allegations are frequently removed from Plaintiffs' discussion of allegedly fraudulent Defendants' statements by thirty to fifty paragraphs.

[2]

On May 23, 2002, Honorable Ronald J. Hedges, Magistrate Judge, granted Plaintiff Kessel's motion to consolidate Civil Case 02-211 with 02-367 and 02-699.  See Docket Entry No. 15.

and the Second Amended Complaint ("Second Amended Complaint") was subsequently filed on December 13, 2002.  See Docket Entry No. 32.  On February 14, 2003, Defendants filed a motion ("Preceding Motion") to dismiss the Second Amended Complaint under Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995 ("Reform Act" or "PSLRA"), 15 U.S.C. §§ 78u-4, et seq.  See Docket Entry No. 35.  On August 17, 2005, the Court issued an opinion ("August Opinion") examining Defendants' Preceding Motion and order granting Plaintiffs leave to replead.  See id. at 48.  On October 21, 2005, Plaintiffs filed the Third Amended Complaint ("Complaint").  See Docket Entry No. 50.  Defendants filed the instant Motion on December 21, 2005.  See Docket Entry No. 51.  Plaintiffs filed two briefs in opposition to the Motion, one on April 18, 2006  ("Opposition"), see Docket Entry No. 53, and another on April 18, 2006 ("Opposition Two").  See Docket Entry No. 55.  Defendants filed their reply ("Reply") on June 2, 2006.  See Docket Entry No. 60.

This matter was transferred to the undersigned on August 7, 2006.  See Docket Entry No. 66.  Except for the instant Motion, no other applications are currently pending in this action.

## DISCUSSION

### I. APPLICABLE LEGAL STANDARDS

#### A. *PLEADING REQUIREMENTS UNDER RULES 12(b)(6) AND 9(b), AND PSLRA, AS READ JOINTLY*

The standard of review under Rule 12(b)(6) is well-settled: the courts must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds,

Harlow v. Fitzgerald, 457 U.S. 800 (1982); Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 434-35 (3d Cir. 2000).  At this stage, the question is whether the plaintiff should be given an opportunity to offer evidence in support of plaintiff's claims, not whether the plaintiff will ultimately prevail in a trial on the merits.  See Scheuer, 416 U.S. at 236.  Therefore, dismissal under Rule 12(b)(6) is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of plaintiff's claim which would entitle him to relief.  See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 346 (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  Nonetheless, the Third Circuit has noted that courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint.  See Burlington Coat Fact. Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997).  Therefore, legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness.  See Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d 551, 565 (D.N.J. 2001).

The Rule 12(b)(6) standard of review is, however, altered by Rule 9(b), which imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud.  Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  "This particularity requirement has been rigorously applied in securities fraud cases."  Burlington, 114 F.3d at 1417 (citations omitted).  A Plaintiff averring securities fraud claims must specify "'the who, what, when, where, and how: the first paragraph of any newspaper story.'"  Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)).

The Third Circuit clarified:

> [a]lthough Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud."

Rockefeller Ctr. Props. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (quoting Nice Sys., 135 F. Supp. 2d at 577).

In addition to the Rule 9(b) requirements, a plaintiff alleging securities fraud must comply with the heightened pleading requirements of the Reform Act. See 15 U.S.C. § 78u-4(b)(1) and (b)(2). Specifically, § 78u-4(b)(1) of the Reform Act requires the plaintiff to specify the facts indicating the falsity of the challenged statement. The Plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Similarly, the Reform Act requires that "the complaint shall, with respect to each act or omission . . . , state with particularity [all] facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

These requirements of the Reform Act modified the traditional Rule 12(b)(6) analysis. "'[W]hereas under Rule 12(b)(6), we must assume all factual allegations in the complaint are true . . . under the Reform Act, we disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute.'" Rockefeller Center, 311 F.3d at 224 (quoting Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 345, 660 (8th Cir. 2001)). "The Reform Act requires a 'strong inference' of scienter, and accordingly, alters the normal operation of inferences under Rule 12(b)(6)." Digital Island Sec. Litig., 357 F.3d 322, 328 (3d Cir. 2004) (citing Rockefeller

Ctr., 311 F.3d at 224, stating that, "unless plaintiffs in securities fraud actions allege facts . . . with the requisite particularity . . . they may not benefit from inferences flowing from vague or unspecific allegations-inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis"); see also Greebel v. FTP Software, Inc., 194 F.3d 185, 196 (1st Cir. 1999) ("A mere reasonable inference is insufficient to survive a motion to dismiss").  A plaintiff's failure to meet these heightened pleading requirements results in dismissal of the complaint.  See Advanta, 180 F.3d at 531.

### B.  SECTION 10(b), RULE 10B-5 AND RELATED PROVISIONS

Section 10(b) proscribes the "use or employ[ment], in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).   The ensuing Rule 10b-5, 17 C.F.R. § 240.10b-5, makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).

While "[t]he private right of action under Section 10(b) and Rule 10b-5 reaches beyond statements and omissions made in a registration statement or prospectus or in connection with an initial distribution of securities and creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market," Burlington, 114 F.3d at 1417 (citing Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994)); see also Eckstein v. Balcor Film Investors, 8 F.3d 1121, 1123-24 (7th Cir. 1993), cert. denied, 510 U.S.

Page 6 of  64

1073 (1994), a Rule 10b-5 plaintiff must still (1) establish that the defendant made a materially false

or misleading statement, see Burlington, 114 F.3d at 1417 (citing Phillips Petroleum Sec. Litig., 881

F.2d 1236, 1243 (3d Cir. 1989)), (2) demonstrate that the defendant acted with scienter, and (3) show

that plaintiff's reliance on defendant's misstatement caused injury to the plaintiff.  See id. (citing

Phillips, 881 F.2d at 1244); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip

Morris Cos., Inc., 75 F.3d 801, 808 (2d Cir. 1996).


### 1.    False and Misleading Forward-Looking Statements

When the plaintiff challenges a forward-looking statement[3] made by the defendant, plaintiff's

mere usage of catchwords or bold assertions that defendant's statement was false or misleading

because the defendant knew it to be false or misleading cannot lend support to plaintiff's claim.  See

GSC Partners CDO Fund v. Washington, 368 F.3d 228, 239 (3d Cir. 2004) ("[I]t is not enough for

plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants

'must have known' their statements were false"); Read-Rite Corp. Sec. Litig., 115 F. Supp. 2d 1181

(N.D. Cal. 2000) (conclusory allegations that the corporate officers must have known the falsity were

insufficient).  Consequently, plaintiff's failure to plead with specificity the facts showing that

defendant's forward-looking statements were made by the defendant with defendant's *actual*

---

[3]
"The term 'forward-looking statement' means [inter alia,] a statement containing a projection
of revenues, income (including . . . loss), earnings (including . . . loss) per share, capital
expenditures, dividends, capital structure, or other financial items; [or] a statement of the plans and
objectives of management for future operations, including [those] relating to the products or services
of the issuer; [or] a statement of future economic performance [or] results of operations; [or] any
statement of the assumptions underlying or relating to any statement described [above.]" 15 U.S.C.
§ 78u-5(i)(1).

*knowledge* that these statements were false precludes plaintiff's claim, and plaintiff's allegation that the defendant was reckless in defendant's projections is insufficient.   See 15 U.S.C. § 78u-5(c)(1)(B).

However, the provision contains no definition of "actual knowledge" for the purposes of forward-looking statements.  Since it is apparent that actual knowledge can exist only in the present or past, and one cannot have actual knowledge of the future, courts have held that a forward-looking statement could be regarded as a representation that the speaker has a present belief as to the future. See NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement . . . must have been misleading at the time it was made") (citing Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d at 586). "[Plaintiff's] mere second-guessing of [defendant's] calculations will not suffice; [the plaintiff] must show that [the defendant's] judgment--at the moment exercised--was sufficiently egregious such that a reasonable [person] reviewing the facts and figures should have concluded that [these facts or figures] were misstated and [in addition,] that . . . the public was likely to be misled. [Securities] 'law does not expect clairvoyance.'" IKON Office Solutions, Inc., 277 F.3d 658, 673 (3d Cir. 2002) (quoting Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978)); see also DiLeo, 901 F.2d at 627) ("[P]roffer[ing a] different financial statement [is not sufficient.]  Investors must point to some facts suggesting that the difference is attributable to fraud"); Harris v. IVAX Corp., 998 F. Supp. 1449, 1455 (S.D. Fla. 1998) ("Plaintiff['] attempt simply to hold up the Defendants' predictions against the backdrop of what actually happened" is insufficient to establish scienter), aff'd, 182 F.3d 799 (11th Cir. 1999), reh'g denied en banc, 209 F.3d 1275 (2000).  Thus, the plaintiff cannot assert defendant's lack of sincere belief by pointing to the difference between the defendant's projections and the actual outcome.  See  Cal. Public Employees' Retirement Sys. v. Chubb Corp.

("Chubb"), 394 F.3d 126, 158 (3d Cir. 2004) (the Third Circuit has "long rejected attempts to plead fraud by hindsight"); Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 514 (7th Cir. 1989) ("If all estimates are made carefully and honestly, half will turn out too favorable to the firm and the other half too pessimistic.  In either case, the difference may disappoint investors, who can say later that they bought for too much [if the projection was too optimistic,] or sold for too little, [if the projection was too pessimistic]. . . . [T]he firm is not liable despite error"); Grossman v. Novell, Inc., 120 F.3d 1112, 1124 (10th Cir. 1997) ("[I]t is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood") (quoting GlenFed Sec. Litig., 42 F.3d 1541, 1548-49 (9th Cir. 1994)); Suprema Specialities, Inc. Sec. Litig., 334 F. Supp. 2d 637, 647 (D.N.J. 2004) ("Allegations that a company's later financial difficulties imply that earlier financial statements were untrue or misleading are 'fraud by hindsight' and do not state a claim") (citations omitted); Boston Tech. Sec. Litig., 8 F. Supp. 2d 43, 53 (D. Mass. 1998) ("A general averment that defendants made a statement knowing at the time what later 'turned out badly' does not suffice") (citation omitted).

Even though all allegations relating to falsity of defendant's statement must be pled with particularity, see 15 U.S.C. § 78u-4(b)(1) and (2), a plaintiff in securities fraud actions can support a complaint by reliance on information attributed to confidential sources.  See Novak, 216 F.3d at 313-14 (holding that, while the PSLRA "may compel revelation of confidential sources under certain circumstances," there was no per se requirement of disclosure if the plaintiff states sufficient facts to support plaintiff's allegations).  However, statements from undisclosed confidential sources can be used in two situations: (1) if the complaint sets forth other factual allegations, such as documentary evidence, which are sufficient alone to support a fraud allegation, see id. at 314; Royal

Dutch/Shell Transp. Sec. Litig., 380 F. Supp. 2d 509 (D.N.J. 2005) (finding sufficient corroboration in specific notes, memoranda, emails and presentation materials); Barnum v. Millbrook Care Ltd. Partnership, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994) (if the allegations are contradicted by the documents, the documents control), aff'd, 43 F.3d 1458 (2d Cir. 1994); or (2) when the confidential sources are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the [confidential] source would possess the information alleged. See Royal Dutch/Shell Transp. Sec. Litig., 380 F. Supp. 2d 509.

Elaborating on the latter scenario, the Third Circuit explained that the complaint must disclose: (1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information. See Chubb, 394 F.3d at 146; Freed v. Universal Health Servs., 2005 U.S. Dist. LEXIS 7789 (E.D. Pa. May 3, 2005); Portal Software, Inc. Secs. Litig., 2005 U.S. Dist. LEXIS 20214, at *28 (N.D. Cal. Aug. 10, 2005) ("[P]laintiffs must describe the job title, job description, duties, and dates of employment for the controller's sources before this information can be deemed reliable").  Moreover, in Chubb, the Third Circuit held that allegations attributed to the information obtained from a confidential source must contain specific details regarding the basis for the source's personal knowledge and describe supporting events in detail.  See id.; see also Northpoint Commc'ns Group, Inc., Sec. Litig., 184 F. Supp. 2d 991, 999-1000 (N.D. Cal. 2001); U.S. Aggregates, Inc. Sec. Litig., 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002); Ramp Networks, Inc., 201 F. Supp. 2d 1051, 1067 (N.D. Cal. 2002).  Failure to meet these requirements with respect to each and every confidential source the plaintiff relies upon, renders that source irrelevant for the purposes of plaintiff's allegations.  See Chubb, 394 F.3d at 146.  "The sheer volume of confidential

sources cited cannot compensate for these inadequacies. . . . Cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA." Id. at 155; see also Am. Bus. Fin. Servs., Inc. Sec. Litig., 413 F. Supp. 2d 378, 391-92 (E.D. Pa. 2005) (finding statements from five insufficiently identified confidential sources insufficient).

Finally, it shall be noted that a company's management is not responsible for opinions, projections and estimates of security analysts, even if the management may have supplied the analysts with some of the information they used to formulate their estimates,[4] unless the plaintiff sets forth facts indicating that the management passed misinformation to analysts with intention that the analysts communicate the misinformation to the market. See V-Mark Software, Sec. Litig., 928 F. Supp. 122 (D. Mass. 1996). Under these circumstances, the complaint must allege "facts showing that a particular defendant both made the statement to the analyst and controlled the content of the [analyst's] report." U.S. Interactive, Inc. Sec. Litig., 2002 U.S. Dist. LEXIS 16009, *48 (E.D. Pa. Aug. 23, 2002) (citing Klein v. Gen. Nutrition Cos., 186 F.3d 338, 345 (3d Cir. 1999)). "The complaint must rise or fall on allegations about defendant['s] conduct and not on wide-eyed citation to the gratuitous commentary of outsiders." Hershfang v. Citicorp, 767 F. Supp. 1251, 1255 (S.D.N.Y. 1991).

---

[4]

"[S]ecurities laws require [the company] to speak truthfully to investors; they do not require the company to police statements made by third parties for inaccuracies, even if the third party attributes the statement to [the company.]" Raab v. General Physics Corp., 4 F.3d 286, 288 (4th Cir. 1993).

