## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re PDI SECURITIES LITIGATION | : | Civil Action No. 02-211 (GEB) |
|  | : |  |
|  | : | **A M E N D E D** |
|  | : | **O P I N I O N** |

**APPEARANCES:**

ALLYN ZISSEL LITE, Esq.,
JOSEPH J. DEPALMA, Esq.,
SUSAN D. PONTORIERO, Esq.,

      LITE, DEPALMA, GREENBERG & RIVAS, LCC
      Two Gateway Center, 12th Floor
      Newark, New Jersey 07102-5003,

      and

LEE A. WEISS, Esq.,
SHARON M. LEE, Esq.,

      MILBERG WEISS BERSHAD & SCHULMAN LLP
      One Pennsylvania Plaza
      New York, New York 10119-0165,

      and

SHERRIE R. SAVETT, Esq.,
CAROLE A. BRODERICK, Esq.,
GARY E. CANTOR, Esq.,

      BERGER & MONTAGUE, P.C.
      1622 Locust Street
      Philadelphia, Pennsylvania 19103,

Attorneys for Plaintiffs GARY KESSEL, RITA LESSER, LEWIS LESSER and the class of all others similarly situated, as well as Consolidated Plaintiffs BENJAMIN VINCENT and MARY KAY RICHARDSON.

ALAN S. NAAR, Esq.,
GINA MARIE PONTORIERO, Esq.,

    GREENBAUM, ROWE, SMITH & DAVIS LLP
    Metro Corporate Campus One
    P.O. Box 5600
    Woodbridge, New Jersey 07095-0988,

    and

DOUGLAS H. FLAUM, Esq.
ISRAEL DAVID, Esq.

    FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
    One New York Plaza
    New York, New York 10004,

Attorneys for Defendants PDI, INC., CHARLES T. SALDARINI and BERNARD C. BOYLE.[1]


**GARRETT E. BROWN, JR., Chief Judge**

This matter is before the Court on Defendants' motions to dismiss the Plaintiffs' Third

Consolidated and Amended Class Action Complaint ("Motion") pursuant to Federal Rules of Civil

Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C.

§§ 78u-4, et seq.[2]

---

[1]

    This Opinion is amended, in accordance with the Order filed herewith, to reflect
representation of Defendants by Douglas H. Flaum, Esq. and Israel David, Esq. of Fried, Frank,
Harris, Shriver & Jacobson LLP (in addition to Alan S. Naar, Esq. and Gina Marie Pontoriero, Esq.
of Greenbaum, Rowe, Smith & Davis).

[2]

    Plaintiffs' Complaint consists of fifty pages and 127 paragraphs, and is, effectively, a
narrative listing (1) the events that Plaintiffs deem pertinent, (2) various Defendants' statements
(those challenged, as well as those apparently frowned at but not actually challenged by Plaintiffs),
and (3) Plaintiffs' twenty-five allegations, scattered between (1) and (2), above. Moreover, Plaintiffs'

For the reasons discussed below, Defendants' Motion will be GRANTED, and Plaintiffs' Third Consolidated and Amended Class Action Complaint will be DISMISSED WITH PREJUDICE.

## PROCEDURAL HISTORY

Plaintiffs, purchasers of the common stock of Defendant PDI, Inc. ("PDI" or "Company") between May 22, 2001, and August 12, 2002 ("Class Period"), brought this securities fraud class action alleging that Defendants defrauded investors by artificially inflating the value of the common stock through false and misleading statements disseminated into the investing community.

The litigation was initiated on January 16, 2002.[3]  See Docket Entry No. 1.  On November 19, 2002, Plaintiffs' motion to file an Amended Complaint was granted, see Docket Entry No. 29, and the Second Amended Complaint ("Second Amended Complaint") was subsequently filed on December 13, 2002.  See Docket Entry No. 32.  On February 14, 2003, Defendants filed a motion ("Preceding Motion") to dismiss the Second Amended Complaint under Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995 ("Reform Act" or "PSLRA"), 15 U.S.C. §§ 78u-4, et seq.  See Docket Entry No. 35.  On August 17, 2005, the Court issued an opinion ("August Opinion") examining Defendants' Preceding Motion and order granting Plaintiffs leave to replead.  See id. at 48.  On October 21, 2005, Plaintiffs filed the Third

---

discussions of factual predicate for Plaintiffs' allegations are frequently removed from Plaintiffs' discussion of allegedly fraudulent Defendants' statements by thirty to fifty paragraphs.

[3]

On May 23, 2002, Honorable Ronald J. Hedges, Magistrate Judge, granted Plaintiff Kessel's motion to consolidate Civil Case 02-211 with 02-367 and 02-699.  See Docket Entry No. 15.

Amended Complaint ("Complaint").  <u>See</u> Docket Entry No. 50.  Defendants filed the instant Motion on December 21, 2005.  <u>See</u> Docket Entry No. 51.  Plaintiffs filed two briefs in opposition to the Motion, one on April 18, 2006  ("Opposition"), <u>see</u> Docket Entry No. 53, and another on April 18, 2006 ("Opposition Two").  <u>See</u> Docket Entry No. 55.  Defendants filed their reply ("Reply") on June 2, 2006.  <u>See</u> Docket Entry No. 60.

This matter was transferred to the undersigned on August 7, 2006.  <u>See</u> Docket Entry No. 66.  Except for the instant Motion, no other applications are currently pending in this action.

<strong><u>DISCUSSION</u></strong>

## I.    APPLICABLE LEGAL STANDARDS

### A.    *PLEADING REQUIREMENTS UNDER RULES 12(b)(6) AND 9(b), AND PSLRA, AS READ JOINTLY*

The standard of review under Rule 12(b)(6) is well-settled: the courts must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  <u>See Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974), <u>overruled on other grounds</u>, <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982); <u>Allegheny Gen. Hosp. v. Philip Morris</u>, Inc., 228 F.3d 429, 434-35 (3d Cir. 2000).  At this stage, the question is whether the plaintiff should be given an opportunity to offer evidence in support of plaintiff's claims, not whether the plaintiff will ultimately prevail in a trial on the merits. <u>See Scheuer</u>, 416 U.S. at 236.  Therefore, dismissal under Rule 12(b)(6) is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of plaintiff's claim which would entitle him to relief.  <u>See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.</u>, 267 F.3d 340, 346 (citing <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46

(1957)). Nonetheless, the Third Circuit has noted that courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint. See Burlington Coat Fact. Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997). Therefore, legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. See Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d 551, 565 (D.N.J. 2001).