2.      Scienter

Rule 10b-5 describes the type of conduct proscribed but it does not set out the appropriate standard of culpability.  The Supreme Court held in Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976), that, in order to establish a valid claim under Rule 10b-5, the plaintiff must prove that the defendant acted with scienter.  The scienter requirement is satisfied by a showing of intentional misrepresentation made with intent to deceive.[5]

Since scienter is based on the defendant's state of mind and, as such, may be difficult to prove with direct evidence, courts are willing to permit an inference that the defendant acted with the requisite scienter.  See, e.g., Fine v. American Solar King Corp., 919 F.2d 290 (5th Cir. 1990), cert. dismissed, 502 U.S. 976 (1991). However, such inferences are not to be made lightly.  See, e.g., Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000) ($1.6 million dollar profit from inside trading was

---

[5]

In addition, the Third Circuit has found that recklessness is sufficient to state a claim under 10b-5 *with respect to past and present events* that were falsely presented to the investing community. See, e.g., Sharp v. Coopers & Lybrand, 649 F.2d 175 (3d Cir. 1981), cert. denied, 455 U.S. 938 (1982); Coleco Indus., Inc. v. Berman, 567 F.2d 569 (3d Cir. 1977), cert. denied, 439 U.S. 830, reh'g denied, 439 U.S. 998 (1978). As the Ninth Circuit explained,

> [R]ecklessness is a lesser form of intent rather than a greater degree of negligence. . . . Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (1990), cert. denied, 499 U.S. 976 (1991) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1044-45 (7th Cir.), cert. denied, 434 U.S. 875 (1977)).

To satisfy the recklessness standard in a case alleging non-disclosure, a plaintiff must demonstrate: "(1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." Wilson, 195 F. Supp.2d at 639.

not sufficiently unusual to provide an inference of scienter).  The inference may be made only when the fact pattern unambiguously indicates that the defendant *must have been* acting with the requisite state of mind.  See, e.g., Phillips Petroleum Sec. Litig., 881 F.2d 1236 (defendant's good faith statement of present intent does not become actionable simply because of defendant's change of intent at a later point).

Thus, to withstand the scrutiny imposed by the Reform Act, the inference of scienter must be (1) reasonable, (2) strong and (3) based on pleadings stating the pertinent facts with particularity. See 15 U.S.C. § 78u-4(b)(1) and (2) (the plaintiff shall state "the reason . . . why the [challenged] statement [was] misleading, and . . . all facts on which [plaintiff's] belief is formed," as well as "particular[] facts giving rise to a strong inference that the defendant acted with the required state of mind"); Alpharma Sec. Litig., 372 F.3d 137, 150 (3d Cir. 2004); The End of the Unbearable Lightness of Pleading: Scienter After *Silicon Graphics*, 48 UCLA L. Rev. 973 (2001) (detailing the development of both elements).

A plaintiff may establish the requisite strong inference of fraudulent intent in one of two ways: (1) by alleging facts "establishing a motive and an opportunity to commit fraud"; or (2) "by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior."  Advanta, 180 F.3d at 534; see also Burlington, 114 F.3d at 1418.  If the plaintiff desires to employ the "motive and opportunity" method, the plaintiff should demonstrate a logical connection between the alleged fraud and motive in order to establish a reasonable inference of fraud.  See Glickman v. Alexander & Alexander Servs., 1996 U.S. Dist. LEXIS 2325, at *36 (S.D.N.Y. Feb. 27, 1996) ("[There should be] coherent nexus between the alleged fraudulent conduct and its alleged purpose").  Furthermore, there must be more than conclusory allegations of motive

and opportunity; stating that "the defendant must have known" is not legally sufficient.  See, e.g., Mortensen v. AmeriCredit Corp., 123 F. Supp. 2d 1018 (N.D. Tex. 2000); Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194  (S.D.N.Y. 1999).  A "strong inference" may arise only if the complaint sufficiently alleges that the defendants: (1) "benefitted in a concrete and personal way from the purported fraud"; (2) "engaged in deliberately illegal behavior"; (3) "knew facts or had access to information suggesting that their public statements were not accurate"; or (4) "failed to check information they had a duty to monitor." Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000); see Wilson v. Bernstock, 195 F. Supp. 2d 619, 633 (D.N.J. 2002) ("Motive entails allegations that the individual corporate defendants stood to gain in a concrete and personal way from one or more of the allegedly false or misleading statements and wrongful nondisclosures. . . . [M]otive and opportunity 'like all other allegations of scienter must now be supported by facts stated with particularity and must give rise to a strong inference of scienter'") (quoting Advanta, 180 F.3d at 535); Cybershop.com Sec. Litig., 189 F. Supp. 2d 214 (D.N.J. 2002).

Under this pleading standard, a plaintiff may not rely on facts indicating that the defendant had certain goals or aspirations (or sought to engage in the industry practices) common to the law-abiding business community , since such goals or practices cannot amount to a valid motive for the purposes of showing scienter.  See  GSC Partners CDO Fund, 368 F.3d at 237 (""Motives that are generally possessed by most corporate directors and officers do not suffice") (quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (capitalization restored); San Leandro, 75 F.3d at 814 ("[A] company's desire to maintain a high bond or credit rating" is an insufficient motive for fraud because such motive could be imputed to any company.  If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could

be forced to defend securities fraud actions"); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068 (5th Cir.1994) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated") (citation omitted); Nice Sys., Ltd. Secs. Litig., 135 F. Supp. 2d at 584) ("[T]he allegation that [d]efendants made false and misleading statements to secure market share is . . . insufficient to demonstrate that [d]efendants had a motive to commit fraud"); Boeing Sec. Litig., 40 F. Supp. 2d 1160, 1175 (W.D.Wash. 1998) ("[T]he desire to remain profitabl[e] is a generic motive that fails to satisfy the heightened pleading standards for scienter under the PSLRA").

With respect to the other method of establishing scienter, that is, by circumstantial evidence of intent, "the strength of the circumstantial allegations must be [even] greater." Kalnit, 264 F.3d at 142; see Oran v. Stafford, 226 F.3d 275, 288-89 (3d Cir. 2000). In that situation, the plaintiff must support his allegations by detailing, with particularity, "the who, what, when, where and how" of the events at issue and present clear facts verifying plaintiff's deductions with respect to defendant's state of mind. Burlington, 114 F.3d at 1422 (citing DiLeo, 901 F.2d at 627); see also Ronconi v. Larkin, 253 F.3d 423, 437 (9th Cir. 2001) (finding that a temporal proximity of events is insufficient circumstantial evidence).

The above-discussed requirement to prove scienter is reflected in Section 21E of the 1934 Act, 15 U.S.C. § 78u-5(c), which provides guidance to corporate managers wishing to issue forward-looking projections without risking legal liability. To be protected by 15 U.S.C. § 78u-5(c), an issuer (or the issuer's agents) must: (1) identify all written or oral forward-looking statements as forward-looking, or couch these statements in such terms that the forward-looking nature of these statements would be self-evident to a reasonable investor. See Clorox Co. Secs. Litig., 238 F. Supp. 2d 1139, at *16 (N.D. Cal. 2002) ("[A] prediction about future events is self-evidently a forward-looking

statement"), and (2) make these projections without *actual knowledge* that the projections are false or misleading; see also 15 U.S.C. §§ 78u-5(c)(1)(B)(i) and 78u-5(c)(1)(B)(ii)(II).[6]

### 3.   Materiality

The test of materiality depends not upon the literal truth of statements but upon the ability of reasonable investors to become accurately informed, see McMahan & Co. v. Warehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir. 1990), cert. denied, 501 U.S. 1249 (1991); this is sometimes referred to as the mosaic representation thesis.  See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Genentech, Inc. Sec. Litig., 1989 WL 137189 (C.D. Cal. 1989).  Thus, a finding of materiality is based on the total mix of information available, see Ieradi v. Mylan Labs., Inc., 230 F.3d 594 (3d Cir. 2000), and the concept of materiality cannot be distilled into a bright-line test, see Basic Inc. V. Levinson, 485 U.S. 224 (1988), see also Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281 (3d Cir. 1992); Ganino v. Citizens Utilities Co., 228 F.3d 154 (2d Cir. 2000), short of stating that an alleged misrepresentation cannot be deemed material to an investor if the general public has access to correct information.  See Basic, 485 U.S. at 231-32; Wallace v. Systems & Computer Tech. Corp., 1997 U.S. Dist. LEXIS 14677, at *42-44 (E.D. Pa. Sept. 22, 1997).

---

[6]

    The rationale of this rule is self-evident: an issuer (or the issuer's agent) made a statement without actual knowledge that the statement was false or misleading, the issuer (or its agent) cannot intend to defraud the market and, thus, lacks the requisite scienter. Alternatively, if the issuer (or issuer's agent) has actual knowledge that the issuer's forward-looking statements are false of misleading, but accompanies these forward-looking statements with a meaningful and directly-related cautionary language, the issuer is not liable for the injuries that might ensue from investors' reliance on the false forward-looking statements.  See 15 U.S.C. § 78u-5(c)(1)(A)(I).  The Court, however, determined in its August Opinion that 15 U.S.C. § 78u-5(c)(1)(A)(I) is inapplicable to the case at bar.  See August Opinion at 17-27.

The fact that materiality is determined in context means that a purchaser or seller of securities is not necessarily entitled to all information relating to each of the circumstances surrounding the transaction.  See Acito v. IMCERA Group, 47 F.3d 47 (2d Cir. 1995) (deficiencies found by FDA inspectors at one of many business locations were not material); Wilensky v. Digital Equip. Corp., 903 F. Supp. 173 (D. Mass. 1995), aff'd in part, rev'd in part on other grounds, 82 F.3d 1194 (1st Cir. 1996) (failure to disclose details of new marketing strategy was immaterial); accord Press v. Quick & Reilly, Inc., 218 F.3d 121 (2d Cir. 2000) (intermediary's conflict of interest is immaterial); Carter-Wallace, Inc. v. Hoyt, 150 F.3d 153 (2d Cir. 1998) (departure from the generally accepted accounting principles cannot qualify as a material element for the purposes of securities fraud action).  It is not sufficient to show that a shareholder might have found the information to be of interest: the plaintiff has to establish importance of the particular piece of information to a reasonable investor.  See Burlington, 114 F.3d at 1432 ("'[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.' [Management's] possession of material nonpublic information alone does not create a duty to disclose it") (quoting Time Warner Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993), and citing Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir. 1996), and Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir. 1987)); Milton v. Van Dorn Co., 961 F.2d 965 (1st Cir. 1992) (where plaintiffs bought the stock of a subsidiary company of the parent corporation and, after the sale was completed, another of the parent corporation's subsidiaries announced plans to begin producing a product that would compete with plaintiffs' product, the court found that nondisclosure of the other subsidiary's production plans was immaterial).

"When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty

to speak [since a] duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information." Chiarella v. United States, 445 U.S. 222, 235 (1980). As the Third Circuit explained,

> "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988); see also Burlington, 114 F.3d at 1432 ("Except for specific periodic reporting requirements . . . there is no general duty on the part of a company to provide the public with all material information"). Such a duty to disclose may arise when there is [an incident of] insider trading, [or presence of] a statute requiring disclosure, or [there was] an inaccurate, incomplete or misleading prior disclosure [requiring a corrective statement]. See Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992); Backman v. Polaroid Corp., 910 F.2d 10, 12 (1st Cir. 1990) (en banc); General Motors Class E Stock Buyout Sec. Litig., 694 F. Supp. 1119, 1129 (D. Del. 1988).

Oran, 226 F.3d at 286-87.

Moreover, "vague and general statements of optimism 'constitute no more than puffery, and [being] understood by reasonable investors as such,'" cannot amount to materially fraudulent information. Advanta, 180 F.3d at 538 (quoting Burlington, 114 F.3d at 1428 n.14); see also ATI Techs., Inc. Sec. Litig., 216 F. Supp. 2d 418, 433 (E.D. Pa. 2002) (holding that "[a] spin on its historical performance, as setting a 'record in revenue,' conferring a 'strong start,' and giving . . . 'market leadership,' is puffery"); cf. San Leandro, 75 F.3d at 811. In Burlington, the Third Circuit clarified that "[c]laims that . . . vague expressions of hope by corporate managers could dupe the market have been . . . uniformly rejected by the courts." 114 F.3d at 1427; see also Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997) ("[S]ome statements are so vague and such obvious hyperbole that no reasonable investor would rely upon them"). For instance, statements by the defendant that merely express defendant's confidence with respect to future results on the basis of previous successes are not actionable. See Advanta, 180 F.3d at 538.

4.        **Reliance**

The reliance requirement is a corollary of materiality.  See Semerenko v. Cendant Corp., 233

F.3d 165, 180 (3d Cir. 2000).  As under common law, the reliance requirement applies in securities

fraud cases, and reliance is an element of a private claim under Rule 10b-5.  See List v. Fashion

Park, Inc., 340 F.2d 457, 452 (2d Cir. 1965), cert. denied, 382 U.S. 811, reh'g denied, 382 U.S. 933

(1965).  Since proving reliance could be hard in view of the nature of modern securities markets,

federal courts fashioned a "fraud-on-the-market" presumption for proving reliance based on the

Efficient Capital Market Hypothesis, i.e., the premise that, if the market is efficient, the information

disclosed by issuers, issuers' agents and analysts is both available to and swiftly absorbed by the

investors.   See Basic, 485 U.S. 224; Hayes v. Gross, 982 F.2d 104 (3d Cir. 1992).

In Cammer v. Bloom, 711 F. Supp. 1264, 1276 n.17 (D.N.J. 1989), appeal dismissed, 993

F.2d 875 (3d Cir. 1993), the Court set out the following key terms for an efficient market that

enables plaintiff's usage of the fraud on the market theory: (1) an open market is one in which

anyone, or at least a large number of persons, can buy or sell; (2) a developed market is one which

has a relatively high level of activity and frequency, and for which trading information (e.g., price

and volume) is widely available, e.g., a secondary market in outstanding securities which usually has

continuity, liquidity and the ability to absorb a reasonable amount of trading with relatively small

price changes; (3) an efficient market is one which rapidly reflects new information in price; and (4)

these terms are cumulative in the sense that a developed market will almost always be an open one,

and an efficient market will almost invariably be a developed one. See Enron Corp. Sec. Derivative

& "ERISA" Litig., 2006 U.S. Dist. LEXIS 43146, at *95 (S.D. Tex. June 5, 2006) (relying on

Cammer).  Since the New York and American Stock Exchanges are examples of open and developed

securities markets, see id., and PDI's common stock is registered with the United States Securities and Exchange Commission and traded on the NASDAQ,[7] the case at bar is subject to both the Efficient Capital Market Hypothesis and the fraud on the market presumption.