The Rule 12(b)(6) standard of review is, however, altered by Rule 9(b), which imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud. Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "This particularity requirement has been rigorously applied in securities fraud cases." Burlington, 114 F.3d at 1417 (citations omitted). A Plaintiff averring securities fraud claims must specify "'the who, what, when, where, and how: the first paragraph of any newspaper story.'" Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)).

The Third Circuit clarified:

> [a]lthough Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud."

Rockefeller Ctr. Props. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (quoting Nice Sys., 135 F. Supp. 2d at 577).

In addition to the Rule 9(b) requirements, a plaintiff alleging securities fraud must comply with the heightened pleading requirements of the Reform Act. See 15 U.S.C. § 78u-4(b)(1) and (b)(2). Specifically, § 78u-4(b)(1) of the Reform Act requires the plaintiff to specify the facts

indicating the falsity of the challenged statement. The Plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Similarly, the Reform Act requires that "the complaint shall, with respect to each act or omission . . . , state with particularity [all] facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

These requirements of the Reform Act modified the traditional Rule 12(b)(6) analysis. "'[W]hereas under Rule 12(b)(6), we must assume all factual allegations in the complaint are true . . . under the Reform Act, we disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute.'" Rockefeller Center, 311 F.3d at 224 (quoting Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 345, 660 (8th Cir. 2001)). "The Reform Act requires a 'strong inference' of scienter, and accordingly, alters the normal operation of inferences under Rule 12(b)(6)." Digital Island Sec. Litig., 357 F.3d 322, 328 (3d Cir. 2004) (citing Rockefeller Ctr., 311 F.3d at 224, stating that, "unless plaintiffs in securities fraud actions allege facts . . . with the requisite particularity . . . they may not benefit from inferences flowing from vague or unspecific allegations-inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis"); see also Greebel v. FTP Software, Inc., 194 F.3d 185, 196 (1st Cir. 1999) ("A mere reasonable inference is insufficient to survive a motion to dismiss"). A plaintiff's failure to meet these heightened pleading requirements results in dismissal of the complaint. See Advanta, 180 F.3d at 531.

**B.**   ***SECTION 10(b), RULE 10B-5 AND RELATED PROVISIONS***

Section 10(b) proscribes the "use or employ[ment], in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).   The ensuing Rule 10b-5, 17 C.F.R. § 240.10b-5, makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

While "[t]he private right of action under Section 10(b) and Rule 10b-5 reaches beyond statements and omissions made in a registration statement or prospectus or in connection with an initial distribution of securities and creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market," Burlington, 114 F.3d at 1417 (citing Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994)); see also Eckstein v. Balcor Film Investors, 8 F.3d 1121, 1123-24 (7th Cir. 1993), cert. denied, 510 U.S. 1073 (1994), a Rule 10b-5 plaintiff must still (1) establish that the defendant made a materially false or misleading statement, see Burlington, 114 F.3d at 1417 (citing Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1243 (3d Cir. 1989)), (2) demonstrate that the defendant acted with scienter, and (3) show that plaintiff's reliance on defendant's misstatement caused injury to the plaintiff. See id. (citing Phillips, 881 F.2d at 1244); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 808 (2d Cir. 1996).

### 1.    False and Misleading Forward-Looking Statements

When the plaintiff challenges a forward-looking statement[4] made by the defendant, plaintiff's

mere usage of catchwords or bold assertions that defendant's statement was false or misleading

because the defendant knew it to be false or misleading cannot lend support to plaintiff's claim.  See

GSC Partners CDO Fund v. Washington, 368 F.3d 228, 239 (3d Cir. 2004) ("[I]t is not enough for

plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants

'must have known' their statements were false"); Read-Rite Corp. Sec. Litig., 115 F. Supp. 2d 1181

(N.D. Cal. 2000) (conclusory allegations that the corporate officers must have known the falsity were

insufficient).   Consequently, plaintiff's failure to plead with specificity the facts showing that

defendant's forward-looking statements were made by the defendant with defendant's *actual*

*knowledge* that these statements were false precludes plaintiff's claim, and plaintiff's allegation that

the defendant was reckless in defendant's projections is insufficient.   See 15 U.S.C. § 78u-

5(c)(1)(B).

However, the provision contains no definition of "actual knowledge" for the purposes of

forward-looking statements.  Since it is apparent that actual knowledge can exist only in the present

or past, and one cannot have actual knowledge of the future, courts have held that a forward-looking

statement could be regarded as a representation that the speaker has a present belief as to the future.

---

[4]

"The term 'forward-looking statement' means [inter alia,] a statement containing a projection
of revenues, income (including . . . loss), earnings (including . . .  loss) per share, capital
expenditures, dividends, capital structure, or other financial items; [or] a statement of the plans and
objectives of management for future operations, including [those] relating to the products or services
of the issuer; [or] a statement of future economic performance [or] results of operations; [or] any
statement of the assumptions underlying or relating to any statement described [above.]" 15 U.S.C.
§ 78u-5(i)(1).

See NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement .
. . must have been misleading at the time it was made") (citing Nice Sys., Ltd. Sec. Litig., 135 F.

Supp. 2d at 586). "[Plaintiff's] mere second-guessing of [defendant's] calculations will not suffice;

[the plaintiff] must show that [the defendant's] judgment--at the moment exercised--was sufficiently

egregious such that a reasonable [person] reviewing the facts and figures should have concluded that

[these facts or figures] were misstated and [in addition,] that . . . the public was likely to be misled.

[Securities] 'law does not expect clairvoyance.'" IKON Office Solutions, Inc., 277 F.3d 658, 673 (3d

Cir. 2002) (quoting Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978)); see also DiLeo, 901 F.2d

at 627) ("[P]roffer[ing a] different financial statement [is not sufficient.]  Investors must point to

some facts suggesting that the difference is attributable to fraud"); Harris v. IVAX Corp., 998 F.

Supp. 1449, 1455 (S.D. Fla. 1998) ("Plaintiff['s] attempt simply to hold up the Defendants'

predictions against the backdrop of what actually happened" is insufficient to establish scienter),

aff'd, 182 F.3d 799 (11th Cir. 1999), reh'g denied en banc, 209 F.3d 1275 (2000).  Thus, the plaintiff

cannot assert defendant's lack of sincere belief by pointing to the difference between the defendant's

projections and the actual outcome.  See  Cal. Public Employees' Retirement Sys. v. Chubb Corp.