### C.    *LIABILITY OF CONTROLLING PERSON*

Section 20(a) of the 1934 Act, 15 U.S.C. § 78(a), states that "[e]very person who, directly or indirectly, controls any person liable [for securities fraud] shall also be liable jointly and severally with and to same extent as such controlled person."  15 U.S.C. § 78t(a).  Thus, for a controlling person to be liable, the person over whom control was exercised must have committed a primary violation of the securities laws.  See Merck & Co. Sec. Litig., 432 F.3d 261 (3d Cir. 2005); Digital Island Sec. Litig., 357 F.3d at 337; Shapiro, 964 F.2d at 279.  To establish a prima facie case that the defendant was a controlling person within the meaning of Section 20(a), the plaintiff must show that: (1) the defendant had actual power or influence over the controlled person; and (2) the defendant actually participated in the alleged illegal activity.[8]  See Kersh v. General Council of the Assemblies

---

[7]

PDI's NASDAQ symbol is PDII. See <<www.pdi-inc>>.

[8]

The group pleading doctrine allows plaintiffs in securities fraud cases to attribute corporate statements to "one or more individual defendants based solely on their corporate titles." Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 363 (5th Cir. 2004).  The doctrine (alternatively referred to as the "group published" doctrine and the "group published information presumption," see id.; William O. Fisher, Don't Call Me a Securities Law Groupie: The Rise and Demise of the "Group Pleading" Protocol in 10b-5 Cases, 56 Bus. Law. 991, 995 n.12 (2001)) favors plaintiffs by making it easier to satisfy Rule 9(b)'s particularity requirement since, under the doctrine, the plaintiffs can name corporate officers as defendants even though the plaintiffs did not know the roles such officers played in an alleged fraud.  The Third, Seventh and Fifth Circuits have held that the PSLRA forecloses the practice of group pleading in securities fraud cases.  See, e.g., Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 603 (7th Cir. 2006); Tyson Foods, Inc. Sec. Litig., 155 Fed. Appx. 53, 57 (3d Cir. 2005); Southland, 365 F.3d at 359-64; Sonus Networks Secs.

of God, 804 F.2d 546, 548 (9th Cir. 1986); Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 885 (3d

Cir. 1975); MobileMedia Secs. Litig., 28 F. Supp. 2d 901, 940 (D.N.J. 1998); Klein v. Boyd, 949

F. Supp. 280 (E.D. Pa. 1996), aff'd in part, rev's on other grounds, 1998 U.S. App. LEXIS 2004 (3d

Cir. Feb. 12, 1998);  Gordon v. Diagnostek, Inc., 812 F. Supp. 57 (E.D. Pa. 1993).


## II.    ANALYSIS

Having provided a brief overview of the pertinent legal standards, this Court now turns to

the facts of the case at bar.

PDI ("Professional Detailing, Inc."), a publicly-held Delaware corporation having its

principal executive offices in Upper Saddle River, New Jersey, see Compl. ¶¶ 7, 11, is a provider

of sales and marketing services to the bio-pharmaceutical industry.[9]  See id. ¶21; Mot., Mem. at 2;

<<http://www.pdi-inc.com/aboutpdi.asp>>.  PDI built its business on "contract sales," that is, on

providing customized marketing services to pharmaceutical manufacturers who wished to outsource

marketing and selling activities for particular drugs.  See Compl. ¶¶ 7, 21, 32.  This type of business

is referred to as "fee-for-service" since the revenue is principally derived from the fees received for

sales and marketing services.  See id. ¶ 21.  In the years up to and including 2000, PDI's contract

---

Litig., 2006 U.S. Dist. LEXIS 28272 (D. Mass. May 10, 2006); AIG Global Secs. Lending Corp. v. Banc of Am. Sec. LLC, 2006 U.S. Dist. LEXIS 25883 (S.D.N.Y. Apr. 25, 2006); see also Steiner v. MedQuist Inc., 2006 U.S. Dist. LEXIS 71952 (D.N.J. Sept. 29, 2006); Cambrex Corp. Secs. Litig., 2005 U.S. Dist. LEXIS 25339 (D.N.J. Oct. 27, 2005); Bio-Technology Gen. Corp. Sec. Litig., 380 F. Supp. 2d 574 (D.N.J. 2005).

[9]

During the Class Period, Saldarini and Boyle served as the Chief Executive Officer and Vice Chairman of the Board of Directors of PDI, and PDI's Chief Financial Officer and Executive Vice President, respectively.  See Compl. ¶¶ 8, 9, Mot., Mem. at 3.  Saldarini, Boyle and other directors of PDI jointly held 40% of PDI's stock.  See Mot. at 1.

sales business enjoyed substantial growth in revenues and earnings.  See id. ¶ 22.  In October 2000, PDI announced that, in addition to its fee-for-service business, PDI had entered into another line of business.  See id. ¶ 24.  This new line of business was based on "performance-based" contracts, that is, agreements to market, distribute and sell particular drugs for pharmaceutical manufacturers.  This new type of agreement envisioned profit to PDI only if PDI could achieve the level of sales above the baseline set in the agreement.  See id. ¶¶ 24-25, 40-43, 56.  In view of the difference between PDI's traditional contract sales and these new performance-based contracts, PDI notified the investing public that PDI had "no prior experience [with performance-based contracts] and, therefore, [PDI's] prospects for success [with this new line of business were] uncertain."  Mot., Ex. 18.

Certain Defendants' statements or actions that took place during 2001 and 2002 and were related to three of such performance-based contracts gave rise to this litigation.  Referring to these statements and actions by Defendants, Plaintiffs'  Complaint, Count I, alleges that Defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  Count II alleges violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), by Saldarini and Boyle as controlling persons of PDI.

Plaintiffs' Complaint, however, does *not* challenge the accuracy of any PDI's financial reports and does *not* assert that either Saldarini, Boyle, or any other director of PDI sold even one share of PDI's stock during the Class Period or profited in any other way from the alleged violations.

A.    *CEFTIN CONTRACT*

In October 2000, PDI entered into its first performance-based contract with GlaxoSmithKline ("GSK").[10]  The contract provided PDI with the right to exclusive marketing, distribution and sale of two forms, i.e., tablets and suspension, of Ceftin ("Ceftin Contract"), a cephalosporin antibiotic patented by GSK.  See Compl. ¶ 24; Mot., Exs. 18-19.

The Ceftin Contract had a five-year term and required PDI to purchase from GSK a minimum amount of Ceftin during each calendar quarter.[11]  See Compl.¶ 24; Mot., Exs. 17-19, 21. After the first quarter of the Ceftin Contract (the fourth calendar quarter of 2000), PDI reported an operating profit from Ceftin in the amount of $1.9 million; PDI's operating profit from Ceftin during the second and third quarter of the Ceftin Contract (the first and second calendar quarter of 2001) reached $8.5 million each quarter.  See Compl.¶ 25; Mot., Exs. 19-21, 23-24.  In the first quarter of 2001, PDI began promoting Ceftin through marketing materials asserting that Ceftin was "[f]irst-line in an era of bacterial resistance."  Compl.¶ 26.  In mid-March of 2001, after the U.S. Food and Drug Administration ("FDA") ordered PDI to "cease distribution of [such] promotional materials," PDI stopped this line of advertisement.  Id.

---

[10]

Prior to entering the Ceftin Contact, PDI had already established a business relationship with GSK, holding a fee-for-services contract ("GSK Contract") that was active at the time the Ceftin Contract was initiated.  The GSK Contract was terminated in February of 2001, prior to beginning of the Class Period.  See Compl.¶ 34.

[11]

For the purposes of either financial or managerial accounting, the period used is either "fiscal year" or a quarter of such year.  A new company or business must select the date on which its fiscal year begins.  See, e.g., Craig A. Peterson and Norman W. Hawker, Does Corporate Law Matter? Legal Capital Restrictions on Stock Distributions, 31 Akron L. Rev. 175 (1997).  However, since Plaintiffs' Complaint often uses the terms "fiscal year" or "fiscal quarter" without specifying whether PDI's fiscal year coincided with calendar year, see, e.g., Compl. ¶¶ 42, 51-52, 79, 82, the Court limits its terminology to calendar yearly and quarterly periods.

Shortly prior to PDI entering the Ceftin Contract, GSK's competitor, Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy") sought to introduce a generic equivalent of Ceftin tablets to the market. See id. ¶ 29. Although GSK obtained an injunction from a district court against Ranbaxy on December 19, 2000, preventing sale of the generic equivalent, the circuit court reversed this decision in August of 2001, finding that Ranbaxy's generic version did not infringe the Ceftin patent, and enabling immediate sale of the generic equivalent (subject to FDA approval), see Mot., Ex. 7, starting from the fourth quarter of the Ceftin Contract (the third calendar quarter of 2001). See Compl. ¶ 30; Mot., Exs. 5, 19. PDI promptly informed investors of that unfavorable to PDI development and enumerated six options that PDI was considering as a response, with one of these options being termination of the Ceftin Contract. See Compl.¶ 30, 65-66; Mot., Exs. 5-6. In November of 2002, the Ceftin Contract was terminated by mutual agreement between PDI and GSK, and PDI notified investors that PDI was taking a $24 million charge as a reserve for potential losses related to the Ceftin Contract. See Mot., Ex. 8.

Plaintiffs set forth seven claims related to the Ceftin Contract and asserting that Defendants' statements or action were fraudulent or false and misleading. Three of these claims relate to Defendants' past or contemporaneous actions and read as follows:

(A)   [T]he Company publicly stated at the time that the Ceftin contract had a five year term, [and concealed the fact that] the patent for Ceftin tablets was due to expire in 2003.

(B)   Upon execution of the [Ceftin C]ontract, PDI . . . took steps to pump up Ceftin sales and profits in the fourth quarter of 2000, by inducing drug distributors to stock up on Ceftin, [causing] Company's reported earnings [to rise during] the fourth quarter of 2000 [by] $0.77 per share.

(C)   [Then] PDI attempted to increase . . . Ceftin's market share . . . in the first quarter of 2001 by promoting the drug [in the fashion later disapproved] by . . . FDA, even though there was no substantial evidence that the drug was effective [in the fashion advertized by PDI].

Compl. ¶¶ 24-26.  None of these allegations, however, presents a claim cognizable under the securities laws.

Plaintiffs' claim (A) is based on facts contradicted by the documents upon which Plaintiffs rely for their information, and which indicate that, in November of 2000 (before the beginning of the Class Period), Defendants disclosed that GSK's patent of Ceflin tablets was expiring in 2003, while GSK's patent of Ceflin suspension was expiring in 2008.  Defendants repeated this disclosure in March of 2001.  See Mot., Exs 18-19.  Since, contrary to Plaintiffs' allegations, Defendants did not conceal true information, Plaintiffs' claim (A) will be dismissed for failure to plead fraud.  Plaintiffs' claims (B) and (C) are similarly insufficiently pled since Plaintiffs failed to set forth any nexus between PDI's sales aggressive techniques *aimed at the distributors* who were purchasing Ceflin from PDI and the alleged injuries suffered by investors.[12]  See Glickman, 1996 U.S. Dist. LEXIS 2325, at *36.  Thus, Plaintiffs' claims (B) and (C) related to the Ceftin Contract and based on Defendants' contemporaneous or previous actions will also be dismissed.

Plaintiffs' remaining four claims related are based on Defendants' forward-looking projections.[13]  These claims are likewise insufficiently pled.  First, Plaintiffs assert that,

_____

[12]

Moreover, any PDI's "inducing," "pumping" or "promoting" marketing techniques called into question by Plaintiffs took place before the beginning of the Class Period and, under the Efficient Capital Market Hypothesis, could not have caused any injury to the investors because the information was long available to and absorbed by the market as of the first day of the Class Period. See Basic, 485 U.S. 224; Hayes, 982 F.2d 104.

[13]

In addition to being expressly qualified by Defendants as "forward-looking," see, e.g., Mot., Ex. 7, all Defendants' projections challenged by Plaintiffs with respect to the Ceftin Contract were paraphrased in language unambiguously indicating that these statements were forward-looking and, therefore, will be examined by this Court as such. See Clorox Co. Secs. Litig., 238 F. Supp. 2d 1139, at *16.

**Page 25 of  64**

> [f]ollowing the FDA [order ] to stop distributing [the promotional] materials, Ceftin's share of [the antibiotic] market declines. [However,] in the second quarter of 2001, the Company [increased] Ceftin's sales by announcing [that] a price increase [would] take effect in the beginning of July, which induced distributors to increase their Ceftin inventories in advance [and] added $0.13-$0.20 per share to the Company's reported earnings.

Compl. ¶ 28. Plaintiffs maintain that Defendants' announcement was made with intent to deceive the investors. See id. This claim is not sufficiently pled in that it fails to show a nexus between PDI's pricing policies disseminated among the distributors purchasing Ceftin from PDI and PDI's alleged fraud on the market. See Glickman, 1996 U.S. Dist. LEXIS 2325, at *36. Indeed, Plaintiffs --being investors in PDI stock--could not have been defrauded by or relied upon PDI's announcement that PDI would increase Ceftin's prices in July of 2001. Plaintiffs' pleading (based on the alleged "ripple-effect" of Defendants' marketing techniques, which, allegedly, affected Ceftin distributors' purchasing behavior, which, in turn, impacted the level of demand for Ceftin during the second quarter of 2001, which, in turn, raised PDI's revenue which, in turn, affected PDI's stock prices, which, in turn, created an incentive for Plaintiffs to purchase PDI's stock) is unduly speculative and fails to provide this Court with the nexus required by the securities laws. See Digital Island Sec. Litig., 357 F.3d at 328 (citing Rockefeller Ctr., 311 F.3d at 224 ) ("The Reform Act requires a 'strong inference' of scienter, and accordingly, alters the normal operation of inferences under Rule 12(b)(6). . . . [P]laintiffs in securities fraud actions . . . may not benefit from inferences flowing from vague or unspecific allegations . . . .").

Next, Plaintiffs assert the following:

"In August 2001, [after] the Federal Circuit decision [allowed marketing of] generic version of Ceftin . . . , [D]efendants conceded . . . that this decision would reduce the profitability of the Ceftin contract.  However, [Defendants] assured investors that reduced profits were the "worst-case scenario" for the Ceftin contract, . . . and the Company could avoid losses by terminating the contract. . . . [T]he representation concerning contract termination was false, as [D]efendants knew that termination of the Ceftin contract would cost the Company millions of dollars in write-offs of capitalized contract acquisition costs, continued liability for sales returns and the costs of administering Medicaid rebates, and significant costs related to the retention of hundreds of sales and marketing personnel whose assignment ended with the termination of the Ceftin contract. . . . Defendants did not publicly disclose the fact that PDI would incur these costs if the Company terminated the Ceftin contract until November 13, 2001.