("Chubb"), 394 F.3d 126, 158 (3d Cir. 2004) (the Third Circuit has "long rejected attempts to plead

fraud by hindsight"); Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 514 (7th Cir. 1989) ("If

all estimates are made carefully and honestly, half will turn out too favorable to the firm and the

other half too pessimistic.  In either case, the difference may disappoint investors, who can say later

that they bought for too much [if the projection was too optimistic,] or sold for too little, [if the

projection was too pessimistic]. . . . [T]he firm is not liable despite error"); Grossman v. Novell, Inc.,

120 F.3d 1112, 1124 (10th Cir. 1997) ("[I]t is clearly insufficient for plaintiffs to say that the later,

sobering revelations make the earlier, cheerier statement a falsehood") (quoting GlenFed Sec. Litig., 42 F.3d 1541, 1548-49 (9th Cir. 1994)); Suprema Specialities, Inc. Sec. Litig., 334 F. Supp. 2d 637, 647 (D.N.J. 2004) ("Allegations that a company's later financial difficulties imply that earlier financial statements were untrue or misleading are 'fraud by hindsight' and do not state a claim") (citations omitted); Boston Tech. Sec. Litig., 8 F. Supp. 2d 43, 53 (D. Mass. 1998) ("A general averment that defendants made a statement knowing at the time what later 'turned out badly' does not suffice") (citation omitted).

Even though all allegations relating to falsity of defendant's statement must be pled with particularity, see 15 U.S.C. § 78u-4(b)(1) and (2), a plaintiff in securities fraud actions can support a complaint by reliance on information attributed to confidential sources.  See Novak, 216 F.3d at 313-14 (holding that, while the PSLRA "may compel revelation of confidential sources under certain circumstances," there was no per se requirement of disclosure if the plaintiff states sufficient facts to support plaintiff's allegations).  However, statements from undisclosed confidential sources can be used in two situations: (1) if the complaint sets forth other factual allegations, such as documentary evidence, which are sufficient alone to support a fraud allegation, see id. at 314; Royal Dutch/Shell Transp. Sec. Litig., 380 F. Supp. 2d 509 (D.N.J. 2005) (finding sufficient corroboration in specific notes, memoranda, emails and presentation materials); Barnum v. Millbrook Care Ltd. Partnership, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994) (if the allegations are contradicted by the documents, the documents control), aff'd, 43 F.3d 1458 (2d Cir. 1994); or (2) when the confidential sources are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the [confidential] source would possess the information alleged. See Royal Dutch/Shell Transp. Sec. Litig., 380 F. Supp. 2d 509.

Elaborating on the latter scenario, the Third Circuit explained that the complaint must disclose: (1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information. See Chubb, 394 F.3d at 146; Freed v. Universal Health Servs., 2005 U.S. Dist. LEXIS 7789 (E.D. Pa. May 3, 2005); Portal Software, Inc. Secs. Litig., 2005 U.S. Dist. LEXIS 20214, at *28 (N.D. Cal. Aug. 10, 2005) ("[P]laintiffs must describe the job title, job description, duties, and dates of employment for the controller's sources before this information can be deemed reliable"). Moreover, in Chubb, the Third Circuit held that allegations attributed to the information obtained from a confidential source must contain specific details regarding the basis for the source's personal knowledge and describe supporting events in detail. See id.; see also Northpoint Commc'ns Group, Inc., Sec. Litig., 184 F. Supp. 2d 991, 999-1000 (N.D. Cal. 2001); U.S. Aggregates, Inc. Sec. Litig., 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002); Ramp Networks, Inc., 201 F. Supp. 2d 1051, 1067 (N.D. Cal. 2002). Failure to meet these requirements with respect to each and every confidential source the plaintiff relies upon, renders that source irrelevant for the purposes of plaintiff's allegations. See Chubb, 394 F.3d at 146. "The sheer volume of confidential sources cited cannot compensate for these inadequacies. . . . Cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA." Id. at155; see also Am. Bus. Fin. Servs., Inc. Sec. Litig., 413 F. Supp. 2d 378, 391-92 (E.D. Pa. 2005) (finding statements from five insufficiently identified confidential sources insufficient).

Finally, it shall be noted that a company's management is not responsible for opinions, projections and estimates of security analysts, even if the management may have supplied the

analysts with some of the information they used to formulate their estimates,[5] unless the plaintiff sets forth facts indicating that the management passed misinformation to analysts with intention that the analysts communicate the misinformation to the market. See V-Mark Software, Sec. Litig., 928 F. Supp. 122 (D. Mass. 1996). Under these circumstances, the complaint must allege "facts showing that a particular defendant both made the statement to the analyst and controlled the content of the [analyst's] report." U.S. Interactive, Inc. Sec. Litig., 2002 U.S. Dist. LEXIS 16009, *48 (E.D. Pa. Aug. 23, 2002) (citing Klein v. Gen. Nutrition Cos., 186 F.3d 338, 345 (3d Cir. 1999)). "The complaint must rise or fall on allegations about defendant['s] conduct and not on wide-eyed citation to the gratuitous commentary of outsiders." Hershfang v. Citicorp, 767 F. Supp. 1251, 1255 (S.D.N.Y. 1991).

## 2.    Scienter

Rule 10b-5 describes the type of conduct proscribed but it does not set out the appropriate standard of culpability. The Supreme Court held in Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976), that, in order to establish a valid claim under Rule 10b-5, the plaintiff must prove that the defendant acted with scienter. The scienter requirement is satisfied by a showing of intentional misrepresentation made with intent to deceive.[6]

[5]

"[S]ecurities laws require [the company] to speak truthfully to investors; they do not require the company to police statements made by third parties for inaccuracies, even if the third party attributes the statement to [the company.]" Raab v. General Physics Corp., 4 F.3d 286, 288 (4th Cir. 1993).

[6]

In addition, the Third Circuit has found that recklessness is sufficient to state a claim under 10b-5 *with respect to past and present events* that were falsely presented to the investing community. See, e.g., Sharp v. Coopers & Lybrand, 649 F.2d 175 (3d Cir. 1981), cert. denied, 455 U.S. 938

Since scienter is based on the defendant's state of mind and, as such, may be difficult to prove with direct evidence, courts are willing to permit an inference that the defendant acted with the requisite scienter. See, e.g., Fine v. American Solar King Corp., 919 F.2d 290 (5th Cir. 1990), cert. dismissed, 502 U.S. 976 (1991). However, such inferences are not to be made lightly. See, e.g., Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000) ($1.6 million dollar profit from inside trading was not sufficiently unusual to provide an inference of scienter). The inference may be made only when the fact pattern unambiguously indicates that the defendant *must have been* acting with the requisite state of mind. See, e.g., Phillips Petroleum Sec. Litig., 881 F.2d 1236 (defendant's good faith statement of present intent does not become actionable simply because of defendant's change of intent at a later point).