Compl. ¶¶ 25-28, 30, 32.  This lengthy and ambiguous chain of allegations appears to combine three separate claims, since Plaintiffs' Complaint also asserts as follows:

(A)     On August 14, 2001, . . . Defendants participated in a conference call regarding the Company's results for the second quarter of 2001 . . . [D]efendants explained that the Company would likely earn $0.20 per share less than previously forecasted for the third quarter due to a Ceftin inventory glut at distributors . . . . Defendants' statements . . . were materially false and misleading when made because . . . Ceftin sales were unlikely to increase given the glut of inventory at the distributor level.

(B)     [Contacting the investors through] August 23, 2001 . . . press release [and] August 24, 2001 conference call, Saldarini stated that

        (1)     the Company was expecting Ceftin to contribute $0.30-$0.40 earnings per share in the fourth quarter of 2001 [and] $0.30 . . . in 2002. [This prediction was false because of the decline of Ceftin's market share from 10.8% to 10.7% during the first and second quarters of 2001, and also because] PDI had never increased Ceftin's market share, except when [PDI had unlawfully promoted the drug, or artificially inflated [the] sales [by announcing the price increase; and]

        (2)     the earnings reductions were the "ugliest scenario" [that could occur if the Ceftin Contract was terminated.  This prediction was false and misleading because the usage of term "ugliest scenario" indicated that PDI intentionally] failed to disclose that the termination of the Ceftin contract . . . would cause PDI [substantial] expenses.

Compl. ¶¶ 62-63, 65, 68-69 (referring to ¶¶ 24, 26-28, 30, 40-41, 61) .

While Plaintiffs maintain that their claim (A) indicates that Defendants made a fraudulent projection, Plaintiffs' claim fails to allege any falsity on the part of Defendants. Defendants' projection that "the Company would likely earn . . . less than previously forecasted . . . due to a Ceftin inventory glut at distributors," id. ¶ 62, the projection is entirely coherent with Plaintiffs' claim that "Ceftin sales were unlikely to increase given the glut of inventory at the distributor level." Id. ¶ 63. Since Plaintiffs' claim (A) fails to allege any fraud on the part of Defendants, the claim will be dismissed. See Chiarella, 445 U.S. at 234-35.

Plaintiffs claim in (B)(1) similarly fails to plead fraud adequately. According to Plaintiffs, Defendants' projections of an increase in earnings per share had to be false because the Ceftin's market share had been declining prior to Defendants' projections. The decline of the Ceftin's market share, however, does not render Defendants' projections necessarily false. The amount of a good demanded is presumed to be steadily increasing (except for goods that become obsolete) since market economies like the United States are presumed to increase their "economic pie."[14] See A. Michell Polinsky, An Introduction to Law and Economics ("Introduction Economics") 7 (2d ed. 1989). The concept is referred to as Pareto efficiency, which implies that the societal purchasing power, as a whole, increases, since the society can increase at least one individual's slice of the pie, without making any other individual worse off. See Emilio Barucci, F. Barucci, and E. Barucci, Financial Markets Theory: Equilibrium, Efficiency and Information 8 (2002); George Cohen,

---

[14]

The concept of "economic pie," the term roughly equated with the "accumulated wealth of a nation," is derived from Adam Smith's "Inquiry into the Nature and Causes of the Wealth of Nations," the famous study that gave birth to the discipline of economics. See, e.g., Ellen Byers, Corporations, Contracts, and the Misguiding Contradictions of Conservatism, 34 Seton Hall L. Rev. 921 (2004).

Posnerian Jurisprudence and Economic Analysis of Law: The View from the Bench, 133 U. Pa. L. Rev. 1117, 1120 (1985).  The concept implies an increase of the societal buying power instead of keeping this buying power at the zero-sum gain, meaning that  the economic pie is continuously and infinitely increasing, that is, factoring out temporary fluctuations caused by unfavorable periods in the business cycle.[15]   See Introduction Economics 7.

To illustrate, if the total market for prescription drugs during the fiscal period One equals 1 billion dollars, and cephalosporin antibiotics constitute, for example, 0.1% of the total market, with Ceftin holding, for example, 1% market share of all cephalosporin antibiotics (i.e., 0.001% of the total market, or 1 million in dollar value) but, during the fiscal period Two, the total market increases 1%, while the market share of Ceftin drops 1% (thus, becoming 0.00099% of the total market), the dollar value of such reduced Ceftin's market share during the fiscal quarter Two becomes $1,009,800, meaning that the revenue increases by $9,800 (allowing for an increase in earnings per share), even though Ceftin's market share declined.  Since the prescription drug market in the United States has been continuously increasing, see, e.g., Pharmaceuticals - North America, Factiva, a Dow Jones and Reuters Company (May 1, 2006) (stating that, in 2005, "the US continued [its] record solid growth in prescription drug sales [being] the world's largest market, [and the sales grew] to $251.8 billion . . . from $239.8 billion in 2004," i.e., 5%), Ceftin's one-tenth of one percent decline in its market share could not possibly constitute a fact that, in August of 2001, Defendants knew that

---

[15]

The term "business cycle" (or "economic cycle") refers to the periodic fluctuations of economic activity about its long term growth trend. The cycle involves shifts over time between periods of relatively rapid growth of output ("recovery" and "prosperity"), alternating with periods of relative stagnation or decline ("contraction" or "recession").  See Michael Baye, Managerial Economics and Business Strategy ("Economics") 130 (4th ed. 2002).

Ceftin's earnings per share would not grow by the fourth quarter of 2001.  Since Plaintiffs' claim ignores the possibility that a decline in market share could still result in an increase in earnings per share, and that Defendants could legitimately factor such increase in Defendants' projections (or sincerely believe that PDI could "turn the tide" and increase Ceftin market share through a skillful marketing), Plaintiffs plead not a fact but a speculation insufficient to meet the requirements set forth by the Reform Act.[16]  See GSC Partners CDO Fund, 368 F.3d at 239; Read-Rite Corp. Sec. Litig., 115 F. Supp. 2d 1181.  Therefore, Plaintiffs' claim in (B)(1) will be dismissed.

Plaintiffs' claim in (B)(2) is also insufficiently pled.  Plaintiffs asserts that Defendants' prediction about the "ugliest scenario" was false because the prediction necessarily meant that PDI could avoid any losses if the Ceftin Contract was terminated.  Compl. ¶ 32, 69.  However, neither Defendants' August 23 nor August 24 statements included such a prediction.[17]  The August 23 press release merely *listed six of PDI's business options*, briefly summarizing them as follows:

_____

[16]

Moreover, Plaintiffs' claim in (B)(1) fails to plead fraud adequately because Plaintiffs make an assertion contradicting the events set forth elsewhere in Plaintiffs' Complaint.  Specifically, Plaintiffs claim that PDI *never* increased Ceftin sales "lawfully" and, therefore, was not likely to increase it in the future.  This claim directly contradicts Plaintiffs' other statement that Ceftin's sales *were indeed increased* during the fourth quarter of 2000 (due to the rise in demand attributed to the fall-winter "flu season") without any marketing tactics that Plaintiffs could qualify as "unlawful."  See Compl. ¶ 26.  Hence, it appears to this Court that Plaintiffs accuse Defendants of committing fraud because Defendants did not describe some of Defendants' more aggressive marketing techniques as "unlawful."  See id. ¶¶ 26-28, 69.  The Court, however, is aware of no securities law (and Plaintiffs enlighten this Court about none) requiring Defendants to use any self-degrading or self-demeaning adjectives when Defendants disclose their marketing tactics to the investing public.  See Ash v. LFE Corp., 525 F.2d 215, 220 (3d Cir. 1975) ("[What matters] is the objective sufficiency of the disclosure").

[17]

Defendants' August 23 and August 24 statements contained neither the phrase "avoid *losses*" nor any other phrase that the Court could perceive as interchangeable, in its meaning, with avoidance of losses.  See Mot., Exs. 6, 7.

> PDI has had preliminary discussions with GSK [and GSK is still] exploring . . . all . . . measures to [prevent introduction of generic competition to the market].  Given the uncertainties surrounding the entry of a generic [equivalent to] tablets . . . and the uncertainty of the impact. . . PDI is . . . evaluating its current options.  These options include [(a)] termination [of the Ceftin Contract]; [(b)] assessing [the marketing] strategies [for each form of Ceftin] individually; [(c)] evaluating Ceftin pricing scenarios; [(d)] assessing demand creation opportunit[ies] . . . ; [e)] assessing cost reduction measures; and [(f)] evaluating the impact of the purchase minimum reset provisions . . . .

Mot., Ex. 6.  On August 24, referring to financial implications of *any one of these options*, PDI told investors that "PDI expect[ed] a severe impact on net revenues and profitability," id., but refused to detail any other negative aspect of these options.  Saldarini expressly stated that:

> [t]he Company's. . . future business decisions [would be] difficult or impossible to predict, and many of which [would be] beyond the Company's control. [As of August 24, 2001, PDI was] prepared [to continue the Ceftin Contract and] accept a reduced profit. . . in exchange for sustaining [the market] platform that [PDI had] created [since] it's important in terms of the [business] model that [PDI has been] building. . . . [Hence,] while [PDI] own[s] the right to terminate, [PDI would be still] examining that right . . . and ha[d not] made any firm [decisions] yet. . . . [Any] conclusions regarding [the above-listed] options [would be provided] later in the year [when PDI would be] able to give additional updates [about] those options. . . .  [When PDI] finalize[s] and put[s] together [its] full . . . picture [PDI would] obviously get back to [the investors] with additional guidance.  [Depending whether the generic equivalent is introduced only as tablets or as tablets and suspension, PDI would] re-examine [the above-listed options] again. . . . If [PDI decides] to deal exclusively with suspension, [PDI] would need to renegotiate . . . with GSK in that regard, and [PDI had not yet] approached GSK on that issue. . . . [PDI] would get back to [the investors] with more guidance if [PDI thinks one particular option would] materialize.

Mot. Ex. 7.  In addition, Saldarini indicated that, under any one of the above-listed six options, PDI anticipated a negative financial impact.  Saldarini stated that

> [PDI's Ceftin] inventory levels [were] high in anticipation of flu season [and, due to introduction of the generic equivalent,  PDI was] not expecting any . . . sales [except for those pre-arranged] during the third quarter [of 2001.  Moreover, PDI would not be] making[,] in the third quarter[,] any changes in sales force deployment. . . . [PDI's Ceftin team] ranges between 125 and 175 full-time [employees and] the . . . team [of] 100 to 125.

Id.

Thus, Defendants' August 23 and 24 statements were not incompatible with the possibility of PDI's future losses since these statements, while unambiguously predicting that (1) revenues were to drop, (2) inventories would substantially exceed the demand, and (3) workforce might be idled, did not address either the issue of "losses" or the extent of such losses with respect to *any* one of these six options.  See id.  Defendants expressly stated that such disclosure would be proper only when the election is made.  See id.  Since Plaintiffs' claim (B)(2) fails to plead fraud sufficiently, this claim will be dismissed.  See Rockefeller Center, 311 F.3d at 224 ("'[The Court will] disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute'") (quoting Green Tree Fin. Corp., 270 F.3d at 660).

In their final set of claims related to the Ceftin Contract, Plaintiffs assert that Defendants were motivated by Defendants' desire to prevent "the negative effect [which the disclosure of losses associated with the termination of the Ceftin Contract] would have on the Company's stock" and, therefore,  Defendants must have fraudulently concealed such losses in order to deceive the investors. Compl. ¶ 64.  Plaintiffs' allegations, however, consist of nothing but Plaintiffs' bold assertions and, therefore, are insufficient to meet the stringent pleading requirements of the Reform Act.  Moreover, the fact that Defendants did not sell a single share of their own stock during the Class Period effaces Plaintiffs' assertions about Defendants' motives.  This Court fails to perceive what possible *concrete and personal* benefits Defendants were trying to obtain by fraudulently inflating PDI's stock price if Defendants were not selling their shares.  See Novak, 216 F.3d at 311; see Wilson, 195 F. Supp. 2d at 633 ("Motive entails allegations that the individual corporate defendants stood to gain in a concrete and personal way from one or more of the allegedly false or misleading statements and wrongful nondisclosures").  "If [this Court] were to conclude that

[Defendants] meant to defraud investors, [the Court] would have to believe that they did so for the sheer joy of it rather than for profit."  <u>SEC v. Steadman</u>, 967 F.2d 636, 642 (D.C. Cir. 1992).

In sum, the Court finds that Plaintiffs failed to allege any factual predicate indicating that Defendants's contemporaneous acts caused Plaintiffs' injuries or that Defendants knew their projections related to the Ceftin Contract were false and misleading and/or intended to defraud investors.  Consequently, all Plaintiffs' claims related to the Ceftin Contract will be dismissed.


**B.    *LOTENSIN CONTRACT***

**1.    Context**

On May 22, 2001, the first day of the Class Period, PDI announced that it had entered into its second performance-based contract.  This contract was with Novartis Pharmaceutical Corporation ("Novartis") and provided for PDI's exclusive rights to marketing, promotion and sale of Lotensin, a drug used for treatment of hypertension ("Lotensin Contract").  <u>See</u> Compl. ¶¶ 37, 39, 59; Mot., Ex. 22.  The Lotensin Contract had a two-and-half-year term and, under the contract, PDI stood to receive "a split of incremental net sales above specified baselines."  <u>See</u> Compl.¶ 39; Mot., Ex. 22. Upon entering the Lotensin Contract, PDI advised the investing community that, "[i]n the event [PDI's] estimates of the demand for Lotensin [were] not accurate[,] or more sales and marketing resources than anticipated are required, the [Lotensin Contract] could have a material adverse impact on [PDI's financial] results."  Mot., Exs. 12, 14, 23.

### 2. Plaintiffs' Challenges

Plaintiffs challenge thirteen forward-looking and contemporaneous statements that Defendants made in connection with the Lotensin Contract. These statements were made on the following six dates: May 22, 2001, August 14, 2001, November 12, 2001, November 13, 2001, February 20, 2002 and May 14, 2002, see ¶¶ 59, 62, 71, 77, 79, 81, 85, 87, and will be examined by this Court chronologically.

### a. *May 22, 2001*

According to Plaintiffs, Defendants made false and misleading statements when,

[o]n May 22, 2001, [PDI] held a conference call with securities analysts to discuss and answer questions regarding the contract with Novartis for distribution of Lotensin. During the conference . . . , Saldarini represented that[,] although startup costs related to the Lotensin [C]ontract, such as training and promotional costs, would likely depress earnings for the second and third quarters [of 2001, i.e., the first and second quarters of the Lotensin Contract], the [C]ontract would generate (a) substantial earnings of $0.25 per share to its fourth quarter of 2001 [i.e., the third quarter of the Lotensin Contract]; (b) revenues of $225 to $250 million from 2001-2003 [i.e., through the life of the Lotensin Contract]; and (c) operating income of $45 to $62.5 million over the same period[,] with an operating profit margin of 20 to 25%.