Thus, to withstand the scrutiny imposed by the Reform Act, the inference of scienter must be (1) reasonable, (2) strong and (3) based on pleadings stating the pertinent facts with particularity. See 15 U.S.C. § 78u-4(b)(1) and (2) (the plaintiff shall state "the reason . . . why the [challenged]

(1982); Coleco Indus., Inc. v. Berman, 567 F.2d 569 (3d Cir. 1977), cert. denied, 439 U.S. 830, reh'g denied, 439 U.S. 998 (1978). As the Ninth Circuit explained,

> [R]ecklessness is a lesser form of intent rather than a greater degree of negligence.
> . . . Reckless conduct may be defined as a highly unreasonable omission, involving
> not merely simple, or even inexcusable negligence, but an extreme departure from
> the standards of ordinary care, and which presents a danger of misleading buyers or
> sellers that is either known to the defendant or is so obvious that the actor must have
> been aware of it.

Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (1990), cert. denied, 499 U.S. 976 (1991) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1044-45 (7th Cir.), cert. denied, 434 U.S. 875 (1977)).

To satisfy the recklessness standard in a case alleging non-disclosure, a plaintiff must demonstrate: "(1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." Wilson, 195 F. Supp.2d at 639.

statement [was] misleading, and . . . all facts on which [plaintiff's] belief is formed," as well as "particular[] facts giving rise to a strong inference that the defendant acted with the required state of mind"); Alpharma Sec. Litig., 372 F.3d 137, 150 (3d Cir. 2004); The End of the Unbearable Lightness of Pleading: Scienter After *Silicon Graphics*, 48 UCLA L. Rev. 973 (2001) (detailing the development of both elements).

A plaintiff may establish the requisite strong inference of fraudulent intent in one of two ways: (1) by alleging facts "establishing a motive and an opportunity to commit fraud"; or (2) "by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior." Advanta, 180 F.3d at 534; see also Burlington, 114 F.3d at 1418. If the plaintiff desires to employ the "motive and opportunity" method, the plaintiff should demonstrate a logical connection between the alleged fraud and motive in order to establish a reasonable inference of fraud. See Glickman v. Alexander & Alexander Servs., 1996 U.S. Dist. LEXIS 2325, at *36 (S.D.N.Y. Feb. 27, 1996) ("[There should be] coherent nexus between the alleged fraudulent conduct and its alleged purpose"). Furthermore, there must be more than conclusory allegations of motive and opportunity; stating that "the defendant must have known" is not legally sufficient. See, e.g., Mortensen v. AmeriCredit Corp., 123 F. Supp. 2d 1018 (N.D. Tex. 2000); Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194  (S.D.N.Y. 1999). A "strong inference" may arise only if the complaint sufficiently alleges that the defendants: (1) "benefitted in a concrete and personal way from the purported fraud"; (2) "engaged in deliberately illegal behavior"; (3) "knew facts or had access to information suggesting that their public statements were not accurate"; or (4) "failed to check information they had a duty to monitor." Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000); see Wilson v. Bernstock, 195 F. Supp. 2d 619, 633 (D.N.J. 2002) ("Motive entails allegations that the

individual corporate defendants stood to gain in a concrete and personal way from one or more of the allegedly false or misleading statements and wrongful nondisclosures. . . . [M]otive and opportunity 'like all other allegations of scienter must now be supported by facts stated with particularity and must give rise to a strong inference of scienter'") (quoting Advanta, 180 F.3d at 535); Cybershop.com Sec. Litig., 189 F. Supp. 2d 214 (D.N.J. 2002).

Under this pleading standard, a plaintiff may not rely on facts indicating that the defendant had certain goals or aspirations (or sought to engage in the industry practices) common to the law-abiding business community , since such goals or practices cannot amount to a valid motive for the purposes of showing scienter. See GSC Partners CDO Fund, 368 F.3d at 237 (""Motives that are generally possessed by most corporate directors and officers do not suffice") (quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (capitalization restored); San Leandro, 75 F.3d at 814 ("[A] company's desire to maintain a high bond or credit rating" is an insufficient motive for fraud because such motive could be imputed to any company. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions"); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068 (5th Cir.1994) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated") (citation omitted); Nice Sys., Ltd. Secs. Litig., 135 F. Supp. 2d at 584) ("[T]he allegation that [d]efendants made false and misleading statements to secure market share is . . . insufficient to demonstrate that [d]efendants had a motive to commit fraud"); Boeing Sec. Litig., 40 F. Supp. 2d 1160, 1175 (W.D.Wash. 1998) ("[T]he desire to remain profitabl[e] is a generic motive that fails to satisfy the heightened pleading standards for scienter under the PSLRA").

With respect to the other method of establishing scienter, that is, by circumstantial evidence of intent, "the strength of the circumstantial allegations must be [even] greater." Kalnit, 264 F.3d at 142; see Oran v. Stafford, 226 F.3d 275, 288-89 (3d Cir. 2000). In that situation, the plaintiff must support his allegations by detailing, with particularity, "the who, what, when, where and how" of the events at issue and present clear facts verifying plaintiff's deductions with respect to defendant's state of mind. Burlington, 114 F.3d at 1422 (citing DiLeo, 901 F.2d at 627); see also Ronconi v. Larkin, 253 F.3d 423, 437 (9th Cir. 2001) (finding that a temporal proximity of events is insufficient circumstantial evidence).

The above-discussed requirement to prove scienter is reflected in Section 21E of the 1934 Act, 15 U.S.C. § 78u-5(c), which provides guidance to corporate managers wishing to issue forward-looking projections without risking legal liability. To be protected by 15 U.S.C. § 78u-5(c), an issuer (or the issuer's agents) must: (1) identify all written or oral forward-looking statements as forward-looking, or couch these statements in such terms that the forward-looking nature of these statements would be self-evident to a reasonable investor. See Clorox Co. Secs. Litig., 238 F. Supp. 2d 1139, at *16 (N.D. Cal. 2002) ("[A] prediction about future events is self-evidently a forward-looking statement"), and (2) make these projections without *actual knowledge* that the projections are false or misleading; see also 15 U.S.C. §§ 78u-5(c)(1)(B)(i) and 78u-5(c)(1)(B)(ii)(II).[7]

---

[7]

The rationale of this rule is self-evident: an issuer (or the issuer's agent) made a statement without actual knowledge that the statement was false or misleading, the issuer (or its agent) cannot intend to defraud the market and, thus, lacks the requisite scienter. Alternatively, if the issuer (or issuer's agent) has actual knowledge that the issuer's forward-looking statements are false of misleading, but accompanies these forward-looking statements with a meaningful and directly-related cautionary language, the issuer is not liable for the injuries that might ensue from investors' reliance on the false forward-looking statements. See 15 U.S.C. § 78u-5(c)(1)(A)(I). The Court, however, determined in its August Opinion that 15 U.S.C. § 78u-5(c)(1)(A)(I) is inapplicable to the