Compl. ¶ 59. It appears from this statement that Plaintiffs challenge two groups of Defendants' projections as materially false and misleading:[18] (1) those related to earnings per share expected during the last quarter of 2001; and (2) those related to revenues, operating income and operating profit margin expected during the remainder of the Lotensin Contract. Plaintiffs assert that the nine facts discussed below verify that Defendants knew their projections were materially false and misleading. Id. ¶¶ 40-41, 43, 45, 59-60, 73, Opposition at 23-27.

---

[18]    All Defendants' statements challenged by Plaintiffs with respect to the Lotensin Contract were either expressly identified as--or paraphrased in the language unambiguously indicating that these statements were--forward-looking. See Clorox Co. Secs. Litig., 238 F. Supp. 2d 1139, at *16.

As a key factual predicate for Plaintiffs' claim that Defendants' projections were false and misleading Plaintiffs offer the fact that Defendants did not disclose the Lotensin baseline. According to Plaintiffs, the fact of such nondisclosure indicated that "Defendants did not expect the Lotensin [C]ontract to produce *any* profit" but wished to conceal this fact from investors. Opposition at 23 (emphasis in original). The claim, as pled, fails to assert a violation of the securities laws since Defendants did not have any obligation to disclose the baseline.[19]  See Oran, 226 F.3d at 286-87 (quoting Basic, 485 U.S. at 239 n.17, and citing Burlington, 114 F.3d at 1432). Therefore, Defendants' silence cannot serve as an indication of what Defendants knew or did not know, including whether the Lotensin Contract would or would not be profitable.[20]  See Chiarella, 445 U.S. at 235. Indeed, if this Court were to find otherwise, any corporation not detailing every aspect of the corporation's agreements with its clients would be presumed to know that these agreements are unprofitable, and such presumption would render most of United States businesses permanently involved in unprofitable contracts.

---

[19]

Plaintiffs assert that Defendants had the duty to disclose the baseline because Defendants "chose[] to speak about the Lotensin contract, including representations that PDI would earn 'substantial' revenues and profits," and that reference to "revenues and profits" created a duty to disclose the baseline. Opposition at 28.

Plaintiffs err. Defendants' belief that PDI would exceed the baseline did not require Defendants to execute such disclosure. The duty to disclose a piece of information is created by either incidents of insider trading or by a statute, or by a previous statements containing an *incorrect* piece of information (e.g., containing a *wrong* baseline or qualifying it as "low") and, thus, requiring a correction. See Oran, 226 F.3d at 286-87. Neither one of these three scenarios is applicable to the case at bar. The mere fact that Defendants disclosed their expectation with respect to PDI's revenues and profits cannot qualify as a "false" previous information requiring a corrective disclosure.

[20]

Plaintiffs' Complaint does not allege that PDI had the practice of disclosing any specific details of PDI's contracts with any client to the investing community. See generally, Compl.

Plaintiffs then allege that PDI knew about the falsity of PDI's predictions with respect to the fourth quarter of 2001 because

(A)    [a]t the inception of the Lotensin [C]ontract, . . . PDI encountered significant difficulties in training sales representatives and obtaining training and marketing materials, [and] Defendants [had to be] aware that these initial problems would . . . adversely impact PDI's short-term ability to increase Lotensin sales.

(B)    On November 13, 2001, [when D]efendants disclosed that . . . the Lotensin [C]ontract . . . produce[d] a loss . . . , [D]efendants blamed th[e] . . . disparity on delay in completing market research and the preparation of marketing materials.

Compl. ¶¶ 41-42, 61.  Plaintiffs assert that these post-May 22 facts indicate that Defendants knew on May 22 that their predictions with respect to any profit from the Lotensin Contract were false. Plaintiffs, however, fail to plead any facts indicating that, as of May 22, Defendants knew about the upcoming problems and how these problems would affect PDI's profit.  Since Defendants' May 22 statements were made a few days after the Lotensin Contract was executed and long before PDI could become aware of the training and marketing difficulties that lay ahead, Plaintiffs offer nothing but their conjecture in support of Plaintiffs' claim with respect to Defendants' May 22 state of mind.[21]  Such pleadings are, however, insufficient.  See NAHC, Inc. Sec. Litig., 306 F.3d at 1330 ("To be actionable, a statement . . . must have been misleading at the time it was made") (citing Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d at 586).  The fact that in November of 2001, six months after the May 22 conference, Defendants acknowledged the problems, which arose during the first few months of the Lotensin Contract, does not show that Defendants falsified their vision of the future

---

[21]

Moreover, Plaintiffs' allegations contradict Plaintiffs' own statement that "PDI deemed the retention of qualified salespersons . . . critical" to PDI's success and, therefore, always kept an ample pool of trained sales professionals.  Compl. ¶ 61.  The presence of such ample pool of sales professionals on May 22, 2001, at the outset of the Lotensin Contract, suggests that PDI could not anticipate the upcoming problems related to training of the sales force.

in May of 2001.  See Suprema Specialties, Inc. Sec. Litig., 334 F. Supp. 2d at 647 ("Allegations

that a company's later financial difficulties imply that earlier financial statements were untrue or

misleading are 'fraud by hindsight' and do not state a claim"); Harris, 998 F. Supp. at 1455

("hold[ing] up Defendants' predictions against the backdrop of what actually happened" is

insufficient to establish scienter), aff'd, 182 F.3d 799, reh'g, en banc, denied, 209 F.3d 1275.

In the alternative, Plaintiffs' allege that PDI's projections with respect to the fourth quarter

of 2001 were known to be false and misleading since, in Plaintiffs' opinion,

> Defendants knew that the Lotensin [C]ontract would ultimately be unprofitable because . .
> . PDI's sole compensation for its marketing efforts was a split of net Lotensin sales over a
> baseline amount . . . set at a level that would cause PDI to lose money . . . throughout 2001
> [unless] PDI would [be able]  to increase Lotensin sales by another $10 million in the quarter
> . . . boost[ing] sales by an additional 13% [and the increase in Lotensin sales actually
> achieved during the fourth quarter of 2001 was not that high].

Id. ¶ 41.

However, the sole fact that, six-to-nine months prior to the fourth quarter, Defendants failed

to foresee that the sales would not climb above 13% (an increase certainly not unthinkable) cannot

qualify as a fact indicating that, as of May 22, 2001, "Defendants knew that the Lotensin [C]ontract

would ultimately be unprofitable." See Grossman, 120 F.3d at 1124 ("[I]t is clearly insufficient for

plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood")

(quoting GlenFed Sec. Litig., 42 F.3d at 1548-49); Boston Tech. Sec. Litig., 8 F. Supp. 2d at 53 ("A

general averment that defendants made a statement knowing at the time what later 'turned out badly'

does not suffice").

The fifth fact that Plaintiffs offer in support of their claim is part calculation and part Plaintiffs' opinion.  Plaintiffs state that, although Saldarini projected earnings of $0.25 per share to the fourth quarter of 2001, i.e., during the third quarter of the Lotensin Contract, on May 22, 2001, Defendants falsified their projections because,

> [t]o achieve the $0.25 earnings per share forecasted by [D]efendants, PDI needed to increase Lotensin sales by over 30%, which [Plaintiffs believe] was not reasonably possible after only a few months of promotional activity . . . in a crowded highly competitive market.

Id. ¶ 41-42.  However, PDI never promised these $0.25 earnings.  As the very document upon which Plaintiffs rely reveals, Saldarini announced the anticipated earnings from Lotensin of merely $0.10 per share for the fourth quarter, see Mot., Ex. 3, a moderate figure indeed.  Moreover, Plaintiffs concede that "Lotensin's share of the . . . market had increased by the fourth quarter of 2001," Compl. ¶ 41, although Defendants' efforts did not generate the earning per share which Defendants anticipated in May of 2001.  The difference between Defendants' projections and the actual outcome cannot amount to a fact verifying Defendants' May 22 knowledge that their projections were false and misleading. See Wielgos, 892 F.2d at 514 ("If all estimates are made carefully and honestly, half will turn out too favorable to the firm and the other half too pessimistic. . . . . [T]he firm is not liable despite error").

Finally, Plaintiffs proffer the following four facts with respect to PDI's Lotensin projections for 2002-2003 as indicators that Defendants knew their 2002-2003 projections were false:

(A)   [At the time of the May 22, 2001, conference call,] there were at least five [substitute goods on the market] with larger market shares than Lotensin, and Lotensin's share of that market was declining.

(B)   [At the time of the May 22, 2001, conference call, t]here was no new data or other information demonstrating any previously unknown advantage of Lotensin over competing [substitute goods].

(C)     [O]n May 23, 2001, WR Hambrecht & Co. published an analyst report based on [D]efendants' announcement during a conference call on May 22, 2001 . . . . In the report, analyst[s] Josh Fisher and Rosemary Wang [entered their opinion that] PDI's main goal with Lotensin [would] be to try and slow-down its market share deterioration.

(D)     Plaintiffs' own opinion that Defendants' knew their predictions were false.[22]

Compl. ¶¶ 40, 43, 60.

     None of these assertions provides Plaintiffs with a properly pled factual support.  The fact

that there were five substitute goods rivaling Lotensin does not show that Defendants knew their

---

[22]

     Plaintiffs' opinion is termed as an assertion that Defendants knew about PDI's inability to achieve "revenues of $225 to $250 million from 2001-2003; and . . . operating income of $45 to $62.5 million over the same period with an operating profit margin of 20 to 25%." Compl. ¶ 60.
     It shall be noted that Plaintiffs' reading of Defendants' statement is incorrect.  Defendants' statement was silent as to PDI's *operating profit margin*.  See Mot., Ex. 3.  Rather, Defendants stated that PDI's *operating profit*, a concept different from that of operating profit margin, would be 20 to 25% of revenue.  See Mot., Ex. 3. The term "operating profit margin" means revenue after subtracting such items as cost of sales, general and administrative expenses, sales and marketing expenses, research and development expenses, depreciation of property, plant and equipment and any other recurring non-financing expense associated with a company's ongoing operations.  See Introduction at 153; Charles Horngren, Gary Sundem, John Elliott, Introduction to Financial Accounting ("Introduction") 757 (8th ed. 2002); see also Economics at 554.  "Profit margin" is an the entirely different term, and it means "a measure of profitability" calculated as net income divided by revenue. See Jamie Pratt, Financial Accounting in an Economic Context ("Financial Accounting") 761 (6th ed. 2005).
     Plaintiffs, however, do not explain how the revenue and operating profit figures indicate that Defendants knew these figures were unattainable, especially in view of the fact that Defendants, having no previous negative experience with Lotensin, were making a prediction of financial performance for the next *two and a half years*.  Conversely, Saldarini's projection of $225 to 250 million for the remainder of the Lotensin Contract appears to be an expression of Defendants' sincere belief in view of Saldarini's other statement, namely, that PDI anticipated about $30 million in revenue for the last quarter of 2001. See Mot., Ex. 3. This Court's quick assessment suggests that these statements are coherent.  Since the Lotensin Contract was to run until December 31, 2003, see Mot., Ex. 22, and the years 2002 and 2003 presented eight fiscal quarters, $30 million by 8 gives $240 million, suggesting that Saldarini factored in $15 million downward and $10 million upward variance to account for possible fluctuations of the expected Lotensin market.

projections were false and misleading.[23]   Most goods in the United States market have rival substitutes, but it does not prevent these goods from staying in and even winning the competition. Similarly, the fact that Lotensin market share was declining prior to the Lotensin Contract does not show that Defendants knew their projections were false and misleading since the *declining market share* does not necessarily indicate *decline in revenue*.[24]   See supra this Opinion at pp. 28-29. Therefore, the state of the competition in the market of hypertension drugs existing as of--or prior to--May of 2001 cannot serve as a sufficiently  pled fact indicating that Defendants knew their predictions for the next two years were false.   See Digital Island Sec. Litig., 357 F.3d at 328.

Plaintiffs' reliance on WR Hambrecht's analyst report is even more inexplicable.  According to Plaintiffs, the "analyst[s'] report [was] *based on [D]efendants' announcement* during a conference call on May 22, 2001."   Id. ¶ 43 (emphasis supplied).  However, using the very same information from PDI that Plaintiffs had, the analysts predicted a much more somber picture than that referred

---

[23]

One kind of good is said to be a substitute good for another kind insofar as the two kinds of goods can be consumed or used in place of one another in at least some of their possible uses, e.g., margarine and butter, or petroleum and natural gas.  See Economics 125.  (One good is a perfect substitute for another only if it can be used in exactly the same way, at exactly the same cost, and with exactly the same quality of outcome; that is, when there is no particular incentive for a customer to prefer one over the other.  See id.)  The concept of "substitute goods" is related to the concept of "demand."  The latter stands for economic want backed up by purchasing power, i.e., it is an estimated amounts of a certain good buyers are willing and able to buy at all possible prices, assuming all other non-price factors remain the same.  See Economics 34-35, 238-40. When more people want a good because of a change in buyers' tastes or needs, the quantity of the good demanded at all prices and in all substitutable forms will tend to increase.  For instance, during cold weather, when more people suffer from colds, demand for all types of cold medicines increases.  See id. at 35-39, 87-92.

[24]

Moreover, the declining market share of Lotensin *prior* to PDI's agreement with Novartis is of little relevance to the inquiry at bar since PDI could believe that it could "turn the tide" and increase Lotensin market share through skillful marketing campaigns, creation of original custom services, introduction of various incentives and a whole panoply of other marketing techniques.

to by Plaintiffs.  Plaintiffs' subjective interpretations of that information does not show that the picture painted by Saldarini was false.  See Basic, 485 U.S. 224.  Moreover, it is not immediately obvious to this Court how Plaintiffs can simultaneously assert that Defendants' statements: (1) were unduly optimistic, (2) served as a basis for the somber findings made by the analysts, (3) contradicted these very findings, and (4)  misled Plaintiffs who were availed to the entire mosaic of representations, including both the analysts' report and PDI's statements, all existing on the market simultaneously under the Efficient Capital Market Hypothesis.