3.    **Materiality**

The test of materiality depends not upon the literal truth of statements but upon the ability of reasonable investors to become accurately informed, see McMahan & Co. v. Warehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir. 1990), cert. denied, 501 U.S. 1249 (1991); this is sometimes referred to as the mosaic representation thesis. See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Genentech, Inc. Sec. Litig., 1989 WL 137189 (C.D. Cal. 1989). Thus, a finding of materiality is based on the total mix of information available, see Ieradi v. Mylan Labs., Inc., 230 F.3d 594 (3d Cir. 2000), and the concept of materiality cannot be distilled into a bright-line test, see Basic Inc. V. Levinson, 485 U.S. 224 (1988), see also Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281 (3d Cir. 1992); Ganino v. Citizens Utilities Co., 228 F.3d 154 (2d Cir. 2000), short of stating that an alleged misrepresentation cannot be deemed material to an investor if the general public has access to correct information. See Basic, 485 U.S. at 231-32; Wallace v. Systems & Computer Tech. Corp., 1997 U.S. Dist. LEXIS 14677, at *42-44 (E.D. Pa. Sept. 22, 1997).

The fact that materiality is determined in context means that a purchaser or seller of securities is not necessarily entitled to all information relating to each of the circumstances surrounding the transaction. See Acito v. IMCERA Group, 47 F.3d 47 (2d Cir. 1995) (deficiencies found by FDA inspectors at one of many business locations were not material); Wilensky v. Digital Equip. Corp., 903 F. Supp. 173 (D. Mass. 1995), aff'd in part, rev'd in part on other grounds, 82 F.3d 1194 (1st Cir. 1996) (failure to disclose details of new marketing strategy was immaterial); accord Press v. Quick & Reilly, Inc., 218 F.3d 121 (2d Cir. 2000) (intermediary's conflict of interest is immaterial); Carter-Wallace, Inc. v. Hoyt, 150 F.3d 153 (2d Cir. 1998) (departure from the generally accepted

case at bar.  See August Opinion at 17-27.

accounting principles cannot qualify as a material element for the purposes of securities fraud action). It is not sufficient to show that a shareholder might have found the information to be of interest: the plaintiff has to establish importance of the particular piece of information to a reasonable investor.  See Burlington, 114 F.3d at 1432 ("'[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.' [Management's] possession of material nonpublic information alone does not create a duty to disclose it") (quoting Time Warner Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993), and citing Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir. 1996), and Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir. 1987)); Milton v. Van Dorn Co., 961 F.2d 965 (1st Cir. 1992) (where plaintiffs bought the stock of a subsidiary company of the parent corporation and, after the sale was completed, another of the parent corporation's subsidiaries announced plans to begin producing a product that would compete with plaintiffs' product, the court found that nondisclosure of the other subsidiary's production plans was immaterial).

"When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak [since a] duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information." Chiarella v. United States, 445 U.S. 222, 235 (1980). As the Third Circuit explained,

> "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988); see also Burlington, 114 F.3d at 1432 ("Except for specific periodic reporting requirements . . . there is no general duty on the part of a company to provide the public with all material information"). Such a duty to disclose may arise when there is [an incident of] insider trading, [or presence of] a statute requiring disclosure, or [there was] an inaccurate, incomplete or misleading prior disclosure [requiring a corrective statement]. See Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992); Backman v. Polaroid Corp., 910 F.2d 10, 12 (1st Cir. 1990) (en banc); General Motors Class E Stock Buyout Sec. Litig., 694

F. Supp. 1119, 1129 (D. Del. 1988).

Oran, 226 F.3d at 286-87.

Moreover, "vague and general statements of optimism 'constitute no more than puffery, and [being] understood by reasonable investors as such,'" cannot amount to materially fraudulent information. Advanta, 180 F.3d at 538 (quoting Burlington, 114 F.3d at 1428 n.14); see also ATI Techs., Inc. Sec. Litig., 216 F. Supp. 2d 418, 433 (E.D. Pa. 2002) (holding that "[a] spin on its historical performance, as setting a 'record in revenue,' conferring a 'strong start,' and giving . . . 'market leadership,' is puffery"); cf. San Leandro, 75 F.3d at 811. In Burlington, the Third Circuit clarified that "[c]laims that . . . vague expressions of hope by corporate managers could dupe the market have been . . . uniformly rejected by the courts." 114 F.3d at 1427; see also Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997) ("[S]ome statements are so vague and such obvious hyperbole that no reasonable investor would rely upon them"). For instance, statements by the defendant that merely express defendant's confidence with respect to future results on the basis of previous successes are not actionable. See Advanta, 180 F.3d at 538.

### 4.    Reliance

The reliance requirement is a corollary of materiality. See Semerenko v. Cendant Corp., 233 F.3d 165, 180 (3d Cir. 2000). As under common law, the reliance requirement applies in securities fraud cases, and reliance is an element of a private claim under Rule 10b-5. See List v. Fashion Park, Inc., 340 F.2d 457, 452 (2d Cir. 1965), cert. denied, 382 U.S. 811, reh'g denied, 382 U.S. 933 (1965). Since proving reliance could be hard in view of the nature of modern securities markets, federal courts fashioned a "fraud-on-the-market" presumption for proving reliance based on the

Efficient Capital Market Hypothesis, i.e., the premise that, if the market is efficient, the information disclosed by issuers, issuers' agents and analysts is both available to and swiftly absorbed by the investors.    See Basic, 485 U.S. 224; Hayes v. Gross, 982 F.2d 104 (3d Cir. 1992).

In Cammer v. Bloom, 711 F. Supp. 1264, 1276 n.17 (D.N.J. 1989), appeal dismissed, 993 F.2d 875 (3d Cir. 1993), the Court set out the following key terms for an efficient market that enables plaintiff's usage of the fraud on the market theory: (1) an open market is one in which anyone, or at least a large number of persons, can buy or sell; (2) a developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available, e.g., a secondary market in outstanding securities which usually has continuity, liquidity and the ability to absorb a reasonable amount of trading with relatively small price changes; (3) an efficient market is one which rapidly reflects new information in price; and (4) these terms are cumulative in the sense that a developed market will almost always be an open one, and an efficient market will almost invariably be a developed one. See Enron Corp. Sec. Derivative & "ERISA" Litig., 2006 U.S. Dist. LEXIS 43146, at *95 (S.D. Tex. June 5, 2006) (relying on Cammer). Since the New York and American Stock Exchanges are examples of open and developed securities markets, see id., and PDI's common stock is registered with the United States Securities and Exchange Commission and traded on the NASDAQ,[8] the case at bar is subject to both the Efficient Capital Market Hypothesis and the fraud on the market presumption.