Finally, in addition to their reliance on the nine facts discussed above, Plaintiffs maintain that Defendants' knowledge of the falsity of their May 22 statements is evident from three facts which indicate that Defendants had a motive to defraud the investing community.  First, Plaintiffs allege that PDI entered into the Lotensin Contract so it could preserve the employ of 500 to 600 sales representatives (who became idle when the GSK Contract was terminated) and--after PDI did so without regard to the losses that Defendants knew would ensue from the Lotensin Contract--PDI kept falsifying its financial projections in order to conceal PDI's true motive from investors.  Id. ¶ 34.

Plaintiffs' allegations defy logic since it would have been anomalous for Defendants, PDI's top executives and holders of 40% of the Company, to enter a "losing" contract in order to temporarily preserve the jobs of 500-600 employees because doing so would create a grave risk to Defendants' own investment and employ and still leave these 500-600 employees unemployed as soon as the Lotensin Contract proved unprofitable.  Moreover, Plaintiffs offer no facts indicating that the very employees idled by termination of the GSK Contract were the ones actually assigned to the Lotensin Contract. Conversely, it appears that the workforce assigned to the Lotensin Contract was different from the GSK one since GSK employees were trained as a result of the GSK Contract, see

Page 41 of  64

Compl. ¶ 34, while the training of Lotensin sales force required, according to Plaintiffs, four months. Moreover, Plaintiffs' assertions that PDI's desire to retain its trained employees must mean that the Lotensin Contract was a "losing" one is nothing but Plaintiffs' conjecture since the facts are merely that: (A) the ex-GSK employees[25] were not laid off; and (B) PDI invariably adhered to the industry practice of keeping qualified employees during the periods of slowdown.  See Compl. ¶¶ 30, 34; Mot., Ex. 3. Plaintiffs fail to provide any nexus between PDI's retention of qualified employees and the alleged fraudulent concealment of the fact that the Lotensin Contract was meant to be a "losing" one.  See Glickman, 1996 U.S. Dist. LEXIS 2325, at *36; cf. Rockefeller Ctr., 311 F.3d at 224; Mortensen, 123 F. Supp. 2d 1018; Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194.  Plaintiffs' assertion that PDI's adherence to a common business practice indicates that Defendants wished to defraud investors similarly fails to plead a fact meeting the requirements of the Reform Act.[26]  See GSC Partners CDO Fund, 368 F.3d at 237; San Leandro, 75 F.3d at 814; Tuchman, 14 F.3d at 1068; Nice Sys., Ltd. Secs. Litig., 135 F. Supp. 2d at 584;  Boeing Sec. Litig., 40 F. Supp. 2d at 1175.

Plaintiffs also assert that PDI had a motive to deceive the investors because PDI "apparently intended [to be] a loss leader in the hope of obtaining future profitable business from Novartis."  See

---

[25]

Although PDI's sales force was contracted rather than permanently employed, this distinction, however, is irrelevant to the analysis conducted by this Court, and the Court refers to these sales representatives as "employees."

[26]

Corporate executives are frequently asked to manage and monitor economic business cycles to gain a competitive advantage. See Economics 51, 466-92.  In modern business, effective business-cycle management often involves programs aiming to prevent layoffs during the period of recession (be it that of the nation or of the industry), since the firms know that, as soon as the economy starts to recover or the industry's business picks up, any apparent labor savings obtained from layoffs would be obliterated by the process of hiring and retraining new employees. See, e.g., Peter Navarro, How To Avoid A Business-Cycle Wipeout; CIOs Play an Integral Role in Helping Their Companies ride the Economic Cycles, Fin. Mgt. at 59 ( June 1, 2006).

Compl. ¶¶ 44-45, 61.  This claim is also insufficiently pled.  In support of this claim, Plaintiffs rely

on Saldarini's later statement (made during November 13, 2001) that "the Lotensin [C]ontract was

a 'long-term strategic opportunity'" for PDI, id. ¶ 45, and offer Plaintiffs' opinion that the usage of

the phrase "long-term strategic opportunity" must mean that PDI always knew that the Lotensin

Contract would be "unprofitable."  See Opposition at 28-29 (citing to Compl. ¶¶ 46, 87, 89).

However, Plaintiffs' reading of ulterior motives into Defendants' garden variety phrase "long-term

strategic opportunity" is pure speculation rather than a fact cognizable under the Reform Act.[27]  See

Digital Island Sec. Litig., 357 F.3d at 328.

Plaintiffs' last allegation, namely, that PDI had a motive to deceive the investing public

because PDI "was attempting to procure contracts for its services with other pharmaceutical

companies[, and] disclosing that the terms of the Lotensin Contract were unprofitable for PDI would

likely cause the companies with whom PDI was negotiating to demand similarly unfavorable

contractual terms," id. ¶ 44, is even more puzzling than the preceding ones.[28]  See Burlington, 114

F.3d at 1417 (plaintiff must allege actual facts that defendant acted with scienter); San Leandro, 75

F.3d at 808.  Plaintiffs' interpretation of the fact that PDI did not intimate the terms of PDI's

---

[27]

Moreover, Plaintiffs' claim that PDI, by entering into the Lotensin Contract, was hoping to impress Novartis with PDI's selling abilities, see Compl. ¶ 87, contradicts Plaintiffs' claim that the Lotensin Contract was a losing one since it would be anomalous for PDI to hope that Novartis could be impressed by--or consider for a long-term future partnership--a marketing company consistently operating at loss.

[28]

The business logic of this claim directly contradicts the asserted business logic of Plaintiffs' "loss leader" allegations.  If, according to Plaintiffs, PDI was hoping to eventually win future lucrative contracts from Novartis by being a "loss leader" for Novartis, why would PDI avoid advertising PDI's willingness to be such "loss leader" in a similar hope to eventually win future lucrative contracts from other influential clients?

agreement with Novartis to other pharmaceutical manufacturers cannot transform PDI's practices into

a piece of evidence verifying that PDI had a motive to deceive the investors, especially in view of

Plaintiffs' failure to establish any nexus between PDI's nondisclosure of the terms of the Lotensin

Contract to the *pharmaceutical manufacturers* seeking PDI's future marketing services and PDI's

alleged fraud on the *investors*.[29]   See Glickman, 1996 U.S. Dist. LEXIS 2325, at *36**.**  Therefore,

the Court finds that all Plaintiffs' allegations based on Defendants' May 22, 2001, statements related

to the Lotensin Contract are not sufficiently pled and will be dismissed.

### b.      *August 14, 2001*

With respect to Defendants' August 14, 2001, conference call, Plaintiffs challenge

Defendants' prediction that PDI would meet its previous full-year 2001 projection to earn $2.30 per

share.  Specifically, Plaintiffs allege that, since these $2.30 projections "included [the] earnings of

$0.25 related to the Lotensin [C]ontract, [which] Defendants could not have reasonably expected to

achieve" for the reasons set forth in Plaintiffs' challenges associated with Defendants' May 22, 2001,

conference, Defendants knew that their $2.30 projections were false and misleading.  Compl. ¶¶ 62-

63 (referring to ¶¶ 40-45).  Following Defendants' pointing out that Saldarini projected $0.10 rather

than $0.25 earnings per share and that Plaintiffs' claim distorted the number by exaggerating it

250%, see Mot. at 12-14; Reply at 3, Plaintiffs paraphrased their original allegation into a claim that

Defendants falsely projected "[t]hat the Company would meet previously announced expected

earnings for the year 2001 of $2.30 per share, due to the expected strength of the fourth quarter."

Opposition at 23-24.  Plaintiffs' allegations, either as originally stated or as paraphrased, fail to allege

---

[29]

Plaintiffs' Complaint does not allege that PDI had a practice of advertising any terms of
PDI's agreement with one client to any other client.

any misrepresentation on part of Defendants.

As originally stated, Plaintiffs' claim that $2.30 projections were unreasonable because these projections included $0.25 earning per share has not been properly pled since the claim is (1) based on the incorrect $0.25 figure, <u>see</u> Compl. ¶¶ 40-45, 62-63; (2) employs an incorrect legal test of "reasonableness" instead of that of intentional misrepresentation, <u>see</u> 15 U.S.C. § 78u-5(c)(1)(B); and (3) presents nothing but Plaintiffs' conjecture not cognizable under the securities laws.  <u>See</u> <u>Rockefeller Center</u>, 311 F.3d at 224 .  As paraphrased, Plaintiffs' claim fails to allege any fraud since the claim is factually divorced from the context of the Lotensin Contract.  Saldarini's statement that PDI would meet the previously announced expected earnings due to expected strength in the fourth quarter were related to the *Ceflin* rather than *Lotensin* Contract.  <u>See</u> Compl. ¶ 62.  Therefore, Plaintiffs' allegations based on Defendants' August 14, 2001, statements related to the Lotensin Contract are insufficiently pled  and will be dismissed.

### c.    *November 12, 2001*

Plaintiffs assert that Defendants' November 12, 2001, press release was false because Defendants stated that Defendants were "continu[ing] to feel confident about Lotensin's ability to contribute positively to 2002 financial results." Compl. ¶ 71.  Plaintiffs' claim is insufficiently pled. Defendants' statement of confidence constitutes nothing but a permitted immaterial puffery. <u>See</u> <u>Advanta</u>, 180 F.3d at 538 (quoting <u>Burlington</u>, 114 F.3d at 1428 n.14); <u>see</u> <u>also</u> <u>ATI Techs., Inc. Sec. Litig.</u>, 216 F. Supp. 2d at 433. Consequently, Plaintiffs' claim based on Defendants' November 12, 2001, statement with respect to the Lotensin Contract will be dismissed.

### d.      *November 13, 2001*

During the November 13, 2001, conference call, PDI revised downward PDI's projection

with respect to Lotensin.  Specifically, Saldarini stated that PDI was projecting $50-60 million in

revenue from Lotensin during the entire 2002.  See Mot., Ex. 9.  According to Plaintiffs, Defendants

knew that these revised projections were false and misleading, see Compl. ¶¶ 77-78 (referring to ¶¶

30, 40-45, 89, 93); Opposition at 24 (referring to Compl. ¶ 85), because of two facts: (1) in its 10-Q

form filed with the SEC on May 15, 2002 (that is, six months after November 13, 2001, conference),

PDI stated that the Lotensin Contract lost money during the first quarter of 2002, see Compl. ¶ 89;

and (2) during August 13, 2002, conference (that is, nine months after November 13, 2001,

conference), Defendants stated that the Lotensin Contract lost money during the second quarter of

2002.  See id. ¶ 93.  However, the fact that six or nine months after the November 13, 2001,

conference, Defendants reported the outcome different from Defendants' earlier projections cannot

amount to a fact indicating that, on November 13, 2001, Defendants knew their revenue projections

were false and misleading.  Plaintiffs are simply "pleading false by hindsight" in violation of the

rigid standards set forth by the Reform Act.[30]  See Chubb, 394 F.3d at 158 (the Third Circuit has

---

[30]

This Court agrees with Defendants that Plaintiffs' claim that Defendants November 13, 2001, *revenue* projections must have been false and misleading since the Lotensin Contract did not show *profit* during the first and second quarter of 2002 is a non sequitur.  See Opposition at 24; Mot. at 3.

"Revenue" is the amount of money that a company earns from its activities (during a given period) from sales of goods and/or services to customers.  See Introduction 134.  In very basic terms, revenue is defined as the price of a good multiplied by the number of goods sold, though it is rarely this simple in actuality.  See Economics 73-76, 457-59.  Various concepts employing the word "profit" are related to that of revenue.  For instance, "net profit" is the revenue less such costs as wages of rank-and-file employees, salaries of administrative personnel, managerial expenses, rent, utilities, fuel, raw materials, research and development, interest on loans, depreciation and corporate taxes (collectively "Total Costs").  See Introduction at 149; see also Financial Accounting 558-64,

"long rejected attempts to plead fraud by hindsight").  Consequently, Plaintiffs' claims, supported

by nothing but hindsight and conjecture, are insufficiently pled and will be dismissed.[31]

   **e.**      *February 20, 2002*

   According to Plaintiffs, Defendants knew that they issued a materially false and misleading

statement during the February 20, 2002, conference call when Saldarini made a forward-looking

projection that PDI was still expecting $50 to $60 million in revenue from the Lotensin contract in

2002.  Just as with respect to their claim based on Defendants' November 13, 2001 predictions

discussed right above, Plaintiffs assert that Defendants' February 20, 2002, forward-looking

statement was false and misleading because of PDI's filing of May 15, 2002 10-Q form, see Compl.

¶ 78 (referring to ¶ 89); and because of Defendants' August 13, 2002, disclosure that the Lotensin

Contract lost money during the second quarter of 2002.  See id. (referring to ¶ 93).  However, the

fact that six weeks into the first quarter of 2002 Defendants stated that they still expected to meet

their previous revenue prediction for the *entire year*, i.e., for the next ten and a half months, cannot

be rendered false and misleading simply because the Lotensin Contract eventually showed loss for

the first or the second quarter.[32]  See Grossman, 120 F.3d at 1124 ("[I]t is clearly insufficient for

_____

756.  By contrast, "operating profit," which is a measure of a company's earning power from ongoing operations, is equal to earnings before the deduction of interest payments and income taxes.  See Introduction at 150; Financial Accounting at 757.  Therefore, if the company's Total Costs exceed revenue, the *revenue* projections may be entirely correct but the company's operations may still result in a loss.

[31]

   Plaintiffs also maintain that Defendants made the November 13, 2001, projections with intent to deceive the investors since Defendants still had the same motives that Plaintiffs alleged with respect to Defendants' May 22, 2001, conference.  These "motives," however, have been already found insufficient by this Court.  See supra this Opinion at pp. 41-44.

[32]

   In their claims related to Defendants' February 20, 2002, statements, Plaintiffs again conflate

plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood") (quoting <u>GlenFed Sec. Litig.</u>, 42 F.3d at 1548-49); <u>Suprema Specialties, Inc. Sec. Litig.</u>, 334 F. Supp. 2d at 647.

In addition, Plaintiffs maintain that, during the February 20, 2002, conference call, Defendants made five materially false and misleading contemporaneous observations when Saldarini stated that:

(A)  Lotensin was "trending in the right direction for [PDI's] 2002 expectations";

(B)  Lotensin was "currently ahead of [PDI's] revised expectations";

(C)  PDI was "creating a substantive delta over [the] baseline";

(D)  "[PDI] made progress against both [the] baseline as well as [PDI's] growth target"; and

(E)   "[b]ecause [PDI] control[led] the spending on the [Lotensin] product, [PDI] can manage the income statement effect of Lotensin very successfully."

Opposition at 24 (referring to Compl. ¶¶ 77, 79, 81, 85, referring, in turn, to ¶¶ 78, 89, 93).