---

[8]

PDI's NASDAQ symbol is PDII. See <<www.pdi-inc>>.

## C.    *LIABILITY OF CONTROLLING PERSON*

Section 20(a) of the 1934 Act, 15 U.S.C. § 78(a), states that "[e]very person who, directly or indirectly, controls any person liable [for securities fraud] shall also be liable jointly and severally with and to same extent as such controlled person." 15 U.S.C. § 78t(a). Thus, for a controlling person to be liable, the person over whom control was exercised must have committed a primary violation of the securities laws. See Merck & Co. Sec. Litig., 432 F.3d 261 (3d Cir. 2005); Digital Island Sec. Litig., 357 F.3d at 337; Shapiro, 964 F.2d at 279. To establish a prima facie case that the defendant was a controlling person within the meaning of Section 20(a), the plaintiff must show that: (1) the defendant had actual power or influence over the controlled person; and (2) the defendant actually participated in the alleged illegal activity.[9] See Kersh v. General Council of the Assemblies of God, 804 F.2d 546, 548 (9th Cir. 1986); Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 885 (3d Cir. 1975); MobileMedia Secs. Litig., 28 F. Supp. 2d 901, 940 (D.N.J. 1998); Klein v. Boyd, 949

---

[9]

The group pleading doctrine allows plaintiffs in securities fraud cases to attribute corporate statements to "one or more individual defendants based solely on their corporate titles." Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 363 (5th Cir. 2004). The doctrine (alternatively referred to as the "group published" doctrine and the "group published information presumption," see id.; William O. Fisher, Don't Call Me a Securities Law Groupie: The Rise and Demise of the "Group Pleading" Protocol in 10b-5 Cases, 56 Bus. Law. 991, 995 n.12 (2001)) favors plaintiffs by making it easier to satisfy Rule 9(b)'s particularity requirement since, under the doctrine, the plaintiffs can name corporate officers as defendants even though the plaintiffs did not know the roles such officers played in an alleged fraud. The Third, Seventh and Fifth Circuits have held that the PSLRA forecloses the practice of group pleading in securities fraud cases. See, e.g., Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 603 (7th Cir. 2006); Tyson Foods, Inc. Sec. Litig., 155 Fed. Appx. 53, 57 (3d Cir. 2005); Southland, 365 F.3d at 359-64; Sonus Networks Secs. Litig., 2006 U.S. Dist. LEXIS 28272 (D. Mass. May 10, 2006); AIG Global Secs. Lending Corp. v. Banc of Am. Sec. LLC, 2006 U.S. Dist. LEXIS 25883 (S.D.N.Y. Apr. 25, 2006); see also Steiner v. MedQuist Inc., 2006 U.S. Dist. LEXIS 71952 (D.N.J. Sept. 29, 2006); Cambrex Corp. Secs. Litig., 2005 U.S. Dist. LEXIS 25339 (D.N.J. Oct. 27, 2005); Bio-Technology Gen. Corp. Sec. Litig., 380 F. Supp. 2d 574 (D.N.J. 2005).

F. Supp. 280 (E.D. Pa. 1996), aff'd in part, rev's on other grounds, 1998 U.S. App. LEXIS 2004 (3d

Cir. Feb. 12, 1998); Gordon v. Diagnostek, Inc., 812 F. Supp. 57 (E.D. Pa. 1993).


## II.   ANALYSIS

Having provided a brief overview of the pertinent legal standards, this Court now turns to

the facts of the case at bar.

PDI ("Professional Detailing, Inc."), a publicly-held Delaware corporation having its

principal executive offices in Upper Saddle River, New Jersey, see Compl. ¶¶ 7, 11, is a provider

of sales and marketing services to the bio-pharmaceutical industry.[10] See id. ¶21; Mot., Mem. at 2;

<<http://www.pdi-inc.com/aboutpdi.asp>>.  PDI built its business on "contract sales," that is, on

providing customized marketing services to pharmaceutical manufacturers who wished to outsource

marketing and selling activities for particular drugs. See Compl. ¶¶ 7, 21, 32. This type of business

is referred to as "fee-for-service" since the revenue is principally derived from the fees received for

sales and marketing services. See id. ¶ 21.  In the years up to and including 2000, PDI's contract

sales business enjoyed substantial growth in revenues and earnings. See id. ¶ 22.  In October 2000,

PDI announced that, in addition to its fee-for-service business, PDI had entered into another line of

business. See id. ¶ 24.  This new line of business was based on "performance-based" contracts, that

is, agreements to market, distribute and sell particular drugs for pharmaceutical manufacturers. This

new type of agreement envisioned profit to PDI only if PDI could achieve the level of sales above

---

[10]

During the Class Period, Saldarini and Boyle served as the Chief Executive Officer and Vice Chairman of the Board of Directors of PDI, and PDI's Chief Financial Officer and Executive Vice President, respectively. See Compl. ¶¶ 8, 9, Mot., Mem. at 3.  Saldarini, Boyle and other directors of PDI jointly held 40% of PDI's stock. See Mot. at 1.

the baseline set in the agreement. See id. ¶¶ 24-25, 40-43, 56. In view of the difference between PDI's traditional contract sales and these new performance-based contracts, PDI notified the investing public that PDI had "no prior experience [with performance-based contracts] and, therefore, [PDI's] prospects for success [with this new line of business were] uncertain." Mot., Ex. 18.

Certain Defendants' statements or actions that took place during 2001 and 2002 and were related to three of such performance-based contracts gave rise to this litigation. Referring to these statements and actions by Defendants, Plaintiffs' Complaint, Count I, alleges that Defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Count II alleges violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), by Saldarini and Boyle as controlling persons of PDI.

Plaintiffs' Complaint, however, does *not* challenge the accuracy of any PDI's financial reports and does *not* assert that either Saldarini, Boyle, or any other director of PDI sold even one share of PDI's stock during the Class Period or profited in any other way from the alleged violations.

## A.    CEFTIN CONTRACT

In October 2000, PDI entered into its first performance-based contract with GlaxoSmithKline ("GSK").[11] The contract provided PDI with the right to exclusive marketing, distribution and sale of two forms, i.e., tablets and suspension, of Ceftin ("Ceftin Contract"), a cephalosporin antibiotic

---

[11]

Prior to entering the Ceftin Contact, PDI had already established a business relationship with GSK, holding a fee-for-services contract ("GSK Contract") that was active at the time the Ceftin Contract was initiated. The GSK Contract was terminated in February of 2001, prior to beginning of the Class Period. See Compl.¶ 34.

patented by GSK. See Compl. ¶ 24; Mot., Exs. 18-19.