Plaintiffs, however, do not plead a single fact indicating that, in February of 2002, Lotensin sales were either trending "in the wrong direction" or otherwise falling below PDI's revised expectations, or "ma[king no] progress against the baseline." Moreover, Plaintiffs' Complaint does not suggest that any entity other than PDI was controlling PDI's spending on the Lotensin brand.[33]

---

the concepts of revenue and profit by claiming that lack of the latter must necessarily mean lack of the former. However, as this Court has pointed out, this proposition is incorrect. <u>See</u> <u>supra</u> this Opinion, note 30.

[33]

The vagueness of Defendants' opinion suggests that some of these observations, e.g., the one that Lotensin was "trending in the right direction," was nothing but harmless puffery. <u>See</u> <u>Advanta</u>, 180 F.3d at 538 ("[V]ague and general statements of optimism 'constitute no more than puffery and [being] understood by reasonable investors as such'" and cannot amount to materially fraudulent

See generally, Compl.  All Plaintiffs' claims with respect to Defendants' February 20, 2002,

contemporaneous statements are based solely on Plaintiffs' allegation that Defendants knew that

Defendants' contemporaneous statements were false since Defendants had the very same "motives"

that were proffered by Plaintiffs with respect to Defendants' May 22, 2001, conference. See id. ¶ 80

(referring to ¶ 78, referring, in turn, to ¶¶ 40-45).  These "motives," however, were already found

insufficient by this Court.  See supra this Opinion at pp. 41-44.  In view of these shortcomings,

Plaintiffs' allegations based on Defendants' February 20, 2002, forward-looking and

contemporaneous statements related to the Lotensin Contract will be dismissed as insufficiently pled.

### f.    *May 14, 2002*

Finally, Plaintiffs maintain that Defendants falsified the truth known to them when, during

May 14, 2002 conference call, [PDI] announced that it had reduced the number of
representatives selling Lotensin from 500 to 150 [in order] to decrease [PDI's] losses from
the Lotensin Contract. [According to Plaintiffs, Defendants knew that this] statement was
false [since Defendants were aware that, due to] the baseline in the [Lotensin C]ontract, PDI
would continue to suffer significant losses.

Compl. ¶ 87.  Plaintiffs' claim, however, lacks logic since PDI announced that it took a measure

intended to *reduce*--rather than to *eliminate*--the losses.  See id.  Contrary to Plaintiffs' falsity

inference, the fact that PDI continued to suffer some losses after the measure was implemented

suggests that Defendants' expectations were both honest and correct.[34]   Consequently, Plaintiffs'

---

information) (quoting Burlington, 114 F.3d at 1428 n.14).

[34]

It appears that Plaintiffs' claim is based on Plaintiffs' disappointment that Defendants did not
use a qualifying adjective before the word "reduced, " i.e., that Defendants did not state "PDI had
*insufficiently* reduced the number of its sales representatives."  See Compl. ¶ 87.  However, the
securities laws do not obligate Defendants to qualify the disclosed numbers by any adjectives.  See
Ash, 525 F.2d at 220("[What matters] is the objective sufficiency of the disclosure").

claim based on Defendants' May 14, 2002 statement will be dismissed.  See Chiarella, 445 U.S. at 234-35.

Having examined all Plaintiffs' claims based on Defendants' statement related to the Lotensin Contract, this Court finds that (1) with respect to Defendants' forward-looking statements, Plaintiffs failed to plead any facts indicating either that Defendants knew these statements were false and misleading or that these statements were made with intent to defraud the investors, and (2) with respect to Defendants' contemporaneous statements, Plaintiffs failed to plead any fact indicating that Defendants' statements were factually false.

### C.   *EVISTA CONTRACT*

#### 1.   **Context**

In October of 2001, PDI announced that it had entered another performance-based contract. The contract was with Eli Lilly and Company ("Eli Lilly"), and its purpose was PDI and Eli Lilly's co-promotion of Evista, a non-hormonal drug used for prevention and treatment of osteoporosis ("Evista Contract").[35]  See Compl. ¶ 47; Mot., Ex. 25.  The Evista Contract provided that PDI would "be compensated  on net sales above a predetermined level," i.e., a baseline.  See id..¶¶ 25, 47, 49; Mot., Ex. 25.  Upon entering the Evista Contract, PDI advised the investing community that, in the event the baseline levels of sale were not achieved, PDI "will not receive any revenue to offset the expenses incurred."  Mot., Exs. 12, 14.  Thirteen months later, in November of 2002, PDI notified the investors that it was terminating the Evista Contract and taking a $9.1 million charge as a reserve

---

[35]  At the time of execution of the Evista Contract, Eli Lilly's sales force was already promoting Evista.  See Compl. ¶ 49.

for potential losses associated with the termination.  See Compl. ¶ 56.  Plaintiffs' Complaint challenges three of Defendants' forward-looking projections[36] and two contemporaneous statements.

### 2.    Forward-Looking Statements

Plaintiffs assert that Defendants knew their projections were false when Saldarini made the following three forward-looking statements: (1) during the November 13, 2001, conference call, Saldarini said that PDI was expecting the Evista Contract to contribute approximately $50 to $60 million in revenue during the entire 2002,  see Compl. ¶¶ 75, Mot., Ex. 9; (2) during the February 20, 2002, conference call, Saldarini reaffirmed these $50 to $60 million expectations, see Compl. ¶¶ 85-86, Mot., Ex. 11; and (3) during the February 20, 2002, conference call, Saldarini opined that PDI was "expect[ing] that [the] increase in share of Evista should produce . . . sales growth of 25-30% on a year-to-year basis."  Compl. ¶ 83; Mot., Ex. 11.

According to Plaintiffs, Defendants knew all these statements were false because the Evista "baselines were set at levels that guaranteed PDI would not earn revenue, even in the event [PDI] materially increased Evista's rate of growth [and, therefore, D]efendants . . . did not expect the contract to be profitable."  See Compl. ¶ 84 (referring to ¶ 76, referring, in turn, to ¶¶ 49-51).

### a.    *Projections Related to Revenue*

In support of Plaintiffs' claim that the Evista Contract was "guaranteed . . . not to earn revenue" Plaintiffs offer (1) one calculation, (2) two facts, and (3) information allegedly obtained

---

[36]

In addition to being expressly qualified by Defendants as "forward-looking," see, e.g., Mot., Exs. 9, 11, these projections were paraphrased in the language unambiguously indicating that these statements were forward-looking.  See Clorox Co. Secs. Litig., 238 F. Supp. 2d 1139, at *16.

from Plaintiffs' confidential source.  Plaintiffs' calculation reads as follows:

> [Since] PDI expected $50-$60 million in revenue from the Lotensin contract in 2002 [and PDI's sales-related] expenses for the contract were approximately $5 million in the fourth quarter of 2001, [the $50-$60 million in revenue] would have produced operating profits of $20 to $30 million, or a profit margin of 20-25%.

Compl. ¶ 77.

However, Plaintiffs: (1) incorrectly define the term "operating profit";(2) erroneously equate such incorrect definition with the term "net profit"; and (3) use this incorrect definition to arrive at Evista's profit margin and render on the issue of profitability of the Evista Contract.[37]   Since Plaintiffs' calculation is based upon the above-discussed errors and Plaintiffs' conjecture about Defendants' state of mind, Plaintiffs' argument based on this calculation does not satisfy the pleading requirements.   Cf. See IKON Office Solutions, Inc., 277 F.3d at 673 ("[plaintiff's] mere second-guessing of [defendant's] calculations will not suffice; [the plaintiff] must show that [defendant's] facts and figures . . . were misstated and [in addition,] that . . . the public was likely to be misled. [Securities] law does not expect clairvoyance'") (quoting Denny, 576 F.2d at 470).

Next, Plaintiffs' offer the following two facts in support of Plaintiffs' claim that Defendants knew PDI was "guaranteed . . . not to earn revenue" from the Evista Contract:

(A)   In May of 2002, PDI revealed that PDI had lost money in the first quarter of 2002 in connection with the Evista Contract.  See Compl. ¶ 88;

---

[37]

See supra this Opinion, note 30, for definitions of revenue, net profit and operating profit. While Plaintiffs' definition equates "net profit" with the difference between revenue and sales-related costs, the actual "net profit" is revenue reduced by such costs as pro-rated administrative and managerial expenses, rents and utilities, interests on loans, depreciation and corporate taxes.  See id. If a firm's Total Costs exceed the amount of the firm's revenue, the firm's net profit would be a negative (meaning that the firm would bear a loss) regardless of the increase in the firm's revenue.

(B)     At the end of the Class Period, PDI finally "admitted for the first time" that the Evista Contract was always meant to be profitable only at the "back-end" of 2002, and the loss from the Evista Contract during the first two quarters of 2002 was "consistent with [PDI's] actual expectations."[38]

Compl. ¶¶ 53, 55, 94. As with Plaintiffs' calculation discussed immediately above, these facts lend no support to Plaintiffs' claim. Plaintiffs do not acknowledge that Defendants' November 13, 2001, and February 20, 2002, projections with respect to *revenue* explored a subject conceptually different from those related to *profit* (which was the subject of Defendants' May 2002 statements).[39] See supra this Opinion, note 30. PDI's projections of the *total yearly revenue* for 2002 are harmonizable with both PDI's report revealing losses half a year later, as well as with Defendants' statement that PDI had been expecting a positive effect from Evista only at the "back-end" of 2002. Conversely, Plaintiffs' reading of these statements as inherently contradictory is incorrect, and Plaintiffs' reading of (A) and (B) above as an indication that Defendants knew PDI would not produce the projected revenue is pure conjecture that cannot support Plaintiffs' claim of falsity. See Grossman, 120 F.3d at 1124; Suprema Specialties, Inc. Sec. Litig., 334 F. Supp. 2d at 647.

Finally, Plaintiffs rely on an unspecified number of confidential sources to support Plaintiffs'

---

[38]

Plaintiffs' facts, however, are incorrect. Contrary to Plaintiffs' assertion, as the documents relied upon by Plaintiffs reveal, Defendants stated their opinion that the Evista Contract was expected to be profitable at the "back-end" of 2002 during Defendants' February 20, 2002, conference by expressly pointing out that, "if [PDI is] successful with [its marketing] strategy, [PDI is expecting a positive] effect on the back half of the year." Mot., Ex. 11. This Plaintiffs error, however, is not a decisive point for the purposes of this Court's analysis.

[39]

The fact that Plaintiffs did not note the difference between the concept of revenue and that of profit did not rendered Defendants' projections false.

claim that PDI's revenue predictions were false and misleading.  According to Plaintiffs,  these confidential sources heard certain statements to the effect that the Evista Contract would be *unprofitable* for a substantial period of time.  See Compl. ¶¶ 51, 76, 78, 107.  Even if this Court were to accept the statements of these  sources as valid facts, such facts would be just as irrelevant as Plaintiffs' calculation and (A) and (B) discussed right above since *lack of profitability* does not necessarily mean *lack of revenue.*  See supra this Opinion, notes 30, 37.  Therefore, the Court does not have to reach the issue of credibility of Plaintiffs' confidential sources in order to dismiss Plaintiffs' claims based on Defendants' Evista projections made during November 13, 2001, and February 20, 2002, conference calls.  However, if this Court were to hypothesize that the statements made by Plaintiffs' sources are somehow relevant, Plaintiffs' pleading with respect to these confidential sources is clearly insufficient.

In order to make a statement of a confidential source a properly pled fact, Plaintiffs need to expressly specify: (1) the time period when the source worked at the company, (2) the dates when the information was acquired, (3) how the sources had access to the information; and (4) specific details setting forth the basis for the source's personal knowledge.  See Chubb, 394 F.3d at 146; Portal Software, 2005 U.S. Dist. LEXIS 20214, at *28.  Plaintiffs fail to meet these requirements with respect to each and every source Plaintiffs cited. For instance, Plaintiffs' reference to a statement made by Saldarini in the presence of a "former PDI employee who managed [PDI's] campaign to compete for the corporate award," Compl. ¶ 51, fails to state the employee's period of employ with PDI, or the date of the alleged Saldarini's statement, or any detail specifying the basis for the

employee's personal knowledge.[40]

Plaintiffs' reference to "[s]everal [unspecified and unnumbered] PDI managers [who] were aware that the Evista [C]ontract would not be profitable" fairs even worse, since such en masse description neither meets a single requirement of <u>Chubb</u> nor explains what fact exactly this "awareness" stands for or how it arose.

Finally, we address Plaintiffs' reference to a confidential source who is a "former regional manager" of PDI.  Plaintiffs maintain that, according to this former regional manager, the fact that PDI was planning, <u>ab initio</u>, to lose money on Evista was: (A) confirmed by PDI's executives (without detailing when and to whom this fact was confirmed, and without specifying, naming or even numbered these PDI's executives); (B) common knowledge at PDI (without providing the Court with either the origin of such "common knowledge" or with Plaintiffs' definition of the term); (C) stated by a PDI's National Vice President (without specifying which PDI's National Vice President Plaintiffs have in mind, and without detailing when, where and to whom this Vice President made this statement); and (D) confirmed, in October of 2001, when a PDI's Executive Vice President stated in that former regional manager's presence that the Company believed it could not make any money off Eli Lilly (without specifying which PDI's Executive Vice President Plaintiffs have in mind or the date of this communication).  <u>See</u> Compl. ¶ 51.

Allegations (A) to (C) fail to meet any requirement of <u>Chubb</u>, while allegation (D) meets only the "access" requirement.  Moreover, all these allegations present *third-hand* information (since second-hand information is the opinions of these unspecified National Vice President, Executive

---

[40]
    Presumably, the employee's claim that Saldarini stated something in the employee's presence could satisfy the "access" requirement.

Vice President and PDI executives, the parties who, allegedly, formed their opinions on the basis of certain Defendants' statements or PDI's internal data or memoranda).  Under the rigid specificity test set forth by the Third Circuit in <u>Chubb</u> and the emphasis placed by the Third Circuit on the source's *personal knowledge*, it would be anomalous for this Court to recognize any allegations styled as a round of the "broken telephone" game and accept Plaintiff's "she-said-that-he-said-that-she-said"as a fact indicating that Defendants actually knew their projections were false.  While a source might have a reason to remain confidential, the narrow rule on admissibility of confidential sources' statements is not meant to open the Court's floodgate to exponential layers of hearsay.  <u>See</u> <u>Chubb</u>, 394 F.3d at 146; <u>Freed</u>, 2005 U.S. Dist. LEXIS 7789; <u>Portal Software, Inc. Secs. Litig.</u>, 2005 U.S. Dist. LEXIS 20214, at *28; <u>U.S. Aggregates, Inc. Sec. Litig.</u>, 235 F. Supp. 2d at 1074; <u>Ramp Networks, Inc.</u>, 201 F. Supp. 2d at 1067; <u>Northpoint Commc'ns Group, Inc., Sec. Litig.</u>, 184 F. Supp. 2d at 999-1000.