The Ceftin Contract had a five-year term and required PDI to purchase from GSK a minimum amount of Ceftin during each calendar quarter.[12] See Compl.¶ 24; Mot., Exs. 17-19, 21. After the first quarter of the Ceftin Contract (the fourth calendar quarter of 2000), PDI reported an operating profit from Ceftin in the amount of $1.9 million; PDI's operating profit from Ceftin during the second and third quarter of the Ceftin Contract (the first and second calendar quarter of 2001) reached $8.5 million each quarter. See Compl.¶ 25; Mot., Exs. 19-21, 23-24. In the first quarter of 2001, PDI began promoting Ceftin through marketing materials asserting that Ceftin was "[f]irst-line in an era of bacterial resistance." Compl.¶ 26. In mid-March of 2001, after the U.S. Food and Drug Administration ("FDA") ordered PDI to "cease distribution of [such] promotional materials," PDI stopped this line of advertisement. Id.

Shortly prior to PDI entering the Ceftin Contract, GSK's competitor, Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy") sought to introduce a generic equivalent of Ceftin tablets to the market. See id. ¶ 29. Although GSK obtained an injunction from a district court against Ranbaxy on December 19, 2000, preventing sale of the generic equivalent, the circuit court reversed this decision in August of 2001, finding that Ranbaxy's generic version did not infringe the Ceftin patent, and enabling immediate sale of the generic equivalent (subject to FDA approval), see Mot., Ex. 7,

---

[12]

For the purposes of either financial or managerial accounting, the period used is either "fiscal year" or a quarter of such year. A new company or business must select the date on which its fiscal year begins. See, e.g., Craig A. Peterson and Norman W. Hawker, Does Corporate Law Matter? Legal Capital Restrictions on Stock Distributions, 31 Akron L. Rev. 175 (1997). However, since Plaintiffs' Complaint often uses the terms "fiscal year" or "fiscal quarter" without specifying whether PDI's fiscal year coincided with calendar year, see, e.g., Compl. ¶¶ 42, 51-52, 79, 82, the Court limits its terminology to calendar yearly and quarterly periods.

starting from the fourth quarter of the Ceftin Contract (the third calendar quarter of 2001).  See Compl. ¶ 30; Mot., Exs. 5, 19.  PDI promptly informed investors of that unfavorable to PDI development and enumerated six options that PDI was considering as a response, with one of these options being termination of the Ceftin Contract.  See Compl.¶ 30, 65-66; Mot., Exs. 5-6.  In November of 2002, the Ceftin Contract was terminated by mutual agreement between PDI and GSK, and PDI notified investors that PDI was taking a $24 million charge as a reserve for potential losses related to the Ceftin Contract.  See Mot., Ex. 8.

Plaintiffs set forth seven claims related to the Ceftin Contract and asserting that Defendants' statements or action were fraudulent or false and misleading.   Three of these claims relate to Defendants' past or contemporaneous actions and read as follows:

(A)     [T]he Company publicly stated at the time that the Ceftin contract had a five year term, [and concealed the fact that] the patent for Ceftin tablets was due to expire in 2003.

(B)     Upon execution of the [Ceftin C]ontract, PDI . . . took steps to pump up Ceftin sales and profits in the fourth quarter of 2000, by inducing drug distributors to stock up on Ceftin, [causing] Company's reported earnings [to rise during] the fourth quarter of 2000 [by] $0.77 per share.

(C)     [Then] PDI attempted to increase . . . Ceftin's market share . . . in the first quarter of 2001 by promoting the drug [in the fashion later disapproved] by . . . FDA, even though there was no substantial evidence that the drug was effective [in the fashion advertized by PDI].

Compl. ¶¶ 24-26.  None of these allegations, however, presents a claim cognizable under the securities laws.

Plaintiffs' claim (A) is based on facts contradicted by the documents upon which Plaintiffs rely for their information, and which indicate that, in November of 2000 (before the beginning of the Class Period), Defendants disclosed that GSK's patent of Ceflin tablets was expiring in 2003, while GSK's patent of Ceflin suspension was expiring in 2008.  Defendants repeated this disclosure in

March of 2001.  See Mot., Exs 18-19.  Since, contrary to Plaintiffs' allegations, Defendants did not

conceal true information, Plaintiffs' claim (A) will be dismissed for failure to plead fraud.  Plaintiffs'

claims (B) and (C) are similarly insufficiently pled since Plaintiffs failed to set forth any nexus

between PDI's sales aggressive techniques *aimed at the distributors* who were purchasing Ceftin

from PDI and the alleged injuries suffered by investors.[13]  See Glickman, 1996 U.S. Dist. LEXIS

2325, at *36.  Thus, Plaintiffs' claims (B) and (C) related to the Ceftin Contract and based on

Defendants' contemporaneous or previous actions will also be dismissed.

Plaintiffs' remaining four claims related are based on Defendants' forward-looking

projections.[14]  These claims are likewise insufficiently pled.  First, Plaintiffs assert that,

> [f]ollowing the FDA [order ] to stop distributing [the promotional] materials, Ceftin's share
> of [the antibiotic] market declines. [However,] in the second quarter of 2001, the Company
> [increased] Ceftin's sales by announcing [that] a price increase [would] take effect in the
> beginning of July, which induced distributors to increase their Ceftin inventories in advance
> [and] added $0.13-$0.20 per share to the Company's reported earnings.

Compl. ¶ 28.  Plaintiffs maintain that Defendants' announcement was made with intent to deceive

the investors.  See id.  This claim is not sufficiently pled in that it fails to show a nexus between

PDI's pricing policies disseminated among the distributors purchasing Ceftin from PDI and PDI's

---

[13]

Moreover, any PDI's "inducing," "pumping" or "promoting" marketing techniques called into question by Plaintiffs took place before the beginning of the Class Period and, under the Efficient Capital Market Hypothesis, could not have caused any injury to the investors because the information was long available to and absorbed by the market as of the first day of the Class Period. See Basic, 485 U.S. 224; Hayes, 982 F.2d 104.