### b.      Projections Related to Sales Growth

Plaintiffs also challenge Defendants' February 20, 2002, projection that PDI was "expect[ing] that [the] increase in share of Evista should produce . . . growth of [Evista sales by] 25-30% on a year-to-year basis."  Compl. ¶ 83 (referring to ¶ 76); Mot., Ex. 11.  Plaintiffs assert that Defendants knew their projections were false because: (1) such growth was not achievable unless Evista sales growth tripled, and Plaintiffs are of opinion that Defendants knew such tripling of sales would not occur,[41] <u>see</u> Compl. ¶¶ 44, 48, 51, 55, 58, 76;  Opposition at 13; Opposition 2 at 21, 32-33; and (2)

---

[41]

In the alternative, Plaintiffs suggest that the growth rate of Evista was unattainable because there was a substitute competing product on the market, and Evista's market share was slightly

Defendants unduly delayed disclosure of the fact that the sales growth had to triple until the end of the Class Period.  See id.; see also Compl. ¶ 54.

Plaintiffs' claim, however, does not satisfy the pleading requirements. First of all, contrary to Plaintiffs' assertion that Defendants unduly concealed the information about the required sales growth, the documents relied upon by Plaintiffs reveal that Defendants expressly disclosed, during the February 20, 2002, conference, that PDI has an "aggressive goal [to increase Evista sales by] 25-30 percent on a year over year basis."[42]  Mot., Ex. 11.  Moreover, Plaintiffs' *opinion* as to what sales growth was or was not achievable, as well as to what Defendants did or did not know, does not qualify as a fact sufficiently pled to show that Defendants *knew* their projections were false.[43]  See GSC Partners CDO Fund, 368 F.3d at 239 ("[I]t is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false"); Read-Rite Corp. Sec. Litig., 115 F. Supp. 2d 1181 (conclusory allegations that the corporate officers must have known the falsity were insufficient).

Finally, Plaintiffs allege that Defendants intended to deceive the investors about the realities of the Evista Contract because Defendants had the "motives" similar to those Defendants had with

---

[42] declining at the beginning of 2001.  See Compl. ¶ 48-50.  These types of arguments were already found invalid by the Court with respect to the Ceftin and Lotensin Contracts and need not be revisited.  See supra this Opinion at pp. 28-29, 39-40.

[42] Plaintiffs' claim is puzzling in view of the fact that Plaintiffs themselves state that the growth rate of Evista sales in the United States at the inception of the Evista Contract was 8%.  See Opposition at 13.  *Tripling* such 8% growth rate cumulatively would yield growth rate of 26% (100% x 1.08 x 1.08 x 1.08 = 125.97%. 125.97% signifies approximately 26% of cumulative increase from the original 100%), that is, the very percentage projected by Defendants.

[43] While Defendants did not achieve 25-30% sales growth, "PDI was able to successfully increase Evista's market share by 15% in the first quarter of . . . 2002."  Compl. ¶ 21.

respect to the Lotensin Contract, namely: (1) PDI's desire to preserve the jobs of PDI employees who were about to become idled, this time, by PDI's upcoming cancellation of the Ceftin Contract: (2) PDI's desire to become the "loss leader," this time, for Eli Lilly, in order to impress Eli Lilly with both PDI's marketing skills and ability to lose money, and eventually obtain a profitable contract with Eli Lilly; and (3) PDI's desire to conceal from PDI's potential clients the unfavorable contractual terms, this time, related to the Evista Contract, in order to prevent potential clients from demanding terms unfavorable to PDI.  See Compl. ¶¶ 49, 52-54.  In support of these allegations, Plaintiffs rely, again, on (1) Defendants' usage of the phrase "long-term strategic opportunity," this time, with respect to the Evista Contract, id. ¶ 53; and (2) Defendants' November 2002 statements informing the investors that PDI's earlier projections eventually did not materialize. Id. ¶ 54.

However, neither Defendants' usage of a common business phrase "long-term strategic opportunity" nor Plaintiffs' hindsight comparison of Defendants' projections to the actual results achieved nine-months-to-a-year later, or the fact that PDI, adhering to a common business practice, was reluctant to lay off qualified employees provides a properly pled factual predicate supporting Plaintiffs' claim that Defendants intended to defraud the investors.[44]  See supra this Opinion at pp. 41-44.  Therefore, Plaintiffs' argument that Defendants knew their February 20, 2002, projections

---

[44]

Plaintiffs also assert that Defendants' intent to defraud the investing public is verified by Plaintiffs' confidential sources who allegedly stated that Defendants knew that the Evista Contract would not be profitable.  See Compl. ¶ 76 (referring to ¶ 51).  These sources are, however, not reliable for failure to meet the requirements set forth in Chubb.  See supra this Opinion at pp. 53-56.  Moreover, Plaintiffs' confidential sources add nothing to Plaintiffs' scienter claim.  Plaintiffs' claim that Defendants' projections were false and misleading (based on the sources' allegations that Defendants were not expecting to make any profit on Evista) cannot indicate that Defendants were planning to become a "loss leader" since lack of profit does not necessarily mean a loss.  See Rockefeller Ctr., 311 F.3d at 224; Greebel, 194 F.3d at 196.

with respect to potential growth rate of Evista sales were false and misleading is not supported by facts and will be dismissed.

### c.     *Contemporaneous Statements*

Finally, Plaintiffs challenge two of Defendants' contemporaneous statements.  One statement was made on May 14, 2002 as part of PDI's press release and the statement made by Defendants on the same day.  According to Plaintiffs,

> [D]efendants revealed that PDI had lost $8.5 million in the first quarter of 2002 in connection with the Evista contract. However, these statements were materially false and misleading, as defendants failed to disclose that the losses would have been much higher absent significant distributor overstocking during the quarter.  Due to this overstocking, the growth of Evista sales dropped sharply from 16% to 5% in the first two quarters of fiscal 2002.[45]

Compl. ¶ 88.

Plaintiffs' claim fails to plead any falsity on part of Defendants, since Plaintiffs do not challenge the $8.5 million figure.  What Plaintiffs appear to challenge is Defendants' unwillingness to engage into speculations as to why the Evista sales were not higher or lower than those actually achieved.  However, the securities laws do not obligate corporate managers to speculate about buyers' behavioral patterns.  Cf.  Ash v. LFE Corp., 525 F.2d at 220.  Consequently, Plaintiffs' claim based on Defendants' May 14, 2002, contemporaneous statement related to the Evista Contract will be dismissed.

---

[45] We note that Plaintiffs' first two sentences appear to suggest that, had the distributors not been "overstocking" during the first quarter of 2002, PDI would suffer even greater loss, hence prompting this Court to  conclude that PDI faired *better* during the first quarter of 2002 because of the "overstocking."  Yet Plaintiffs' third sentence appears to suggest that PDI faired *worse* during the very same first quarter of 2002 because the "overstocking" caused PDI loss of business in the amount of 70%.

The other challenged statement was made by Defendants on February 20, 2002, when Saldarini stated that PDI was "providing a major increase in the brand share of Evista [and PDI] believe[d] that [was] approximately a 50% increase."  Compl. ¶ 83.  Plaintiffs allege that this statement was "materially false and misleading when made for the reasons stated in ¶ 76," Compl. ¶ 84, i.e., because (1) the Evista baseline was, in Plaintiffs' opinion, unduly high, and (2) Plaintiffs believe that Defendants purposely entered into a losing contract with Eli Lilly to retain PDI's employees and to eventually lend a profitable contract with Eli Lilly after being a "loss leader" for a prolonged period of time.  Id. ¶ 76.  Plaintiffs' alleged "facts," however, are nothing but pure conjecture.[46]  Therefore, Plaintiffs' claim based on Defendants' February 20, 2002, contemporaneous statements related to the Evista Contract will be dismissed as insufficiently pled.  See GSC Partners CDO Fund, 368 F.3d at 239; Read-Rite Corp. Sec. Litig., 115 F. Supp. 2d 1181.

## D.   *CONTROLLING PERSON CLAIMS*

Plaintiffs assert that both Saldarini and Boyle "violated §10(b) . . . and Rule 10b-5 by their acts and omissions as alleged in th[e] Complaint. By virtue of their positions as controlling persons of PDI, the Individual Defendants also are liable pursuant to §20(a)."[47]  Compl. ¶ 49-50.  However,

---

[46]

Moreover, Plaintiffs' own data appears to be entirely coherent with Saldarini's assessment since (1) Plaintiffs acknowledge that PDI indeed did raise Evista's growth rate by 7% (from original 8% existing before PDI started marketing Evista to 15%) by the end of the first quarter of 2002, see Opposition at 13; (2) 7% increase in growth rate during that quarter is completely coherent with 4% increase in growth rate half way into this period; (3) 8% original growth rate, together with such 4% increase, yields 12% growth rate as of the middle of the first quarter of 2002; and (5) in comparison to the original growth rate of 8%, such 12% growth rate constitutes the very 50% increase stated by Saldarini.

[47]

Plaintiffs employ the group pleading technique with respect to Boyle, even though the

for a controlling person to be liable, the person over whom control was exercised must have committed a primary violation of the securities laws.  See Merck, 432 F.3d 261, at *41-42; Digital Island., 357 F.3d at 337; Shapiro, 964 F.2d at 279.  Having found that none of PDI's statements qualified as a violation of the securities law, this Court has no reason to presume that Plaintiffs would be able to prove Saldarini or Boyle's derivative liability.  Consequently, Plaintiffs' claims against Saldarini and Boyle in their capacity as controlling persons of PDI will be dismissed.


**E.    *LEAVE TO AMEND***

Having thoroughly examined all Plaintiffs' twenty five claims and finding that each of these challenges is not supported by properly pled facts indicating that Defendants knew that their statements were false when made or that Defendants made these statement with the requisite scienter, this Court now turns to the question of whether Plaintiffs shall be allowed to replead their claims for the fourth time.

The Court recognizes that, ordinarily, dismissal based on failure to plead fraud with particularity under Fed. R. Civ. P. 9(b) is without prejudice to a plaintiff's filing an amended complaint to cure the deficient pleading and, under Federal Rule of Civil Procedure 15(a), the plaintiff may be granted "leave [to amend,] . . . when justice so requires."  See Foman v. Davis, 371 U.S. 178, 182 (1962); Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993).  However, "[a]llowing leave to amend where 'there is a stark absence of any suggestion by the plaintiffs that

---

technique is found invalid under the Reform Act.  See Tyson Foods, Inc. Sec. Litig., 155 Fed. Appx. at 57.   The Court, however, does not need to reach the issue of Plaintiffs' pleading with respect to Plaintiffs' claims against Boyle since these claims are derivative from Plaintiffs' claims against PDI. See Merck, 432 F.3d 261, at *41-42.

they have developed any facts since the action was commenced, which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA,' would frustrate Congress's objective in enacting this statute of 'provid[ing] a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis.'" Chubb, 394 F.3d at 164 (quoting GSC Partners CDO Fund, 368 F.3d at 246); see Cybershop.com Sec. Litig., 189 F. Supp. 2d at 237 ("[T]he Reform Act would be 'meaningless' if judges liberally granted leave to amend on a limitless basis") (citing Champion Enter., Inc., Sec. Litig., 145 F. Supp. 2d 871, 872 (E.D. Mich. 2001)).  For instance, where the plaintiff had already amended plaintiff's complaint and yet failed to allege sufficient facts, the courts hold that "[t]hree bites at the apple is enough," and find it proper to deny leave to replead.  Salinger v. Projectavision, Inc., 972 F. Supp. 222, 236 (S.D.N.Y. 1997) (citing Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2 (2d Cir. 1996); American Express Co. Shareholder Litig., 39 F.3d 395, 402 (2d Cir. 1994); and Fisher v. Offerman & Co., Inc., 1996 U.S. Dist. LEXIS 14560 (S.D.N.Y. 1996)).

Plaintiffs' instant Complaint, as well as its predecessor, Plaintiffs' Second Amended Complaint, sets forth no facts that might serve as a basis for a claim cognizable under the securities laws.  While the instant Complaint exceeds in length its predecessor by five pages and eleven paragraphs, it does not improve substantively the claims set forth in the Second Amended Complaint.  After three attempts over a period of almost five years, Plaintiffs are still unable to present this Court with anything but Plaintiffs' speculations or bold assertions.  Plaintiffs' Complaint does not challenge the accuracy of any of PDI's financial results and does not assert that either Saldarini, Boyle, or any other director of PDI, being the main holders of PDI stock, sold even one share during the Class Period or profited in any other way from the statements that Plaintiffs are

trying to qualify as violations of securities laws.  "Far from supporting a 'strong inference' that [D]efendants had a motive to capitalize on artificially inflated stock prices, these facts suggest [Defendants] had every incentive to keep [the Company] profitable."  Advanta, 180 F.3d at 541 (citing Burlington, 114 F.3d at 1422 n.12 ).

While the Court certainly sympathizes with Plaintiffs' disappointment over a financial investment that turned out sour, the securities laws are not meant to provide a disappointed investor with a consolation prize in the form of a legal trial.  "Section 10 (b) is aptly described as a catchall provision, but what it catches must be fraud."  Chiarella, 445 U.S. at 234-35.  Since (1) Plaintiffs' allegations present nothing but Plaintiffs' conjecture and, hence, are too general to meet  pleading requirement of the Reform Act, and (2) under § 78u-5(c)(1)(B), Defendants could not be liable for forward-looking statements unless Defendants knew the statements were false and misleading when made, and Plaintiffs, third time around, failed to plead any specific facts indicating that Defendants so knew, the Court finds it contrary to both the letter and spirit of the Reform Act, as well as entirely futile, to grant Plaintiffs another leave to amend.[48]

Consequently, Plaintiffs' Complaint will be dismissed with prejudice.

---

[48]

The purpose of the [Reform] Act was to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of "deep pocket" defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys.  See H.R. Conf. Rep. No. 104-369, at 28 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 748.

Advanta, 180 F.3d at 531.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED.  Plaintiffs'

Third  Consolidated  and  Amended  Class  Action  Complaint  will  be  DISMISSED  WITH

PREJUDICE.

An appropriate Order accompanies this Opinion.


s/Garrett E. Brown, Jr.
_____
**GARRETT E. BROWN, JR., Chief Judge**
**United States District Court**

Dated: November 2, 2006