[14]

In addition to being expressly qualified by Defendants as "forward-looking," see, e.g., Mot., Ex. 7, all Defendants' projections challenged by Plaintiffs with respect to the Ceftin Contract were paraphrased in language unambiguously indicating that these statements were forward-looking and, therefore, will be examined by this Court as such. See Clorox Co. Secs. Litig., 238 F. Supp. 2d 1139, at *16.

alleged fraud on the market. See Glickman, 1996 U.S. Dist. LEXIS 2325, at *36. Indeed, Plaintiffs

--being investors in PDI stock--could not have been defrauded by or relied upon PDI's announcement

that PDI would increase Ceftin's prices in July of 2001. Plaintiffs' pleading (based on the alleged

"ripple-effect" of Defendants' marketing techniques, which, allegedly, affected Ceftin distributors'

purchasing behavior, which, in turn, impacted the level of demand for Ceftin during the second

quarter of 2001, which, in turn, raised PDI's revenue which, in turn, affected PDI's stock prices,

which, in turn, created an incentive for Plaintiffs to purchase PDI's stock) is unduly speculative and

fails to provide this Court with the nexus required by the securities laws. See Digital Island Sec.

Litig., 357 F.3d at 328 (citing Rockefeller Ctr., 311 F.3d at 224 ) ("The Reform Act requires a 'strong

inference' of scienter, and accordingly, alters the normal operation of inferences under Rule 12(b)(6).

. . . [P]laintiffs in securities fraud actions . . . may not benefit from inferences flowing from vague

or unspecific allegations . . . .").

     Next, Plaintiffs assert the following:

> "In August 2001, [after] the Federal Circuit decision [allowed marketing of] generic version
> of Ceftin . . . , [D]efendants conceded . . . that this decision would reduce the profitability of
> the Ceftin contract. However, [Defendants] assured investors that reduced profits were the
> "worst-case scenario" for the Ceftin contract, . . . and the Company could avoid losses by
> terminating the contract. . . . [T]he representation concerning contract termination was false,
> as [D]efendants knew that termination of the Ceftin contract would cost the Company
> millions of dollars in write-offs of capitalized contract acquisition costs, continued liability
> for sales returns and the costs of administering Medicaid rebates, and significant costs related
> to the retention of hundreds of sales and marketing personnel whose assignment ended with
> the termination of the Ceftin contract. . . . Defendants did not publicly disclose the fact that
> PDI would incur these costs if the Company terminated the Ceftin contract until November
> 13, 2001.

Compl. ¶¶ 25-28, 30, 32. This lengthy and ambiguous chain of allegations appears to combine three

separate claims, since Plaintiffs' Complaint also asserts as follows:

(A)     On August 14, 2001, . . . Defendants participated in a conference call regarding the Company's results for the second quarter of 2001 . . . [D]efendants explained that the Company would likely earn $0.20 per share less than previously forecasted for the third quarter due to a Ceftin inventory glut at distributors . . . . Defendants' statements . . . were materially false and misleading when made because . . . Ceftin sales were unlikely to increase given the glut of inventory at the distributor level.

(B)     [Contacting the investors through] August 23, 2001 . . . press release [and] August 24, 2001 conference call, Saldarini stated that

(1)     the Company was expecting Ceftin to contribute $0.30-$0.40 earnings per share in the fourth quarter of 2001 [and] $0.30 . . . in 2002. [This prediction was false because of the decline of Ceftin's market share from 10.8% to 10.7% during the first and second quarters of 2001, and also because] PDI had never increased Ceftin's market share, except when [PDI] had unlawfully promoted the drug, or artificially inflated [the] sales [by announcing the price increase; and]

(2)     the earnings reductions were the "ugliest scenario" [that could occur if the Ceftin Contract was terminated. This prediction was false and misleading because the usage of term "ugliest scenario" indicated that PDI intentionally] failed to disclose that the termination of the Ceftin contract . . . would cause PDI [substantial] expenses.

Compl. ¶¶ 62-63, 65, 68-69 (referring to ¶¶ 24, 26-28, 30, 40-41, 61) .

While Plaintiffs maintain that their claim (A) indicates that Defendants made a fraudulent projection, Plaintiffs' claim fails to allege any falsity on the part of Defendants.  Defendants' projection that "the Company would likely earn . . . less than previously forecasted . . . due to a Ceftin inventory glut at distributors," id. ¶ 62, the projection is entirely coherent with Plaintiffs' claim that "Ceftin sales were unlikely to increase given the glut of inventory at the distributor level." Id. ¶ 63. Since Plaintiffs' claim (A) fails to allege any fraud on the part of Defendants, the claim will be dismissed.  See Chiarella, 445 U.S. at 234-35.

Plaintiffs claim in (B)(1) similarly fails to plead fraud adequately.  According to Plaintiffs, Defendants' projections of an increase in earnings per share had to be false because the Ceftin's market share had been declining prior to Defendants' projections.  The decline of the Ceftin's market

share, however, does not render Defendants' projections necessarily false. The amount of a good demanded is presumed to be steadily increasing (except for goods that become obsolete) since market economies like the United States are presumed to increase their "economic pie."[15] See A. Michell Polinsky, An Introduction to Law and Economics ("Introduction Economics") 7 (2d ed. 1989). The concept is referred to as Pareto efficiency, which implies that the societal purchasing power, as a whole, increases, since the society can increase at least one individual's slice of the pie, without making any other individual worse off. See Emilio Barucci, F. Barucci, and E. Barucci, Financial Markets Theory: Equilibrium, Efficiency and Information 8 (2002); George Cohen, Posnerian Jurisprudence and Economic Analysis of Law: The View from the Bench, 133 U. Pa. L. Rev. 1117, 1120 (1985). The concept implies an increase of the societal buying power instead of keeping this buying power at the zero-sum gain, meaning that the economic pie is continuously and infinitely increasing, that is, factoring out temporary fluctuations caused by unfavorable periods in the business cycle.[16]   See Introduction Economics 7.

To illustrate, if the total market for prescription drugs during the fiscal period One equals 1 billion dollars, and cephalosporin antibiotics constitute, for example, 0.1% of the total market, with

---

[15]

The concept of "economic pie," the term roughly equated with the "accumulated wealth of a nation," is derived from Adam Smith's "Inquiry into the Nature and Causes of the Wealth of Nations," the famous study that gave birth to the discipline of economics. See, e.g., Ellen Byers, Corporations, Contracts, and the Misguiding Contradictions of Conservatism, 34 Seton Hall L. Rev. 921 (2004).

[16]

The term "business cycle" (or "economic cycle") refers to the periodic fluctuations of economic activity about its long term growth trend. The cycle involves shifts over time between periods of relatively rapid growth of output ("recovery" and "prosperity"), alternating with periods of relative stagnation or decline ("contraction" or "recession"). See Michael Baye, Managerial Economics and Business Strategy ("Economics") 130 (4th ed. 2002).